

Michael S. Davis
Greg M. Bernhard
Mary G. McCarthy
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
(212) 223-0400

*Attorneys for Petitioners*
*National Union Fire Insurance Company of Pittsburgh, Pa.*
*and American International South Insurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 3147

---

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA. and AMERICAN
INTERNATIONAL SOUTH INSURANCE COMPANY,

                                    Petitioners,

                - and -

THE UNITED COMPANY,

                                    Respondent.

---

Case No.:

**PETITION TO
COMPEL ARBITRATION**

---

        National Union Fire Insurance Company of Pittsburgh, Pa. ("National

Union") and American International South Insurance Company ("AISIC") (collectively,

the "AIG Companies"), on behalf of themselves and each of the related insurers that

provided coverage to Respondent, by their attorneys, Zeichner Ellman & Krause LLP, as

and for its petition to compel The United Company ("Respondent") to arbitrate, aver

upon information and belief, as follows:

1.    This Court has subject matter jurisdiction over this matter due to the diversity of citizenship of the parties, under 28 U.S.C. § 1332(a)(1).  It is a dispute between citizens of different states and the amount in controversy is more than $75,000.

2.    Petitioner National Union is an insurance company licensed under the laws of Pennsylvania, with its principal place of business in the Southern District of New York.

3.    Petitioner AISIC is an insurance company licensed under the laws of Pennsylvania, with its principal place of business in the Southern District of New York.

4.    Upon information and belief, Respondent is a corporation organized and existing under the laws of Virginia, with its principal place of business in the State of Virginia.

5.    Respondent is subject to the personal jurisdiction of this Court.

6.    Respondent filed a complaint, dated March 7, 2008 (the "Complaint"), in the United States District Court for the Eastern District of Kentucky, Pikeville Division.  A copy of the Complaint with exhibits is attached as Exhibit 1.

7.    Respondent expressly agreed that "any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York." See, Exhibit 1 at Complaint 037.

2

8.    The AIG Companies and Respondent have a business relationship that goes back a number of years. Respondent holds investments in the coal and energy business. Two of its subsidiaries, Sapphire Coal Company and Wellmore Coal Company, are engaged in the coal mining business in Kentucky and Virginia respectively.

9.    In and around August or September 2006, Respondent began negotiations with the AIG Companies to consolidate its insurance programs for it and its subsidiaries into one loss sensitive, high deductible workers' compensation program. As a result, AISIC issued workers compensation policy # 720-94-31, effective November 1, 2006 to Respondent.

10.    The parties also entered into a Payment Agreement between National Union and Respondent effective as of November 1, 2006 (the "2006 Payment Agreement"), a 2006 addendum to the Payment Agreement (the "2006 Addendum"), and certain addenda and schedules to the Payment Agreement (together with the policy, these documents establish the "Insurance Program" and these documents are referred to as the "Insurance Program Agreements") which, by their terms, govern Respondent's payment obligations and collateral requirements under the Insurance Program. Fully executed copies of the 2006 Payment Agreement and the 2006 Addendum were attached to Respondent's Complaint.

11.    The 2006 Payment Agreement contains a broad arbitration clause (the "Arbitration Clause") by which the parties agreed that all unresolved disputes,

3

including the dispute underlying Respondent's Complaint, "must . . . be submitted to arbitration." See, Exhibit 1 at COMPLAINT 027. The Arbitration Clause, found under a bolded and capitalized heading which reads "**HOW WILL DISAGREEMENTS BE RESOLVED?**," is extremely expansive. It encompasses the instant dispute because it governs disputes related specifically to payment obligations, as well as "[a]ny other unresolved disputes arising out of this Agreement . . ." Id. Even though Respondent filed its Complaint in the Eastern District of Kentucky, the AIG Companies bring this motion to this Court pursuant to the terms of the 2006 Addendum which states "any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court . . . of competent jurisdiction in the City, County, and State of New York."[1] See, Exhibit 1 at COMPLAINT 037.

> 12.    The Arbitration Clause provides:

> **HOW WILL DISAGREEMENTS BE RESOLVED?**

> **What if we disagree about payment due?**

> If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

> - give us written particulars about the items with which *You* disagree; and

> - pay those items with which *You* do not disagree.

> We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You*

---

[1]    The AIG Companies are simultaneously filing a motion for an extension of time to respond with the U.S. District Court for the E.D. Kentucky pending a decision from this Court.

4

must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. **Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration** as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your* *Payment Obligation*.

**What about disputes other than disputes about payment due?**

**Any other unresolved dispute arising out of this Agreement must be submitted to arbitration.** *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

**Arbitration Procedures**

...

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement. <u>They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability</u>. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

**Expenses of Arbitration:** *You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

Exhibit 1 at COMPLAINT 027-028 (emphasis added). The 2006 Addendum provides:

**How arbitrators must be chosen:** You must choose one arbitrator and we must choose another. They will choose

6

the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. <u>Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.</u>

Exhibit 1 at COMPLAINT 037 (emphasis added).

13.    On or about March 7, 2008, Respondent filed the Complaint asserting claims for return of all premium and security delivered to the AIG Companies pursuant to the 2006 Payment Agreement. Premium and security are expressly governed by the 2006 Payment Agreement containing the broad Arbitration Clause.

14.    The allegations in the Complaint relate entirely to Respondent's demand for return of premium and collateral as governed by the 2006 Payment Agreement. In Count I, notwithstanding that Respondent acknowledges signing the 2006 Payment Agreement (and even attaches it to the Complaint), Respondent seeks a declaratory judgment that no insurance contracts existed. In Count II, Respondent seeks "restitution" for a "pro-rated portion of all premium payments" made pursuant to the 2006 Payment Agreement. Count III seeks a "release" of a letter of credit premium delivered pursuant to the 2006 Payment Agreement. Count IV asserts a claim of unjust enrichment and seeks of return of the same premiums paid pursuant to the 2006 Payment Agreement.

7

Count V seeks damages for alleged breach of the "duty of good faith and fair dealing under the laws of the Commonwealth of Kentucky as well as other states' laws." And Count VI appears to seek an order directing the AIG Companies to "comply with" a purported order issued by the Kentucky Office of Workers' Claims in connection with the policies governed by the 2006 Payment Agreement.

15.    The disputes alleged in the Complaint are subject to the broad Arbitration Clause.

16.    To the extent Respondent contests that the disputes alleged in the Complaint are subject to arbitration, the Arbitration Clause expressly provides that: "They [the arbitrators] shall have exclusive jurisdiction over the entire matter in dispute, including any questions as to arbitrability." Exhibit 1 at COMPLAINT 028.

17.    No previous request has been made for the relief requested herein.

WHEREFORE, the AIG Companies respectfully request that this Court compel Respondent to arbitrate the disputes asserted in the Complaint.

Dated:    New York, New York
          March 27, 2008

                                        ZEICHNER ELLMAN & KRAUSE LLP

                                        By _Michael S. Davis (M. M.)_
                                            Michael S. Davis
                                            Greg M. Bernhard
                                            Mary G. McCarthy
                                             Attorneys for Petitioners
                                            575 Lexington Avenue
                                            New York, New York 10022
                                            (212) 223-0400

ρ- 000 43

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### PIKEVILLE DIVISION

**The United Company**
1005 Glenway Avenue
Bristol, VA 24201-3473

**Sapphire Coal Company**
147 Big Blue Blvd.
Whitesburg, KY 41858

**Wellmore Coal Company**
P.O. Box 458
Big Rock, VA 24603-0458

Plaintiffs

- vs. -

**American International Group, Inc. a/k/a
American International South Insurance
Company**
70 Pine Street
New York, New York 10270

**Imperial A.I. Credit Companies d/b/a
A.I. Credit Corporation**
101 Hudson Street
Jersey City, New Jersey 07302

**National Union Fire Insurance Company of
Pittsburgh, Pennsylvania**
70 Pine Street
New York, New York 10270

Defendants

<u>**COMPLAINT**</u>

**JURY DEMAND**

## INTRODUCTION

This is a dispute about workers' compensation insurance coverage which was never provided and does not presently exist. The insurance company, however, continues to wrongfully withhold the release of more than $3 million of its putative policyholder's money and is demanding additional premium payments.

Now come Plaintiffs, The United Company ("United") and its affiliate companies Sapphire Coal Company ("Sapphire") and Wellmore Coal Company ("Wellmore") (collectively "Plaintiffs"), by and through Counsel, for their Complaint against Defendants American International Group, Inc., a/k/a/ American International South Insurance Company, the financing arm of American International Group, Inc., known as Imperial A.I. Credit Companies d/b/a A.I. Credit Corporation ("A.I. Credit"), and National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union/AIG") (a member company of American International Group, Inc.) (collectively "AIG") which state and aver as follows:

## THE PARTIES

1.      United is a Virginia corporation that holds investments in the coal and energy business. United is the majority owner of United Coal Company, LLC, a Virginia limited liability company ("UCC"). UCC mines and sells high grade steam and metallurgical coals through its subsidiary companies in Virginia, Kentucky, and West Virginia, and has its principal place of business in the Commonwealth of Virginia.

2.      UCC is comprised of four subsidiary companies: Carter Roag Coal Company, Pocahontas Coal Company, Sapphire, and Wellmore.

3.      Sapphire is a subsidiary of UCC, and is engaged in the coal mining business in the Commonwealth of Kentucky, specifically in Letcher County.

2

COMPLAINT 002

4.    Wellmore is a subsidiary of UCC and is engaged in the coal mining business in the Commonwealth of Virginia.

5.    American International Group, Inc. a/k/a American International South Insurance Company is, upon information and belief, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 70 Pine Street, New York, New York 10270, and which transacts business throughout the United States, including in the Commonwealth of Kentucky.

6.    A.I. Credit is, upon information and belief, a member company of American International Group, Inc. and provides American International Group, Inc.'s premium financing services. A. I. Credit transacts business throughout the United States, including in the Commonwealth of Kentucky, and has its principal place of business located at 101 Water Street, Jersey City, New Jersey 07302.

7.    National Union is, upon information and belief, a subsidiary company of American International Group, Inc.  It transacts business throughout the United States, including in the Commonwealth of Kentucky, and has its principal place of business also located at 70 Pine Street, New York, New York 10270.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9.    This Court has personal jurisdiction over AIG because AIG, its subsidiaries and agents transact business in Kentucky, providing insurance and related services in this state.

3

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial part of the events and injuries giving rise to this cause of action, including determinations by duly authorized state insurance regulators, occurred in this judicial district.

### FACTS COMMON TO ALL COUNTS

11.    In 2004 and 2005, AIG provided workers' compensation coverage to Sapphire and Wellmore.

12.    On or about September 2006 and based, in part, on their past favorable claims history, Plaintiffs began negotiations with AIG by requesting information on workers' compensation coverage for their business, specifically for their coal operations in Kentucky and Virginia, through UCC's insurance brokers, Acordia West Virginia. The coverage anticipated would have involved a significant change from previous coverage obtained from AIG and significantly increased the deductible applicable to the coverage. Such anticipated coverage required considerable negotiation and reduced the premiums.

13.    On or about November 14, 2006, AIG sent a Payment Agreement to Plaintiffs and sought a $626,000 down payment on the workers' compensation policy premium and $2,323,000 in a letter of credit from United in anticipation of completing a high deductible workers' compensation policy as the parties had been discussing. A copy of the Payment Agreement is attached hereto, made a part hereof for all purposes and is labeled Exhibit A for identification. The letter of credit from United was intended by AIG to cover anticipated workers' compensation claims that would be made by employees of Sapphire and Wellmore due to incidents occurring during the period of November 1, 2006 through October 31, 2007.

14.    On or about November 17, 2006, Acordia West Virginia sent Plaintiffs a "recap" of an insurance coverage proposal from AIG. The proposal failed to include certain essential terms of the agreement, including the so-called proposed cross-collateralization

4

agreement (the "Proposed Cross-Collateralization Agreement"). A copy of such insurance coverage proposal is attached hereto, made a part hereof for all purposes and is labeled Exhibit B for identification. See also the Index of Exhibits attached hereto, including Exhibits C and D, respectively, an insurance policy "binder" describing the proposed workers' compensation coverage prepared by AIG's Les Lappe and dated November 1, 2006 and the putative insurance policy with number: WC 720-94-31 which was included with an Acordia "Insurance Program Policy Kit" dated January 19, 2007. Exhibits C and D are made a part hereof for all purposes.

15.    Upon information and belief, AIG sent the Proposed Cross-Collateralization Agreement to Plaintiffs in January 2007 and requested Plaintiffs' signature on the document. The Proposed Cross-Collateralization Agreement indicated that the terms would be effective going back to November 1, 2006, and that the terms applied between AIG, and Plaintiffs. A copy of said **unsigned** Proposed Cross-Collateralization Agreement is attached hereto, made a part hereof for all purposes and labeled Exhibit E for identification. The Proposed Cross-Collateralization Agreement was never signed or agreed to by Plaintiffs.

16.    On or about December 31, 2006, without having agreed to any cross-collateralization agreement and under the expectation that the parties would negotiate in good faith regarding the terms of the insurance policy contract, including the Proposed Cross-Collateralization Agreement, Plaintiffs provided AIG with Letters of Credit in the amount of $2,323,000.

17.    On or about December 31, 2006, without having agreed to any cross-collateralization agreement and under the expectation that the parties would negotiate in good faith regarding the terms of the insurance policy contract, including the Proposed Cross-

5

Collateralization Agreement, Plaintiffs provided AIG with a premium payment in the amount of $626,000.

18.    To date, Plaintiffs have paid AIG the initial $626,000 premium payment, as well as two subsequent additional payments of $258,363.44 for a total of $1,142,726.88 in premium payments.

19.    On or about January 25, 2007 Plaintiffs contacted AIG via e-mail and, among other things, stated that the terms of the Proposed Cross-Collateralization Agreement were unacceptable. A copy of said e-mail is attached hereto, made a part hereof for all purposes and labeled Exhibit F for identification.

20.    By e-mail dated February 14, 2007, a representative of AIG's Global Energy and Marine Department threatened in an email that AIG would call in United's Letter of Credit on February 16, 2007 if United did not accept the terms of AIG's Proposed Cross-Collateralization Agreement. A copy of said e-mail is attached hereto, made a part hereof for all purposes and labeled Exhibit G for identification.

21.    The February 14, 2007 e-mail was sent by AIG more than three months after the purported inception of the new AIG workers' compensation insurance program. In the e-mail, AIG's representative stated, "One [sic] we receive from United the signed [C]ross-[C]ollateralization Agreement or AIG will send out a bill for the amount of the current Letter of Credit . . . . Tom [Griffin, United's Vice President of Risk Management], we value our relationship with you and United but, in this situation we MUST have the signed Proposed Cross-Collateralization agreement – PERIOD" (emphasis in original).

22.    AIG's representative also told Plaintiffs that if Plaintiffs did not assent to the sign Proposed Cross-Collateralization Agreement, the coverage would revert to a full

6

manuscript program at much greater expense, negating the economic benefit of the deductible mechanisms that Plaintiffs had negotiated for months.

23.    Plaintiffs never agreed to the terms of the Proposed Cross-Collateralization Agreement and, thus, did not sign the document as requested by AIG.

24.    Because of AIG's threats, including, but not limited to, its statement that AIG would call in United's letter of credit and change the terms of the proposed workers' compensation policy to a full manuscript policy at a much higher premium, Plaintiffs sought alternative workers' compensation insurance coverage to protect their interests. On March 16, 2007, Plaintiffs entered into an insurance agreement with Old Republic Insurance Company ("Old Republic"), whereby Old Republic provided workers' compensation coverage to Plaintiffs effective November 1, 2006. Among other things, such insurance agreement rendered the proposed AIG insurance policy coverage unnecessary and redundant.

25.    By letter dated March 20, 2007, Plaintiffs (through Underwriters Safety & Claims, their broker on the Old Republic Policy ("Underwriters")) formally notified AIG of Plaintiffs' workers' compensation insurance agreement with Old Republic. Such letter stated that Underwriters "will be taking over all claim service with claims with dates of occurrence after November 1, 2006." Plaintiffs accordingly requested "the return of the associated letters of credit and premium for the period of time beginning November 1, 2006." A copy of said letter is attached hereto, made a part hereof for all purposes and is labeled Exhibit H for identification.

26.    By letter dated April 19, 2007, Old Republic, to avoid any potential confusion and at Plaintiffs' request, sent notice to the Commonwealth of Virginia's Workers' Compensation Commission, informing the commission of Plaintiffs' insurance agreement with Old Republic as of the November 1, 2006 inception date. A copy of said letter is attached

7

hereto, made a part hereof for all purposes and is labeled Exhibit I for identification. The stated purpose of this letter was "to remove any confusion the Virginia Workers Compensation Commission may have that duplicate coverage is in effect."

27.    A similar notification was provided to the United States Department of Labor.

28.    By letter dated April 24, 2007, Old Republic, to avoid any potential confusion and once again at Plaintiffs' request and pursuant to KRS § 342.340(2), sent notice to the Commonwealth of Kentucky's Office of Workers' Claims, informing the agencies of Plaintiffs' insurance agreement with Old Republic as of the November 1, 2006 inception date. A copy of said letter is attached hereto, made a part hereof for all purposes and is labeled Exhibit J for identification. The stated purpose of this letter was "to remove any confusion the Kentucky Office of Worker Claims may have that duplicate coverage is in effect."

29.    On or about May 10, 2007, the Commonwealth of Kentucky's Office of Workers' Claims, through its General Counsel, Carla H. Montgomery, issued a letter to AIG's Louisville, Kentucky office requiring AIG to file a notice of cancellation with the Office of Workers' Claims, effective November 1, 2006, or be subject to civil penalties under KRS § 342.990(7)(c). A copy of said letter from the Kentucky Office of Workers' Claims is attached hereto, made a part hereof for all purposes and labeled Exhibit K for identification. Specifically, such letter stated that "[p]ursuant to KRS § 342.340(2) and KAR § 25:175, AIG is required to file a notice of cancellation with the Office of Workers' Claims . . . . Please immediately file the appropriate documents with our agency to avoid a potential civil penalty."

30.    To date, AIG has not filed the necessary papers as directed by the Commonwealth of Kentucky.

8

31.    Upon information and belief, AIG has taken no steps to handle or otherwise manage any claims under the alleged workers' compensation insurance.

32.    AIG has, however, upon information and belief, wrongfully pursued a strategy to avoid a resolution, avoid a return of premium paid for insurance coverage which never existed, and improperly maintain a letter of credit posted by United, all in order to serve its own interests and enrich itself at the expense of Plaintiffs.

33.    Because, among other reasons, AIG failed to respond to the Kentucky Office of Workers' Claims and has failed to take reasonable steps to address these matters, on or about June 7, 2007, Plaintiffs provided AIG with a "No Claims Letter." Plaintiffs prepared and sent such letter at the request of AIG in a good faith attempt to resolve these matters and to further document that AIG had not paid any claims as of the date of the letter, and would likewise not be "on risk" for any claims thereafter. Plaintiffs took the added steps of providing AIG with full indemnity, to clarify and release AIG's potential liability for future claims possibly associated with the period between November 1, 2006 and March 16, 2007 (the time period between alleged inception of the AIG coverage and the date upon which Plaintiffs entered into an insurance agreement with Old Republic providing workers' compensation coverage retroactive to November 1, 2006). A copy of said No Claims Letter is attached hereto, made a part hereof for all purposes and labeled Exhibit L for identification.

34.    AIG sent a Notice of Intent to Cancel Insurance Policies dated July 10, 2007 to Plaintiffs. A copy of such document is attached hereto, made a part hereof for all purposes and labeled Exhibit M for identification.

35.    AIG does not face any potential claims or liability for the period between November 1, 2006 and March 16, 2007. No insurance policy contract was accepted and

9

finalized between Plaintiffs or any of them and AIG.  This has been recognized and acknowledged by the Commonwealth of Kentucky.

36.    The present or known workers' compensation claims asserted against Sapphire and/or Wellmore during the period between November 1, 2006 and March 16, 2007 are mostly minor in nature, typically do not involve significant time off from work by claimants, and are all covered by Old Republic, not AIG.

37.    Even if, for the sake of argument, a valid workers' compensation insurance policy contract existed between Plaintiffs and AIG, which Plaintiffs deny, AIG does not have risk under the purported policy and any alleged contract fails for lack of consideration.

38.    In the alternative, even if, for the sake of argument, AIG accepted risk for a limited period pursuant to a valid workers' compensation insurance policy contract between Plaintiffs and AIG, which Plaintiffs deny:

    (a)    AIG's failure to: (i) follow the directive of the Commonwealth of Kentucky, Office of Workers' Claims; (ii) avoid engaging in unfair trade practices; and (iii) avoid engaging in bad faith actions by refusing to address the matters discussed above appropriately, subjects AIG to sanctions and voids and negates any of AIG's potential defenses or counterclaims to Plaintiffs' allegations herein; and

    (b)    AIG has been unjustly enriched and fundamental fairness and equity require that AIG disgorge all premium payments it received less any applicable cancellation penalties or pro-rated amounts; and

    (c)    Fundamental fairness and equity require that AIG release any claim it asserts against Plaintiffs' collateral in the form of Letters of Credit.

## COUNT ONE
### Declaratory Judgment:  No Contract Existed

39.    Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 38 above as if fully set forth herein, verbatim.

10

40.   AIG, an insurance company, was required to provide the purported insurance policy terms and conditions in their entirety in order to form a valid contract.

41.   AIG failed to provide essential terms of the policy (including the Proposed Cross-Collateralization Agreement) in a timely manner.

42.   AIG did not provide the Proposed Cross-Collateralization Agreement until more than two months after the purported insurance policy allegedly went into effect.

43.   Upon receipt of the Proposed Cross-Collateralization Agreement, Plaintiffs refused to sign the document and enter into a contract with AIG, as Plaintiffs never agreed to AIG's proposed terms.

44.   The Proposed Cross-Collateralization Agreement was a central element of the proposed workers' compensation insurance policy.  Without Plaintiffs' agreement to the Proposed Cross-Collateralization Agreement there was no meeting of the minds sufficient to form a valid insurance contract.

45.   In the alternative, AIG does not have risk under the purported insurance policy despite receiving Plaintiffs' down payment, premium payments and Plaintiffs' Letters of Credit. Accordingly, any alleged insurance contract would fail for want of consideration.

46.   Wherefore, Plaintiffs seek a judicial declaration by the Court that there was no meeting of the minds and, therefore, no valid insurance contract between Plaintiffs and AIG reached for the period of November 1, 2006 through November 1, 2007.

47.   In the alternative, Plaintiffs seek a judicial declaration by the Court that there was no valid insurance contract between Plaintiffs and AIG for the period of November 1, 2006 through November 1, 2007, for want of consideration on the part of AIG.

11

## COUNT TWO
### Restitution Of The Insurance Premiums

48.     Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 47 above as if fully set forth herein, verbatim.

49.     There was no valid insurance contract between Plaintiffs, on the one hand, and AIG on the other, for the period of November 1, 2006 through November 1, 2007.

50.     Wherefore, Plaintiffs seek an order of restitution directing AIG immediately to return all premium payments and accrued interest to Plaintiffs.

51.     In the alternative, Plaintiffs seek an order of restitution directing AIG immediately to return a pro-rated portion of all premium payments and accrued interest to Plaintiffs to reflect the period (November 1, 2006 to March 16, 2007) that AIG insurance coverage allegedly was in effect.

## COUNT THREE
### Release of the Letter(s) of Credit

52.     Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 51 above as if fully set forth herein, verbatim.

53.     There was no valid insurance contract between Plaintiffs on the one hand, and AIG on the other, for the period of November 1, 2006 through November 1, 2007.

54.     In the above referenced No Claims Letter, Plaintiffs unilaterally have agreed to fully indemnify and release AIG with respect to any AIG potential liability for future workers' compensation claims possibly associated with the period between November 1, 2006 and March 16, 2007.

55.     Wherefore, Plaintiffs seek an order directing AIG immediately to release and return the Letter of Credit to Plaintiffs which Letter of Credit AIG wrongfully has failed to return.

12

**COUNT FOUR**
**Unjust Enrichment**

56.    Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 55 above as if fully set forth herein, verbatim.

57.    There was no valid insurance contract between Plaintiffs on the one hand, and AIG on the other, for the period of November 1, 2006 through November 1, 2007.

58.    In good faith, Plaintiffs made premium payments in anticipation of obtaining workers' compensation insurance coverage from AIG for the period of November 1, 2006 through November 1, 2007. Despite making premium payments, and negotiating with AIG towards a mutually acceptable workers' compensation insurance policy for the period of November 1, 2006 through November 1, 2007, the parties never finalized such a contract, and Plaintiffs never received the benefit of such a policy.

59.    AIG never assumed any risk and therefore never provided Plaintiffs with workers' compensation insurance coverage for the period of November 1, 2006 through November 1, 2007.

60.    AIG has been unjustly enriched by receiving the benefit of premium payments from Plaintiffs, while not providing insurance coverage or claims handling services to Plaintiffs.

61.    Wherefore, in conjunction with, or as an alternative to, restitution, Plaintiffs seek an award against AIG for a sum equal to the amount of premiums paid without receiving insurance coverage, including any interest accrued thereon in the amount in which AIG was unjustly enriched.

COMPLAINT 013

<u>**COUNT FIVE**</u>
**Breach of the Duty of Good Faith and Fair Dealing**

62.    Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 61 above as if fully set forth herein, verbatim.

63.    In the alternative, Plaintiffs plead as follows:  AIG, as an insurance provider, is required to act in good faith, cannot place its own interests above the interests of its policyholders, and must provide insurance coverage in an equitable and honest manner.

64.    The duty of good faith and fair dealing prevents AIG from taking any action which would deprive Plaintiffs of the benefits of any contract between AIG and Plaintiffs or to cause undue hardship to Plaintiff.

65.    AIG has pursued an improper strategy of delay designed to further its own interests improperly at the expense of Plaintiffs.

66.    Generally as an insurance company and in the event that the Court determines that a valid contract did exist between AIG and Plaintiffs, AIG owes a duty of good faith and fair dealing to Plaintiffs under applicable law, including, without limitation, KRS § 304.12-230.

67.    Generally and in the event that the Court determines that a valid contract did exist between AIG and Plaintiffs, AIG breached its duty of good faith and fair dealing under the laws of the Commonwealth of Kentucky as well as other states' laws in, among other things, the following respects:

(a)    Failing to provide essential contract language prior to entering into an agreement with Plaintiffs;

(b)    Refusing to negotiate in good faith regarding the Proposed Cross-Collateralization Agreement;

(c)    Threatening a "take it or leave it" scenario while negotiating the terms of the Proposed Cross-Collateralization Agreement;

14

(d)     Refusing to cancel the purported policy as requested by Plaintiffs and directed by the Commonwealth of Kentucky's Department of Workers' Claims, pursuant to KRS § 342.880(7)(c);

(e)     Refusing to respond to or otherwise directly address the Commonwealth of Kentucky's stated concerns;

(f)     Failing to return unearned premiums;

(g)     Wrongfully failing to release the Letter(s) of Credit; and

(h)     Forcing Plaintiffs to resort to litigation in order to clarify the status of their relationship with AIG.

68.     Wherefore, Plaintiffs seek consequential and exemplary damages because of AIG's violation of the covenant of good faith and fair dealing and its wanton and reckless disregard for the right and property of others.

## COUNT SIX
## AIG Must Comply With Order Issued by Kentucky's Office of Workers' Claims

69.     Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 through 68 above as if fully set forth herein, verbatim.

70.     AIG, as a corporation doing business in the Commonwealth of Kentucky, is required to adhere to the state's laws and regulations.

71.     The Commonwealth of Kentucky, through its Office of Workers' Claims, issued a directive on May 10, 2007, ordering AIG to file a notice of cancellation for its insurance policy with Plaintiffs, or be subject to civil penalties under KRS § 342.990(7)(c).

72.     AIG has failed to comply with such directive and has not filed a notice of cancellation of Plaintiffs' policy consistent therewith.

73.     Wherefore, Plaintiffs seek an order from the Court requiring AIG to comply with the Commonwealth of Kentucky's above directive.

COMPLAINT 015

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, The United Company, Sapphire Coal Company and Wellmore Coal Company, pray for judgment on all counts and seek relief as follows:

1.  With respect to the First Count, Plaintiffs seek a judicial declaration, pursuant to 28 USC § 2201 that because, among other reasons, Plaintiffs did not agree to the terms of the Proposed Cross-Collateralization Agreement, there was no meeting of the minds or acceptance, and thus no workers' compensation insurance policy agreement between Plaintiffs and AIG. Furthermore, because no contract existed between the parties, Plaintiffs seek the immediate return of any and all funds exchanged between or withheld on behalf of the parties, including but not limited to insurance premiums paid (including any interest accrued at the prevailing statutory rate) and release of the Letter(s) of Credit.

2.  With respect to the Second Count, Plaintiffs seek an order against AIG immediately awarding Plaintiffs a sum equal to the amount of premiums paid, including any interest accrued at the prevailing statutory rate.

3.  With respect to the Third Count, Plaintiffs seek an order against AIG requiring the immediate release and return to Plaintiffs of the Letter(s) of Credit.

4.  With respect to the Fourth Count, Plaintiffs seek an order against AIG immediately awarding Plaintiffs a sum equal to the amount of premiums paid, including any interest accrued at the prevailing statutory rate.

5.  With respect to the Fifth Count Plaintiffs seek compensatory, statutory and exemplary damages in an amount to be proven at trial as well as immediate return of all premiums with interest and release and return of the Letter(s) of Credit.

6.  With respect to the Sixth Count, Plaintiffs seek an order from the Court requiring AIG immediately to comply with the Commonwealth of Kentucky's directive ordering

COMPLAINT 016

AIG to file a notice of cancellation as of November 1, 2006 to, among other things, clarify any

potential confusion AIG may have created or has sought to capitalize upon.

7.    With respect to all counts, Plaintiffs respectfully request the following:

(a)    A judgment directing AIG's immediate disgorgement of Plaintiffs' insurance premium payments (including any interest accrued);

(b)    A judgment directing AIG's immediate release and return of Plaintiffs' $2,323,000 Letter(s) of Credit;

(c)    Compensatory, statutory and exemplary damages in an amount to be established at trial;

(d)    Costs and expenses of this action including reasonable attorney's fees as well as post and pre-judgment interest;

(e)    A trial by jury of all issues triable of right by a jury; and

(f)    All other relief such as this Court deems just and equitable.

March 7, 2008                           Respectfully submitted,


_/s/ Samuel D. Hinkle IV_
Samuel D. Hinkle IV, Esq.
Adam T. Goebel, Esq.
STOLL KEENON OGDEN PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, KY 40202-2828
Telephone: (502) 333-6000
Facsimile: (502) 562-0909

John G. Nevius, Esq., P.E.
Greg Hansen, Esq.
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000
Facsimile: (212) 278-1733

Attorneys for Plaintiffs

018133.129182/514097.1

17

## INDEX OF EXHIBITS

A.   Payment Agreement for Insurance and Risk Management Services between National Union Fire Insurance Company of Pittsburgh, Pa., et al. and The United Company dated November 14, 2006.

B.   Four-page "recap" of an insurance proposal dated November 17, 2006.

C.   Insurance policy "binder" describing the proposed workers' compensation coverage prepared by AIG's Les Lappe and dated November 1, 2006.

D.   Putative insurance policy with number: WC 720-94-31 included with an "Insurance Program Policy Kit" dated January 19, 2007.

E.   Proposed Cross-Collateralization Agreement between National Union and Plaintiffs to be effective November 1, 2006.

F.   String e-mail dated January 25, 2007 from Thomas Griffin, Vice President of Risk Management at The United Company to Glenn McQuate of Acordia West Virginia Re: "United/Sapphire [Proposed] Cross-Collateralization Agreement – Problems."

G.   String e-mail dated February 14, 2007 from Harry Horner, Senior Vice President of AIG Global Energy Casualty, to Mr. Griffin, Re: "AIG [Proposed] Cross-Collateralization Agreement."

H.   Letter dated March 20, 2007 from Jack Stewart, Executive Vice President of Underwriters Safety and Claims to Jim Bill Harvey, Senior Managing Vice President of Acordia, West Virginia, Re: "United Coal Company LLC, et al."

I.   Letter dated April 19, 2007 from Robert Lloyd, Assistant Vice President, Old Republic Insurance Company to Virginia Workers Compensation Commission Re: United Coal, LLC.

J.   Letter dated April 24, 2007 from Robert Lloyd, Assistant Vice President of Old Republic Insurance Company to Carla Montgomery, Kentucky Office of Workers Claims, Re: United Coal, LLC.

K.   Letter dated May 10, 2007 from Ms. Montgomery, General Counsel, Environmental and Public Protection Cabinet, to AIG regarding filing of notice of cancellation.

L.   Letter dated June 7, 2007 from Mr. Griffin to Thomas Morelli, President, AIG Global Marine & Energy, AIG Global Energy Casualty, Re: The United Company No Claims Letter.

M.   Notice of Intent to Cancel Insurance Policies dated July 10, 2007 from AIG's premium financing subsidiary, A.I. Credit a/k/a AICCO, Inc.

COMPLAINT 018

# EXHIBIT A

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the 01 day of November, 2006

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.
On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company

And You, our Client

*THE UNITED COMPANY*
*1005 GLENWAY AVENUE*
*BRISTOL   VA   24201*

In consultation with *Your* representative

*ACORDIA OF WV-BLUEFIELD*
*320 FEDERAL ST*
*BLUEFIELD   WV   24701-3006*



1/20/07
CC Kenny D
Anita G

# PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your Payment Obligation*? | 4 |
| When Must *You* Pay *Your Payment Obligation*? | 4 |
| What Is the Payment Plan? | 4 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 7 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 9 |
| Are *You* Authorized to Make This Agreement? | 9 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

COMPLAINT 021

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:
- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

We have agreed to the following:
- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

*You* have agreed to the following:
- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. "ALAE" means Allocated Loss Adjustment Expense as defined in the *Policies*.

2. "Deductible Loss Reimbursements" means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.

3. "Loss" or "Losses" means damages, benefits or indemnity that we become obligated to pay to claimants.

4. "Policy" or "Policies" means:
   - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.

5. "Retained Amount" or "Retention" means one of the following:
   - Self-Insured Retention: the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - Deductible: the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - Loss Limit: the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

COMPLAINT 022

# PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** or **"Your"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation.*

8. **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

- the premiums and premium surcharges,
- *Deductible Loss Reimbursements,*
- any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,
- any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE.* Those reserves shall include specific reserves on known *Losses* and *ALAE,* reserves for incurred but not reported *Losses* and *ALAE,* and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION?*

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies.*

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to *You.* The Credit Fee, if any, is shown in the *Schedule.* Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements.*

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION?*

All payments are due by the due date stated in the *Schedule,* or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

COMPLAINT 023

# PAYMENT AGREEMENT

### Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

Claims Payment Deposit: If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

### Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

## WHAT IS THE BILLING METHOD?

Deposit and Installments: *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

Additional Payments: *You* have chosen the Direct Billing Method or the Automatic Withdrawal Method, or a combination of both. *Your* choice is shown in the *Schedule*.

### Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your* Retention and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

### Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your* Retention and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*. *You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your* Retention and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

COMPLAINT 024

## PAYMENT AGREEMENT

### WHAT ABOUT COLLATERAL?

#### Collateral Is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

#### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

#### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

#### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

#### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *You*, *Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

COMPLAINT 025

# PAYMENT AGREEMENT

### Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to *Your* primary casualty insurance with us.

### Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request. If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement,
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

### Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

## WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

   - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

   - *Your* default on any material outstanding debt not cured within its applicable cure period, if any,

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this agreement. However, *Your* concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

## WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

COMPLAINT 026

# PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. *You* authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and
- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

How arbitrators must be chosen: *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

Qualifications of arbitrators: Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

COMPLAINT 027

# PAYMENT AGREEMENT

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

*Expenses of Arbitration: You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *You* at *Your* address in the *Schedule. You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule.* All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *Your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *Your* behalf has full right and authority to execute and deliver this agreement and to bind *You* jointly and severally.

COMPLAINT 028

## PAYMENT AGREEMENT ·

---

### SIGNATURES

TO SIGNIFY AGREEMENT, *You* and we have caused this Agreement to be executed by the duly authorized representatives of each.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This <u>14th</u> day of <u>November</u>, <u>2006</u>

Signed by _____ *Michael Shiley*

Typed Name <u>Michael Shiley</u>

Title <u>Assistant Vice President</u>

For *You*, our Client

THE UNITED COMPANY

In ____ Bristol _____, VA,

This 31st day of December, 2006

Signed by ____ *Brian D. Sullivan*

Typed Name Brian D. Sullivan

Title Vice President

---

COMPLAINT 029

**Pete Lunati**

| | |
|---|---|
| **From:** | Tom Griffin [TGriffin@unitedco.net] |
| **Sent:** | Wednesday, April 04, 2007 10:02 AM |
| **To:** | Pete Lunati; Jack Stewart |
| **Subject:** | SCN_20070404095722_001.pdf SCHEDULE OF PAYMENTS & POLICIES-KY-VA -AIG WC PROGRAM |

**Attachments:** SCN_20070404095722_001.pdf

*(handwritten notes):*

Program Date 11-1-06
? $ 3,706,411
on
$1,500,000 new deal

1,383,411

down 626,000
1st qtr   258,369
────────
884,000   PD

SR @ .472 -  652,972
────────
231,028  b/c

GC- WC  dud - 2004
500,000 ded SAP - 2005
GC       Prim - 2006
combo
1st ded.

1st qtr - $ 275,000
11-1 to 2-1

Annual

4/4/2007

COMPLAINT 030

$E_{NC}$

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 11/01/2006 to 11/01/2007

Annexed to the PAYMENT AGREEMENT

effective on 11/01/2006

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company
and *You*, our Client

THE UNITED COMPANY
1005 GLENWAY AVENUE
BRISTOL  VA  24201

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 439263

COMPLAINT 031

_ENC_

## List of Addressees for Notices and Other Purposes

### Your Address:

Contact Name: Tom Griffin
Company Name: THE UNITED COMPANY
Street: 1005 GLENWAY AVENUE
City: BRISTOL          State: VA          Zip: 24201      Phone:

### Your Representative:

Contact Name: Jim Bill Harvey
Company Name: ACORDIA OF WV-BLUEFIELD
Street: 320 FEDERAL ST
City: BLUEFIELD          State: WV          Zip: 24701-3006  Phone: (276) 619-6056

### Our Account Executive:

Contact Name: Les Lappe
Company Name: AIG Global Marine & Energy
Street: 1375 East 9th Street
City: Cleveland          State: OH          Zip: 44114      Phone: 216-479-8922

### Our Law Representative:

Contact Name: Mark Pasko
Company Name: American International Group
Street: 175 Water Street
City: New York          State: NY          Zip: 10038      Phone: 212-468-5707

### Remit Payments to:

Contact Name: Fusion Group
Company Name: American International Companies
Street: PO Box 10472
City: Newark          State: NJ          Zip: 07193      Phone: 908-679-3923

### Remit Collateral to:

Contact Name: Attn: Mr. Donato DiLuzio
Company Name: American International Group Inc.
Street: P.O.Box 923 Wall Street Station
City: New York          State: NY          Zip: 10268      Phone: 212-770-7000

Contact Name:
Company Name:
Street:
City:          State:          Zip:      Phone:

Contact Name:
Company Name:
Street:
City:          State:          Zip:      Phone:

COMPLAINT 032

*E*NC

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

WC 7209431,

Commercial General Liability Insurance

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your* Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 11/01/2006 | $1,259,123 | $124,293 | $0 | $0 | $1,383,416 |
| | Subtotals | $1,259,123 | $124,293 | $0 | $0 | $1,383,416 |
| | DLP* | N/A | N/A | N/A | $2,323,000 | $2,323,000 |
| | DEP* | $0 | $0 | $0 | N/A | $0 |
| | Totals | $1,259,123 | $124,293 | $0 | $2,323,000 | $3,706,416 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

Notes    (1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a Monthly basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

Regular Loss Payments: Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

Sizable Loss Payments: If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of $25,000 , *You* must pay us the amount of that payment of *Loss* within 10 days after

COMPLAINT 033

*You* receive our bill.

Billing Method:

☒ Billing to

☒ *You* at *Your* address shown in the *Schedule*, or

☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

The Conversion Date for each *Policy* described in section A above shall be the date _as mutually agreed upon_ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| LOCs | $1,650,000 |
| Total Collateral on Hand | $1,650,000 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| LETTER OF CREDIT | $2,323,000 | 2006-11-01 |
| Total Additional Collateral Required | $2,323,000 | |
| Total Collateral Required | $3,973,000 | |

### 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

   i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

   ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity: <u>Not Applicable</u> Type of Debt Rated: <u>Not Applicable</u>

**Ratings at Effective Date**

COMPLAINT 034

*Enc*

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
|     |         |                            |
|     |         |                            |

b. Other Financial Tests or Covenants:

### 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under Item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

### SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, National Union Fire Insurance Company of Pittsburgh Pa., on behalf of itself and all its affiliates,

this 14th day of November, 2006

Signed by *Michael Shiley*

Typed Name Michael Shiley

Title Assistant Vice President

For You: THE UNITED COMPANY

this 31st day of December, 2006

Signed by *Brian Sullivan*

Typed Name Brian D. Sullivan

Title Vice President

11/01/2006 000/01 9465903

COMPLAINT 035

ENC

# 2006 Addendum

## to

## PAYMENT AGREEMENT

**By and between us**

National Union Fire Insurance Company of Pittsburgh, Pa.
On behalf of itself and all its affiliates including, but not limited to:
American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Vermont
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
Granite State Insurance Company
New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

*THE UNITED COMPANY*
*1005 GLENWAY AVENUE*
*BRISTOL, VA 24201*

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the <u>1st</u> day of <u>November , 2006</u>

1. The section entitled WHO HAS AGREED TO THIS AGREEMENT?, is deleted and replaced with the following:

   This Agreement is between:

   - *You*, the organization(s) named as "our Client" in the *Schedule*, and

   - *us*, the insurers set forth above as "Company" "we," "us" and "our" in this Addendum.

2. The section entitled WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation, is deleted and replaced with the following:

   "Your Payment Obligation" means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   - the premiums and premium surcharges, taxes and assessments,

   - *Deductible Loss Reimbursements*,

   - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,

   - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

   - costs and expenses incurred by any third party administrator.

COMPLAINT 036

*ENC*

Loss Reserves: *Your Payment Obligation* Includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

Premium Tax on Deductibles: If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies*. Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule*.

3. The section entitled: WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION? is amended to include the following:

We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the *Policies* provided that we consent to your selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA that we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of *Your Payment Obligation*, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4. The section entitled: WHEN MUST YOU PAY YOUR PAYMENT OBLIGATION? is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5. The section entitled: WHAT ABOUT COLLATERAL? is amended to include the following:

Collateral Exchange:

At our sole discretion we may approve Your substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6. The section entitled: HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRATION PROCEDURES - How Arbitrators Must Be Chosen, is deleted and replaced with the following:

How arbitrators must be chosen; You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of court of competent jurisdiction in the City, County, and State of New York.

7. The section entitled: ARE YOU AUTHORIZED TO MAKE THIS AGREEMENT? is amended to include the following:

COMPLAINT 037

*E*NC

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *Us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without your agreement on all of them. For that reason, you should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This <u>14th</u> day of <u>November, 2006</u>

Signed by _Michael Shiley_

Typed Name <u>Michael Shiley</u>

Title <u>Assistant Vice President</u>

For *You*, our Client

**THE UNITED COMPANY**

In _Bristol_ , _VA_,

This _31st_ day of _December_ , _2006_

Signed by _Brian D. Sullivan_

Typed Name _Brian D. Sullivan_

Title _Vice President_

2006 Addendum to Pmt. Agrmt.          11/01/2006 003401 9963905          Page 3 of 3

COMPLAINT 038

# EXHIBIT B



Acordia
353 Falls Drive
P.O. Box 1567 (ZIP 24212-1567)
Abingdon, VA 24210-8093
Voice: 276.676.3603
Fax: 276.676.0152

www.acordia.com

November 17, 2006

Mr. Tom Griffin
The United Company
1005 Glenway Avenue
Bristol, VA   24203

Re:    Workers Compensation Programs

Dear Tom:

As we discussed, attached is a recap of the workers compensation programs for United Coal
Company, LLC.

I'm pleased to inform you that by switching to a $1,000,000 deductible you've saved over
$6,800,000. This represents a 61% savings. This savings is before you include the claims costs.
Even with the claims costs included, you've saved over $5,700,000. I applaud you for your
innovative & aggressive approach.

I'd like to make the following comments:

- This is the first deductible program Brickstreet has offered. They made a mistake in
calculating some WV surcharges but they agreed to "eat" their $51,000 mistake.
- The "revised" Brickstreet quote includes Brokerage commission. This is different
from the original quote.
- Our claims handling fee in VA & KY is 38% lower than originally proposed by AIG.
This represents a $141,680 savings to UCC, LLC. Please be advised we've priced the
claims administration based on "the life of the claim". This is an important issue and
shouldn't be overlooked.
- On the Brickstreet program, even if you hit the $2,000,000 aggregate, United Coal Co
will save over $2,706,000. This represents a very good deal for UCC, LLC.
- I've amended the payrolls to reflect accurate payrolls.
- The VA & KY policy have only one composite rate. This will make budgeting &
auditing much simpler.
- Brickstreet has agreed to use any unearned premium to offset the deductible premium.
Kristina is out of the office today but we will have an accurate accounting to you early
next week.

I appreciate all of your assistance you've offered in the past few months. I know both Brickstreet
and AIG value your input. They both acknowledge your expertise means a lot to them.

A Wells Fargo Company

A Member of the [ ] global Network

COMPLAINT 040



Mr. Tom Griffin
November 17, 2006
Page 2

I've included an explanation of the funding process. I recommend you have Earl call either Gail King or Ron Casto with any specific questions/comments.

Please review everything attached and let me know if you have any questions/comments.

On behalf of everyone at Acordia, we appreciate the opportunity to handle the Workers Compensation needs of United Coal Company.

Best Regards,

Glenn W. McQuate CPCU, ARM
Senior Vice President
Acordia Energy Group

## LARGE DEDUCTIBLE QUOTE FOR UNITED COAL COMPANY, LLC

REVISED 11/7/06

### PAYROLLS

**Wellmore**

| | | |
|---|---|---|
| Coal Mining-Surface & Drivers | $1,500,000 | |
| Coal Mining-NOC | $4,000,000 | |
| Machine Shop | $300,000 | |
| Grading of Land | $300,000 | |
| Coal Merchant | $2,000,000 | |
| Architect/Engineer | $450,000 | |
| Clerical | $400,000 | |
| TOTAL | $8,950,000 | |

**Sapphire**

| | | |
|---|---|---|
| Coal Mining-Surface & Drivers | $1,972,806 | |
| Coal Mining-NOC | $6,865,502 | |
| Coal Merchant | $338,001 | |
| Storage Warehouse | $172,364 | |
| Automobile Repair or Service | $184,675 | |
| Clerical | $242,453 | |
| TOTAL | $9,775,702 | |

| | |
|---|---|
| GRAND TOTAL | $18,725,702 |

| DEDUCTIBLE OPTIONS | $500,000 | $750,000 | $1,000,000 |
|---|---|---|---|
| Premium | $1,627,459 | $1,422,038 | $1,259,123 |
| WC Surcharges | $169,955 | $169,908 | $124,293 |
| Total Premium | $1,797,414 | $1,591,946 | $1,383,416 |
| **Rates** | | | |
| Specific | 7.66 | 6.44 | 5.57 |
| Aggregate | 1.031 | 1.154 | 1.154 |
| Total | 8.691 | 7.594 | 6.724 |
| Collateral | $1,930,000 | $2,160,000 | $2,323,000 |

**Current Premiums**

| | | | | |
|---|---|---|---|---|
| Wellmore | $2,301,444 | | | |
| Sapphire | $1,177,591 | | | |
| TOTAL | $3,479,035 | $1,681,621 Savings | $1,887,089 Savings | $2,095,619 |
| | | 48% Reduction | 54% Reduction | 60% Savings |

| | | | |
|---|---|---|---|
| AIG CLAIMS FEE | $308,000 | $345,600 | $371,600 |
| AES CLAIMS FEE | $230,000 | $230,000 | $230,000 |

Comments:

AIG had built $371,680 into their program for claims handling fees. AES can handle the claims for $230,000, a $141,680 savings
This represents a 38% savings to UCC.

AIG is using a composite rate for both states.

The premium for Sapphire includes $124,293 in KY taxes/surcharges.

# UNITED COAL CO
# LARGE DEDUCTIBLE

<u>Revised 11/17/06</u>

| | CURRENT PREMIUM | $1,000,00 DEDUCTIBLE | SAVINGS |
|---|---|---|---|
| **WV OPERATIONS** | $    7,676,087.00 | $2,970,050 | $4,706,037 (61% Savings) |
| **SAPPHIRE** | $    1,177,591.00 | $781,618 | $395,973 (34% Savings) |
| **WELLMORE** | $    2,301,444.00 | $601,798 | $1,699,646 (74% Savings) |
| **TOTAL** | $    11,155,122.00 | $4,353,466 | $6,801,656 (61% Savings) |

## COMMENTS:

1. Acordia Employers Service will be the claims administrator on both of the above progams. Claims Administration fees are as follows:

| | |
|---|---|
| CRCC | $22,500/quarter |
| Pocahontas | $22,500/quarter |
| Wellmore | $28,750/quarter |
| Sapphire | $28,750/quarter |

AIG had built into their program $371,680 for claims handling fees. Acordia Employers Service can handle these claims for $230,000, a $141,680 savings.

2. The Brickstreet quote includes 4% brokerage commission.

3. Collateral Requirements are as follows:

| | |
|---|---|
| Brickstreet | $1,000,000 |
| AIG | $2,323,000 |

4. AIG will require a cross collateral agreement since there is already collateral in place for Sapphire

5. AIG has requested a copy of your latest in-house financial statements

6. AIG is requiring the LOC wording concerning the GL policy be corrected.

7. Incurred claims through 10/31/06 are as follows:

| | |
|---|---|
| WV Operations: | $624,214 |
| Wellmore: | $299,430 |
| Sapphire: | $139,006 |

COMPLAINT 043

# EXHIBIT C



# Binder For Primary Casualty Insurance Program

for

# The United Company

## In consultation with your Representative

## Acordia

PREPARED BY:    LES LAPPE
DATED:          11/01/2006

1

COMPLAINT 045

# TABLE OF CONTENTS

| Section 1 | General information |
|-----------|---------------------|
| Section 2 | Program Rates and Premiums |
| Section 3 | Limits, Program Type and Coverage |
| Section 4 | Premium Payments & Program Terms |
| Section 5 | Important Notes |
| Section 6 | Glossary |
| Section 7 | AIG Claim Service |
| Section 8 | AIG Loss Consultants |
| Section 9 | Attachments |

1. Letter of Credit Wording

2

COMPLAINT 046

## SECTION 1    -    THE CONTACTS

AIG Global Energy Casualty is committed to providing superior service on your Insurance Program. The People listed below are the primary team representatives for your account.

| Your Address : | |
|---|---|
| Contact Name: | Tom Griffin |
| Company Name: | The United Company |
| Street: | 1005 Glenway Avenue |
| City: | Bristol |
| State: | VA |
| Zip: | 24201 |

| Your Representative: | |
|---|---|
| Contact Name: | Glenn McQuate |
| Company Name: | Acordia |
| Street: | 320 Federal Street |
| City: | Bluefield |
| State: | WV |
| Zip: | 24701 |
| Telephone #: | 276-619-6055 |
| Fax #: | 276-676-0152 |
| Email: | Glenn_McQuate@acordia.com |

| Our Account Representative: | |
|---|---|
| Contact Name: | Les Lappe |
| Company Name: | AIG Global Energy |
| Street: | 1375 East 9th Street |
| City: | Cleveland |
| State: | OH |
| Zip: | 44114 |
| Telephone #: | 216-479-8922 |
| Fax #: | 216-696-2842 |

3

COMPLAINT 047

# SECTION - 1 - INFORMATION ABOUT AIG GLOBAL ENERGY CASUALTY

AIG Global Energy Casualty provides a comprehensive array of tailor-made insurance and alternative risk solutions to national and commercial size oil and gas, power generation and utilities, chemical, and mining companies worldwide. The experts providing underwriting, claims, and loss mitigation services have years of energy and insurance experience. Their expertise fuels out integrated approach to underwriting, loss control, and claims services - and allows us to customize programs to make a meaningful difference in our insureds' ability to prevent and control losses. Whether an energy company's operations are stateside or in a number of countries,

### Quality Service

AIG Global Energy recognizes the importance of a customer-focused, integrated approach to risk management. Each client has a team of highly skilled experts serving its underwriting, loss control, and claims needs. Account managers ease and streamline communications on all facets of an insured's account. Regular, consistent interaction among AIG Global Energy underwriters on all casualty lines helps to ensure comprehensive casualty coverage and reduce gaps or overlaps in our insureds' programs. They constantly examine the big picture, helping to ensure seamless casualty coverage for our insureds. They help energy operations take advantage of the full gamut of solutions available through AIG Global Energy.

Our loss control experts specialize in the specific sectors of the energy industry and examine the issues that impact safety - management practices, physical hazards, and regulatory compliance. They customize strategies to reduce and eliminate costly risks and enhance workplace safety. Services can include hazard evaluation associated with employee injury, liability, and fleet operations, business partner training, and loss control program audits. In addition, each AIG Global Energy client benefits from our unique Claims Liaison department which serves as a central point of contact for the client, broker, claims, underwriting and loss control teams. By facilitating communication, your Claims Liaison can answer the myriad of questions that can arise from a claim, resolve issues and mitigate losses by helping stop smaller claims from escalating for our clients. Our online claims reporting system makes it convenient for clients to report claims 24 hours a day, seven days a week. Once a claim is reported, our approach brings to bear high quality investigative, legal, medical, and accounting expertise early in the claims process when it can have the greatest benefit for the client. We consider all aspects of a claim and work collaboratively with our insureds and brokers to achieve mutually agreed upon objectives.

### Financial Strength

American International Group, Inc. (AIG) is one of the world's leading international insurance and financial services organization, with operations in more than 130 countries and jurisdictions. AIG member companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty network of any insurer. In the United States, AIG member companies are the largest underwriters of commercial and industrial insurance.
Financial strength and long-term stability are important factors when selecting an insurance carrier. Our strong financial resources and more than 80 years experience help ensure that clients' claims are successfully and satisfactorily handled - today and well into the future.

4

## SECTION 2    -    PROGRAM RATES AND PREMIUMS

The amounts shown throughout are intended as estimates only. Any reference to Total or Final Premium is for explanatory purposes only. None of the numbers herein are intended to represent final calculation. Neither AIG Global Energy Casualty, nor any member company of American International, Inc. shall be bound by the calculations arrived at in the tables below. The tables serve merely to demonstrate the calculation process. All amounts are subject to modification through the binding process and to program adjustments after binding.

Rates and Estimated Premiums for:

| Line of Business | Coverage Plan Type | Retention/Deductible/SIR |
|---|---|---|
| Workers' Compensation | Deductible Coverage | $1,000,000 Deductible |

## SECTION 2    -    PROGRAM RATES AND PREMIUMS

5

COMPLAINT 049

| Coverage Description | Rates | Estimated Per | Premium Basis Types | Estimated Basis | Minimum Premium | Estimated Premium |
|---|---|---|---|---|---|---|
| Work Comp Deductible Premium | 5.57 | $100 | Payroll | $18,725,801 | N/A | $1,043,027 |
| Workers Comp Aggregate Stop | 1.154 | $100 | Total Payroll | $18,725,801 | 100% | $216,096 |
| Workers Comp Terrorism Premium | N/A | N/A | | | N/A | Included See Below |
| Workers Compensation Surcharges | N/A | Rating W/Sheet | | | N/A | $169,955 |
| | | | | Estimated Premiums | | $1,259,123 |

### Summary of Expected Cost

| | |
|---|---|
| Estimated Premium (Subject and Non-subject) | $1,259,123 |
| WC Surcharges | $  169,896 |
| Total Estimated Premium, Terrorism and Surcharges | $1,429,019 |
| Expected Reimbursable Losses/ Deductible Loss/*Self-Insured Losses* and *ALAE*, if applicable | $ 2,323,000 |
| Estimated Total Escrow Fee | $       N/A |
| Credit Fee | N/A |

6

COMPLAINT 050

# SECTION 2    -    PROGRAM RATES AND PREMIUMS

Description of Various Surcharges, if applicable, are represented in the surcharge totals shown above:

AK - Guarantee Fund Assessment
CA- Fraud Assessment -
    User Fund Surcharge-
    Uninsured Employers Benefits Fund Assessment
    Subsequent Injuries Benefit Fund Assessment
    CIGA
CT- Industrial Tax
    USL&H Tax
    Second Injury Assessment
IL - Industrial Commission Fund Surcharge
IN- Second Injury Fund
KY- Special Assessment Fund Assessment
    Coal Workers Fund
ME- Board Assessment
    Supplemental Benefit Surcharge
MA- MACHWC Surcharge
MN- MN Surcharge
MO- MOSIF Surcharge
MT- Regulatory Assessment
NJ- NJSIF Surcharge
NY- NY Assessment Charge
OR- ORWCA Surcharge
    OIGA Assessment
PA- Employer Assessment
SD- Policy Flat Fee
VT- VTWCAFA Surcharge

NOTE FOR THOSE RISK WHICH HAVE EXPOSURE IN THE STATE OF NEW JERSEY FOR AUTO AND GENERAL LIABILITY, THERE IS A NJ Property Liability Insurance Guaranty Association policy surcharge applicable which is 1.75% of the New Jersey policy premium.

Workers Compensation Terrorism Charges
Total Cost: $27,853 broken down as follows
(This terrorism charge is included within the premium above)

| Workers' Compensation | | % of Estimated Premium | Estimated TRIA Charge |
|---|---|---|---|
| | Alabama | % | $N/A |
| | Arizona | % | $N/A |
| | Connecticut | % | $N/A |
| | Kansas | % | $N/A |
| | Maine | % | $N/A |
| | Nevada | % | $N/A |
| | New Jersey | % | $N/A |
| | New Hampshire | % | $N/A |
| | New York | % | $N/A |
| | Oregon | % | $N/A |
| | Tennessee | % | $N/A |
| | Virginia | % | $Included |
| | Wisconsin | % | $N/A |
| | All Other States | % | $27,853 |

# SECTION 2    -    PROGRAM RATES AND PREMIUMS

7

☒ Claim Fee is not included as all claims are being handled by Acordia Employer Services.

☐ Fixed Loss Conversion Factor* on Incurred Losses
*Note: The Estimated Claims Service Charges shown represent a deposit only. If this deposit is exhausted during the policy period, we will bill you immediately for the estimated policy period shortfall.

☐ Fixed Loss Conversion Factor* on Paid Losses
*Note: The Estimated Claims Service Charges shown represent a deposit only. If this deposit is exhausted during the policy period, we will bill you immediately for the estimated policy period shortfall.

8

COMPLAINT 052

# SECTION 3    -    LIMITS, PROGRAM & COVERAGE

### General Notes About Coverages

Coverage outlined in this document is for explanatory and reference purposes only. The coverage provisions do not necessarily conform to any specifications furnished in the submission received from your representative.

The policy (or policies) that we issue to you shall contain the full and complete terms, conditions, exclusions and coverages provided under your insurance program. In the case of any conflict between the insurance policy (or policies), and the provisions contained in this Binder, the provisions in the policy (or policies) shall govern. Upon receipt, please review the policy (policies) thoroughly with your broker, and notify us promptly in writing if you have any questions or concerns.

The calculation of premiums, and other program features, included in this document have been established based upon the information provided by you and your representative. Additional locations, changes in exposure, or other variations may make it necessary to re-evaluate the Binder, premium calculations and plan factors. Any modification we make shall be based on our evaluation of these changes and whether they represent a measurable difference from the insurance program originally contemplated at inception.

While it is our intention to honor the terms and conditions of our contract with you, we are required to follow all regulatory and filing requirements in effect for various states where you have an exposure. We shall adhere to all state regulatory requirements. We shall not issue any form, or apply any program , that is in contravention to a governing regulation, rule, statute or law.

Prior to the inception date of coverage, you must provide us with the following information: All applicable FEIN numbers, DMV reporting information (other than New York), Florida Acord 130 for Florida Workers' Compensation coverage (fully completed, executed and notarized), and UAIN

Entities included as Named Insureds are those shown as such on the policy (policies) Declaration page, as well as in the appropriate Named Insured Endorsements attached to each individual policy, whether such are issued at inception, or included by an additional endorsement thereafter.

Any questions regarding this Binder should be directed to Our AIG Risk Management Representative shown in this document. *No Alterations to this Proposal May Be Made Without the Prior Written Approval of AIG Global Energy Casualty.*

9

COMPLAINT 053

# SECTION 3    -    LIMITS, PROGRAM & COVERAGE

Workers' Compensation

Policy Term:  Effective at 12:01 AM      11/01/2006          to      11/01/2007
Issuing Company:  A I South Insurance Company
Policy No.:  WC 720-94-31

| | |
|---|---|
| Workers' Compensation Coverage | Statutory |

Employers Liability:
Bodily Injury by Accident - Each Accident         $1,000,000
Each Employee Bodily Injury by Disease            $1,000,000
Policy Limit Bodily Injury by Disease             $1,000,000
States Covered:                                   KY, VA

| | Deductible Amount | Applicable To: |
|---|---|---|
| Workers' Compensation and Employers Liability under State Law - Insured States | $1,000,000 | Each Accident or each Person for Disease |
| Workers' Compensation and Employers Liability under Federal Law - Insured States | $1,000,000 | Each Accident or each Person for Disease |
| ALAE Option A | ALAE Option C Excess % N/A | Applies to All States |

Workers' Compensation Expected Deductible Losses         $2,323,000

Note: 1)For Insured States, the limit of coverage as shown in this document include(s) the Retention/Loss Reimbursement Limit layer amount(s)retained by the Insured . 2) Self-Insured States, the limits of liability shown are in excess of the Self Insured Retention amount. 3)Aggregate Limits apply where applicable.

Aggregate Stop Amount for WC Only : $3,484,500 is a minimum amount that is adjustable upwards based on rate of  $18.61 per $100 of WC payroll. Estimated Payroll at inception is $18,725,801.

Note this aggregate amount shown is based a loss cost only aggregate amount and is not eroded by Allocated Claims Expenses.

Insurance Charge $216,096 adjustable at a rate of $1.154 per $100 of WC Payroll. Estimated Payroll at inception is $18,725,801.

10

COMPLAINT 054

# SECTION 3    -    LIMITS, PROGRAM & COVERAGE

Workers Compensation Coverage Extensions and Exclusions

| Form # | Name |
|---|---|
| Various | All Mandatory State Endorsements |
| 81461 | LRRP (Large Risk Rating Plan) |
| WC 00 01 02 | Federal Health and Safety Act Coverage Endorsement |
| | States Covered: KY, VA |
| WC 00 04 14 | Notification of Change in Ownership Endorsement |
| WC 00 01 13 | Terrorism Risk Insurance Extension Act Endorsement |
| WC 00 04 06 | Premium Discount Endorsement |
| WC 99 00 02A | Loss Reimbursement Endorsement |
| WC 00 01 06A | Longshore & Harbor WC Act Coverage |
| WC 99 00 11A | Unintentional Error and Omissions |
| WC 99 00 08A | Amendment of Your Duties if Injury Occurs |

11

COMPLAINT 055

# SECTION 3    -    LIMITS, PROGRAM AND COVERAGE

### Workers' Compensation Premiums

Except for guaranteed cost policies, the Workers' Compensation premium does not include the non-ratable elements mandated by the various states.

WC/EL premiums and non-ratable elements are subject to rates approved by the various states and the actual   experience modifications promulgated. Premium adjustments resulting from WC/EL rate/premium changes applicable at inception, which were not recognized at the time the workers' compensation policy was initially rated, will result in revised installments reflecting the amount of any such adjustments. The revised amounts will be an obligation of yours under the insurance program.

### Workers' Compensation Loss Reimbursement (Deductible) Policy/Plan Premiums

A discount in the premium for the loss reimbursement (deductible) policies shown in the schedule is calculated in accordance with our deductible rating plan.  The premium includes a provision for certain taxes and assessments (including residual market plan assessments), which we expect to become obligated to pay based on the premium.

Furthermore, in the event that any state regulatory authority determines that deductible reimbursements are taxable as premium or subject to assessments you will be obligated to pay the premium taxes and/or assessments applicable to the Policies.

Any additional premium amounts calculated under this insurance program do not accrue toward maximum or aggregates which may be included in your Casualty Insurance Program.

12

COMPLAINT 056

### UM/UIM Automobile Coverage

For Uninsured Motorists coverage (UM), Underinsured Motorist coverage (UIM) and Personal Injury Protection coverage (PIP), there are specific rejection/election of coverage forms that must be completed, signed, and returned to us prior to the inception of automobile coverage. You must complete, sign and return such forms to us by the Policy(ies) inception date of coverage. Your failure to return all required selection forms shall be deemed your acceptance that the automobile policy(ies) will issued and rated to include the limits of UM/UIM coverage equal to the policy limits of liability, or equal to the maximum limits required by law if lower than policy limits, and the limit for PIP coverage that we are required to offer for each state. In the event you fail to return the signed forms and we apply UM/UIM and PIP limits as described herein an additional charge for this change in coverage will be added to your Automobile Liability premium. Your acceptance of the casualty insurance program supersedes anything to the contrary in specification(s), proposal(s), quotation(s), this binder(s) or any other "agreement" or "understanding" , and you will be responsible for the payment of UM/UIM/PIP damages within your "retention or deductible" whichever is applicable.

Please be advised that we do not offer UM/UIM coverage in Michigan and Ohio. This program does not include in its pricing UM/UIM for vehicles garaged in Ohio or Michigan..

In any State permitting election of UM limit "stacking", any UI coverage contemplated herein is predicated upon rejection of the "stacking" provision by each Named Insured.

### DMV Reporting Requirements

In order to conform with the requirements of the various state DMV laws, we must make certain filings that provide the state DMV with specific data. Upon binding Auto Liability coverage you are required to provide us with all requisite information. For more about the DMV reporting requirements visit the Virtual Office web site under https://.accessaig.com/accessaig/public/login/frameset.

Your acceptance of this insurance program constitutes your agreement that the requisite date will be entered into ALIR or supplied to us in the agreed upon format. In the event that you or your representatives have not supplied, or entered complete, accurate information, the following may occur after binding: 1)You will be expected to pay the price we charge you for transmitting the data to the State DMV(s). 2)You may have vehicles, as well as cargo, impounded by authorities and you may not be able to register new vehicles or renew existing registrations. 3) In addition, you may be subject to State fines and penalties.

### Automobile Coverage where a Composite Rate Applies

For automobile coverage, the earned premium will be computed based on the number of units at inception of the casualty insurance program plus the number of units at expiration, divided by two (2).

13

## SECTION 4     -     PREMIUM PAYMENTS AND PROGRAM TERMS

Incurred Loss Payment Plan:

Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses and Excess Losses [1] | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses [2] | Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 12/01/06 | $1,259,123 | $169,896 | $0 | $0 | $1,429,019 |
| 2 | | $ | $ | $ | $ | $ |
| 3 | | $ | $ | $ | $ | $ |
| 4 | | $ | $ | $ | $ | $ |
| 5 | | $ | $ | $ | $ | $ |
| 6 | | $ | $ | $ | $ | $ |
| 7 | | $ | $ | $ | $ | $ |
| 8 | | $ | $ | $ | $ | $ |
| 9 | | $ | $ | $ | $ | $ |
| 10 | | $ | $ | $ | $ | $ |
| 11 | | $ | $ | $ | $ | $ |
| 12 | | $ | $ | $ | $ | $ |
| 13 | | $ | $ | $ | $ | $ |
| Subtotals | | $1,259,123 | $169,896 | $0 | $0 | $1,429,019 |
| DLP* | | N/A | N/A | N/A | $2,323,000 | $2,323,000 |
| DEP* | | $ | $ | $ | | $0 |
| Totals | | $1,259,123 | $169,896 | $0 | $2,323,000 | $3,752,019 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Additional Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as such shown in the Schedule of Policies and Premiums to the Payment Agreement.

Notes: (1)"Provision for Expenses and Excess Losses" is a part of the Premium. The remainder of the Premium is included under "Provision for Limited Losses". 2) "Provision for Limited Losses" includes provision for *Loss* within your *Retention* (both Deductible and Loss Reimbursement Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### Additional Payments

You must pay us the installment amounts by the due dates as specified in this document. We have calculated the part of those installments designated as "Provision for Limited Losses" to equal the Losses within Your retention/deductible/loss reimbursement limit and Your share of ALAE that we expect to incur during the period for which Provision for Limited Losses amounts are shown. The amount we incur will be the sum of the amounts we pay and the amounts we reserve for payment on claims that have been reported to us, but shall not include our reserves for losses that have been incurred but have not been reported to us.

SECTION 4     -     PREMIUM PAYMENTS AND PROGRAM TERMS

14

COMPLAINT 058

Billing Method

☒ Billing to
☐ *You* at *Your* address shown in the *Schedule*, or
☒ *Your* Representative at its address shown in the *Schedule*; or
☐ Automatic Withdrawal from the account described below.
    If Automatic Withdrawal Account applies:   Minimum Amount: $0
    Name of Depository Institution:
    Address:

    Account Number:

Incurred Loss Accounting Adjustments

The first Premium Plan Adjustment will take place as soon as practicable after the expiration date of the policies. The adjustment will be based on the rates shown in this document, audited exposures and loss information valued as of 6 months after policy expiration, subject to the minimums indicated within the terms of your insurance program. Thereafter, annual Ultimate Incurred Loss Plan adjustments will take place and continue until you and we agree in writing to perform no further recalculation.

Additional premium due us, or return premium due you, resulting from the adjustment, will be payable in its entirety within the time permitted by notice to you and subject to the terms of the Payment Agreement.

Specific Loss Development Factors

If we have agreed to use specific Loss Development Factors in determining Ultimate Losses, the following applies:

GRID of Loss Development Factors

| Valuation Date | Kind of Insurance | | | |
|---|---|---|---|---|
| | Workers Comp LDF's | General Liability LDF's | Auto Liability LDF's | LDF's |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

NOTE THAT:
We may apply a different table of LDF's that will enable us more accurately to estimate such final amount of *Loss* and *ALAE*, if during the term of the policies, a change occurs in the hazards insured against because of *Your* acquisition or disposition of a subsidiary, division or operation with assets at least equal to 20% of *your* assets on the effective date hereof, or the organization that provides claims service under the *Policies is changed*, or *Your retention/deductible/loss reimbursement limit* under any of the *Policies*, or any other change occurs which is likely to render the LDF's shown in the Grid ineffective as a tool for estimating with reasonable accuracy the amount of *Loss* and *ALAE* that we will pay because of accidents, occurrences, or offenses covered by the *Policies*.

# SECTION 5    -    IMPORTANT NOTES

Security Plan

15

COMPLAINT 059

Collateral

| Collateral on Hand (by Type) | Amount of Collateral | |
|---|---|---|
| Letter of Credit | $1,650,000 | |
| Escrow Fund | $0 | |
| | $ | |
| Estimated Gross Amounts of Collateral on Hand | $1,650,000 | |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Letter of Credit | $2,323,000 | 12/01/06 |
| Claims Payment Fund (Escrow) | $0 | 12/01/06 |
| | | |
| Total Additional Collateral Required | $2,323,000 | 12/01/06 |
| Estimated Gross Amount of Collateral Required | $3,973,000 | 12/01/06 |

**2. Financial Covenants, Tests, or Minimum Credit Ratings**

We may require additional collateral from *You* in the event of the following:

Credit Trigger:

If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or if S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity: N/A

Type of Debt Rated:  N/A

| Ratings at Effective Date | | |
|---|---|---|
| S&P | Moody's | Unsecured Exposure at Effective Date |
| A+ | Aa3 | |
| Potential Future Ratings | | |
| S&P | Moody's | Maximum Unsecured Exposure |
| AA- | Aa3 | |
| A | A1 | |
| A- | A2 | |
| BBB+ or below | A3 or Below | |

b. Other Financial Tests or Covenants:

Collateral Reviews

We will review our collateral requirement annually.  In addition, we may review our collateral requirement at any time that we may deem reasonably necessary. If as a result of any review we find that we require additional collateral, you will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof.  If a return of collateral to you is indicated, we will return  annually the indicated amount to you within 30 days of our written acknowledgement thereof.

COMPLAINT 060

# SECTION 5   -   IMPORTANT NOTES

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*. If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set For the above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Claims Fund Deposit and Adjustment

The amount of the initial deposit for the Claims Payment Fund has been determined on the basis of an analysis of your loss experience in prior years. The fund will initially equal 4 months of expected paid claims and Allocated Loss Adjustment Expenses. After the inception, if the total amount of claims paid exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, additional funds for the Claims Payment Deposit may be required.

NOTE: A sample of the required LOC wording *(exact wording mandatory)* is attached to this document.
Where indicated, security may be accumulated in four (4) equal quarterly automatic increments.

### Non-Depleting Cash Security

Cash posted by you will be placed in a pooled cash account. Based on an interest rate determined by us, we will credit interest earned on the daily cash balance, quarterly. This cash will not be utilized to pay for losses and expenses you incur. We will bill you on a monthly basis for the reimbursement of losses.

### Depleting Cash Security

Cash posted by you will be placed in a pooled cash account. Based on an interest rate determined by us, we will credit interest earned on the daily cash balance, quarterly. This cash will be utilized to pay for losses and expenses you incur. Should your funds fall below a predetermined amount, as determined by us, we will commence billing you monthly for reimbursement of losses and expenses.

### Collateral Trust

Cash will be invested in various securities, selected by you, in accordance with the applicable trust agreement, executed between you (Grantor), us (Beneficiary) and the bank (Escrow Agent). Our oversight fee charge for this arrangement will be between 7 and 10 basis points of the market value of the trust. The Escrow Agent may also ask you for a separate fee for their services. At our discretion, we will determine if this cash will, or will not, be utilized to pay for losses and expenses you incur.

17

COMPLAINT 061

# SECTION 5    -    IMPORTANT NOTES

### Documentation

By accepting this Casualty Insurance Program, the Insured agrees to provide AIG Risk Management with the correctly completed and signed documents as requested by AIG Risk Management:

- The Payment Agreement, including any Addendum(s), and Security required under any Premium Deferral Plan (when required), within 30 days of the inception date of the program.

- Per Florida statute, an Acord 130 application applying to Workers' Compensation coverage, fully *completed, executed and notarized* (applicable only to Florida coverage).

All documents requiring signature must be signed by a *corporate officer* of the Insured and in some instances, on behalf of Your Insurance Representative. All documents *must* be dated as of the inception date of the program.

Failure to execute any of the requisite documents within the time periods required will render the Financial Plan of your Casualty Insurance Program voidable at the discretion of AIG Risk Management. The entire amount of the "Estimated Cost" specified under the program will thereafter become immediately due and payable to us in cash. Failure to *pay premium within 5 Days of the billing date* may result in the exercise of various default remedies including, but not limited to, cancellation.

### As respects Automobile and General Liability

### POTENTIAL RESTRICTIONS OF TERRORISM COVERAGE

The Terrorism Risk Insurance Act of 2002 (TRIA) established a program (Terrorism Risk Insurance Program) within the United States Department of the Treasury, under which the Federal Government shares, with the insurance industry, the risk of loss from terrorist attacks. This Program is scheduled to terminate on December 31, 2005 unless extended by the Federal Government.

Your enclosed policy incepts while the Federal Program is still in effect, but prior to a decision by the Federal Government concerning extension of the Federal Program. If the Federal Government does not extend TRIA during the term of your policy, then the treatment of terrorism under your policy will change.

If you have *not* purchased TRIA coverage for the additional premium quoted, *two* (2) terrorism exclusion endorsements will be attached to your policy, so long as they have been approved by the applicable state regulatory office. If regulatory approval has not been granted for your applicable state neither endorsement is available for attachment:

- The first exclusion serves to identify that TRIA may terminate  during your policy period. If it does, the first exclusion will be replaced by the second exclusion.  If TRIA is not terminated, the first exclusion also serves to exclude coverage for terrorism as defined by TRIA.

- The second exclusion serves to eliminate coverage for acts of "terrorism" and will essentially read*:

18

COMPLAINT 062

# SECTION 5  -    IMPORTANT NOTES

This insurance does not apply to loss, injury, damage, claim or suit, arising directly or indirectly as a result of, in connection with, or relating to "terrorism" including but not limited to:

1. Any action taken in hindering or defending against an actual or expected incident of "terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage; and
2. Any contemporaneous or ensuing loss caused by explosion, fire, heat, vandalism, looting, theft, civil commotion, rebellion or insurrection.

However, this exclusion only applies if one or more of the following are attributable to an incident of "terrorism":

1. The total of damages and/or loss to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include the replacement cost, without deduction for depreciation, for all damage sustained by any property affected by the "terrorism" and business interruption losses sustained by owners or occupants of damaged property; or
2. Fifty or more persons sustain death or serious physical injury.  For the purposes of this provision, serious physical injury means:
   a. Physical injury that involves a substantial risk of death; or
   b. Protracted and obvious physical disfigurement; or
   c. Protracted loss of or impairment of the function of any bodily member or organ; or
3. The "terrorism" involves the actual, alleged or threatened use, release, escape, dispersal, application and or existence of:
   a. Any nuclear reaction;
   b. Radioactive materials or "nuclear materials" in any form and from any source;
   c. Radionuclides;
   d. Radiation emitted from any radioactive source whether natural or manmade; and/or
   e. Electromagnetic pulses; or
4. The "terrorism" involves the actual, alleged or threatened use, release, escape, dispersal and/or application of pathogenic or poisonous chemical or "biological" materials, whether natural, manmade, living or dead.

Multiple incidents of "terrorism" that occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership will be considered to be one incident.

This endorsement is subject to the approval of various states.  Attachment of such an endorsement would provide for a return of the unearned pro-rata portion of any charge for terrorism coverage that you paid to us calculated based upon the date the TRIA program terminates relative to the number of days remaining until your policy's natural expiration.

DEFINITIONS - The following definitions shall apply:

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection

19

## SECTION 5     -     IMPORTANT NOTES

with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

a. A government;
b. The civilian population of a country, state or community; or
c. To disrupt the economy of a country, state or community.

"Nuclear materials" means "source material," "special nuclear material" or "by-product material." "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Biological" materials includes all microorganisms, viruses, rickettsia, prions, nucleic acids, toxins, toxin-producing agents, and poisons produced by biological organisms.

*Actual endorsement wording may vary based on modifications required by the various state regulatory offices during their approval process.

Note as respects Workers Compensation

### TERRORISM RISK INSURANCE ACT

The provisions below address the requirements of the Terrorism Risk Insurance Act of 2002.

### DEFINITIONS

The definitions provided in below are based on the definitions in the Act and are intended to have the same meaning. If words or phrases not defined below are defined in the Act, the definitions in the Act will apply.

"Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments.

"Act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States as meeting all of the following requirements:

a.   The act is an act of terrorism.

b.   The act is violent or dangerous to human life, property or infrastructure.

c.   The act resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels.

d.   The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism or war loss" means any loss resulting from an act of terrorism (including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means:

20

COMPLAINT 064

# SECTION 5    -    IMPORTANT NOTES

a.  For the period beginning on November 26, 2002 and ending on December 31, 2002, an amount equal to 1% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding November 26, 2002.

b.  For the period beginning on January 1, 2003 and ending on December 31, 2003, an amount equal to 7% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2003.

c.  For the period beginning on January 1, 2004 and ending on December 31, 2004, an amount equal to 10% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2004.

d.  For the period beginning on January 1, 2005 and ending on December 31, 2005, an amount equal to 15% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2005.

## LIMITATION OF LIABILITY

The Act may limit our liability to you under your policy.  If annual aggregate insured terrorism or war losses of all insurers exceed $100,000,000,000 during the applicable period provided in the Act, and if we have met our insurer deductible, the amount we will pay for insured terrorism or war losses under your policy will be limited by the Act, as determined by the Secretary of the Treasury.

## POLICYHOLDER DISCLOSURE NOTICE

1.  Insured terrorism or war losses would be partially reimbursed by the United States Government under a formula established by the Act. Under this formula, the United States Government would pay 90% of our insured terrorism or war losses exceeding our insurer deductible.

2.  The additional premium charged for the coverage your policy will provide for insured terrorism or war losses will be shown in Item 4 of the Information Page of your policy or the Schedule below.

Schedule

| STATE | Rate per $100 of Remuneration (or premium determination method shown below) |
|---|---|
| Arizona .................................................................. | Rate per $100 of Remuneration in addition to rate included in Arizona premium as set forth below **. |
| Connecticut, New Jersey  and Wisconsin ............................. | Rate per $100 of Remuneration. |
| New York ............................................................... | Rate per $100 of Remuneration and rate applied to Total Classification Premium. |
| Kansas, Maine, New Hampshire and Virginia ...................... | Included in Rates applied to Premium Basis (Remuneration) for calculation of annual premium for each applicable classification of operations. |
| Alabama, Nevada and Tennessee....................................... | Rate per $100 of Remuneration in addition to charge included in rates applied to Premium Basis (Remuneration) for calculation of annual premium for each applicable classification of operations. |
| All Other States ....................................................... | Rate applied to Total Classification Premium. |

Th

21

COMPLAINT 065

## SECTION 5    -    IMPORTANT NOTES

e premium charged for the coverage your policy will provide for insured terrorism or war losses is included in your Total Estimated Premium and is an estimate. The final premium for this coverage will be determined after your policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by your policy.

### Estimated Premium Quoted in This Binder

The estimated premium(s) shown in this Binder is based on rates, and experience modifications (if applicable) in use at the time this Binder is submitted to you. The terms of the Casualty Insurance Program, our manuals of rules, classifications, rates and rating plan will determine the adjusted premium and surcharges (if any). All information required to conduct our adjustments are subject to verification and change.

### Estimated Taxes and Assessments Quotes in this Binder

Any references made in this Binder to taxes or tax rates or assessments are subject to change if such taxes or tax rates or assessments are changed or modified by the respective taxing authority (ies) prior to inception or following inception. You shall be obligated for any resulting increase that occurs.

### Premium Tax on Deductibles

If any state regulatory authority that mandates amounts which you have paid as deductible reimbursements are considered premium, and thus are subject to premium taxes and/or assessments makes any claim, we will notify you of the existence of such a claim. We will give you the opportunity of joining with us in any proceeding to contest such claim at your own expense, or to contest such claim independently at your own expense. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments, you will be responsible to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the Policies.

### Payment of Premium

Wire Transfers
The Broker will be sent a premium invoice for the insured and the insured will then forward the money to the broker who will then wire transfer the money, indicating what the payment is for, to our account:
CHASE MANHATTAN BANK, NEW YORK, N. Y.
    ABA NO. 021-000-021
    ACCOUNT NAME: NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.
    ACCOUNT NO. 323-160-387 Phone #: 1-877-204-1124
The broker is to notify AIG Global Energy Casualty the day the wire transfer is made so that we may notify our New York accounting department.

Express Mail: Premium Payments can be express mailed to the following address:
NATIONAL UNION SPECIAL BUSINESS (FUSION GROUP)
4 CHASE METROTECH CENTER, 7TH FLOOR EAST
LOCKBOX 10472
BROOKLYN, N. Y. 11245

22

COMPLAINT 066

# SECTION 5   -   IMPORTANT NOTES

### Premium Audit

Premium audits are required in all states covered under your Casualty Insurance Program. AIG Risk Management has a staff devoted to the professional auditing of our accounts. A lead auditor will be available to meet with you to set the parameters and timetable for the audit process. Records for audit purposes should be available at each location within 30 Days after the policy(ies) anniversary or expiration.

Any premium adjustment developed in the course of an audit of programs/plans that are subject to the terms of the Payment Agreement will be deferred until Plan Adjustment. Changes in the premium amount, based on the completed audits, of all other types of program/plans will be due within 30 *Days of the billing date*

Guaranteed cost programs/coverages or any other audit premiums will be due within 30 *Days* of billing.

### Acquisitions and Divestitures

With respect to any acquisitions or divestitures that represent a greater than 10% increase in exposure, AIG Risk Management may, at its discretion, require a program review. That review MAY result in a premium adjustment.

Your responsibility for the payment of "Allocated Loss Adjustment Expenses" is:

A   100% of the total "Allocated Loss Adjustment Expenses" up to the "Retained Limit". However, the most you are responsible for with respect to damages and/or indemnity and "Allocated Loss Adjustment Expenses" combined shall not exceed the "Retained Limit".

B   100% of the total "Allocated Loss Adjustment Expenses".

C   All or part of the "Allocated Loss Adjustment Expenses" determined according to the following:

If we incur NO obligation under the policy (ies) to pay damages resulting from a claim, you are responsible for all "Allocated Loss Adjustment Expenses" up to the applicable "Retained Limit" plus 100% of all remaining "Allocated Loss Adjustment Expenses".

If we DO incur an obligation under the policy(ies) to pay damages resulting from a claim, you will be responsible for a percentage of "Allocated Expense Adjustment Expenses". That percentage shall be determined by dividing the "Retained Limit" paid by the total damages paid subject to the Limits of Insurance.

D   No "Allocated Loss Adjustment Expenses".

23

COMPLAINT 067

# SECTION 6   -   GLOSSARY

### Aggregate Stop Amount

The maximum amount of benefits, damages and, if stipulated, Allocated Loss Adjustment Expense payable by you for losses under policies that are subject to your retention/deductible/loss reimbursement, and (if applicable) self-insured retention insurance plan.

### Aggregate Stop Limit

If shown in conjunction with the Aggregate Stop Amount, the Aggregate Stop Limit is the maximum amount of benefits, damages and, if stipulated, Allocated Loss Adjustment Expense that we will not require you to reimburse to us under your retention/deductible/loss reimbursement, and (if applicable) self-insured retention insurance plan.

### ALAE (Allocated Loss Adjustment Expense)

Loss adjustment expenses that are assignable or allocated to specific claims.   "Allocated Loss Expenses" or "*ALAE*" will include, but are not limited to, all fees for service of process and court costs and court expenses; pre- and post-judgement interest; attorney's fees; cost of undercover operative and detective services; costs of employing experts; costs for legal transcripts, copies of any public records and costs of depositions and court-reported or recorded statements; costs and expenses of subrogation; and any similar fee, cost or expense reasonably chargeable to the investigation, negotiation, settlement or defense of a loss or a claim or suit against you, or to the protection and perfection of either your or our subrogation rights.

ALAE will not include loss adjustment expenses explicitly included in the premium calculation formula or otherwise explicitly included in the rating values, nor the salary, employee benefits, or overhead of any of our employees, nor the fees of any attorney who is our employee or under our permanent retainer; nor the fees of any attorney we retain to provide counsel to us about our obligations, if any, under any policy issued by us or our affiliated companies, with respect to a claim or suit against you.

### ALIR System

Automobile Liability Insurance Reporting software system used for the reporting of required vehicle data to the various state DMV offices.

### Automatic Withdrawal

An insured funded account established to facilitate the carrier's payment of the insured's losses and ALAE within the insureds deductible layer.   The insured authorizes the insurer to make withdrawals as necessary and upon the insurer's demand from the account.   The insured is obligated to fund the account to cover expected losses and ALAE within the insured's retained/deductible layer.   The insured is responsible to replenish the account as necessary.

### Basis of Adjustment

Exposure (such as payroll) and factor (such as a rate) used to determine a specific number or amount.

### Claims Payment Deposit

The amount deposited into the Claims Payment Fund.

24

COMPLAINT 068

# SECTION 6    -    GLOSSARY

### Claims Payment Fund

"Claims Payment Fund" is a non-interest bearing escrow fund established in the amount of two and one half (2 ½) months' estimated Reimbursable Loss Plus Allocated Loss Expenses. The Claims Payment Fund is deposited with the Claims Administrator for the payment of claims. The Claims Payment Fund is an estimated amount, and it will be adjusted depending upon the actual claims paid. The prior four months' paid losses will be reviewed by the Company to determine a two and one-half (2 ½) month average.

### Claims Service Charges

Fees associated with the Third Party Administrator's handling of claims adjustment for a given account.

### Deductible

The amount of any damages or benefits arising out of any single accident, occurrence, claim or suit, paid or payable by you and which is not included in the computation of the *Subject Premium*.

### Deferred Expense Provision

Is an estimated amount of expenses that you must pay as shown in the Schedule of Policies and Premiums to the Payment Agreement.

### Deferred Loss Provision

Is the estimated amount you must pay us as regular (usually billed monthly) loss payments and sizable loss payments as described in the Schedule of Policies and Premiums to the Payment Agreement.

### DMV

Department of Motor Vehicles.

### Estimated Deferred Amounts

Estimate of the Deferred Loss Provision and Deferred Expense Provision shown in the Schedule of Policies and Premiums to the Payment Agreement.

### Estimated Cost

All costs and amounts set out in the binder are considered estimated amounts subject to change prior to program binding and in the case of adjustable programs post program inception. Tax amounts quoted through out the binder are estimated and subject to change based on revised tax rates and additional assessments that come due during the policy period.

### Experience Modifications

A factor to adjust the premium in anticipation of loss experience that is expected to vary from the provision for losses in the rates. It is based upon the past variance of experience from expected experience.

### FEIN numbers

Federal Employer Identification number.

25

# SECTION 6    -    GLOSSARY

### Guaranteed Cost Policies

Policies of insurance under which premium is charged on a prospective basis without adjustment for loss experience during the policy period.

### Incurred Loss Conversion

Amendment of a program from one in which you are reimbursing us for loss and expense actually paid out, to a program in which you are paying loss and expense actually paid out, but also for reserve amounts established on pending claim activity.

### Insured States

States that are covered by insurance

### Loss Conversion Factor

Are factors used in the retention rating formula that provide a charge to cover the cost of the insurer's claims service fee.

### Loss Development Factors

Loss Development Factors shall mean those factors promulgated by the Company from time to time which are applied to Incurred Loss(es) to project Outstanding Loss Reserves and Allocated Loss Expense Reserves to ultimate and contain a reserve for IBNR.

### Loss Reimbursement Limit

The portion of any loss and ALAE we pay that you must reimburse us for under any "Loss Reimbursement" provisions of a Policy.

### LRRP endorsement

LRRP (Large Risk Rating Plan) is RMG's version of the NCCI/ISO Large Risk Alternative Rating Option. The LRRP endorsement moves the adjustment process from the individual policies to the overall program adjustment and moves expenses among different lines of insurance.

### Maximum Cost

The maximum amount that you must pay for the Subject Premium, and if applicable, non-subject premium, Self-Insured losses and ALAE.

### Maximum Insurance Cost

Subject, non-subject and deductible reimbursements and surcharges and special taxes.

### Maximum Premium

Largest amount that the subject premium can attain.

### Minimum Cost

The minimum amount that you must pay for the Subject Premium, and if applicable, non-subject premium, Self-Insured losses and ALAE.

# SECTION 6    -    GLOSSARY

### Monopolistic States

26

COMPLAINT 070

Those states where employers must obtain workers compensation insurance from compulsory state funds or qualify as a self-insurer. North Dakota, Ohio, Washington, West Virginia and Wyoming (for certain codes only) are monopolistic states.

### Non-Ratable

A type of charge, especially in workers compensation rating, that is based on a catastrophic type exposure and is thus excluded from ordinary rate-making and is also not subject to experience rating and retrospective rating.

### Non-Subject Premium

All other premium under a policy that is not subject to adjustment on the basis of loss adjustment.

### Plan Adjustment

Recalculation of the estimated premium from policy inception based on audited exposures and factors shown in the binder, plus losses and expenses, where applicable.

### Paid Loss adjustments

Recalculation of the estimated premium based on audited exposures and factors shown in the binder, plus the difference between losses and expenses you have paid to date and the losses and expenses paid by us as of the loss and expense evaluation date used in the Paid Loss Adjustment.

### Paid Losses

Losses paid under the insurance program as they become due.

### Premium Deferral Plan

Plan under which the insured and insurer agree to defer the insurance program premium over the course of the policy period. The Plan is set out in the schedule to the payment agreement and the insured is obligated to provide collateral to secure for the deferred payment plan.

### Premium Discount

A discount granted to reflect expense savings relative to the size of the standard premium.

### Retention

The amount of any damages or benefits arising out of any single accident, occurrence, claim or suit, paid or payable by you and which is included in the computation of the *Subject Premium*.

### Self-Insured Retention

A specific amount the insured retains as its obligation for a covered loss. It is the insured providing primary insurance over which the carrier provides excess coverage. Unlike a Deductible, the insurer is not obligated to pay the insured's SIR and then seek reimbursement form the insured. The insured is directly responsible to the claimant for the amount of the SIR.

### Self Insured States

Those states in which you, the insured, are providing the primary layer of insurance.

## SECTION 6  -  GLOSSARY

### Sizable Loss Payments

A set amount shown in the Payment Agreement schedule for which the insured will be obligated to reimburse us following our payment of any Loss and ALAE within the insured's retention.

27

### Stacking

Refers to a condition allowed in some states that permits you to add the policy limits of other vehicles covered by you, either on the same policy (interpolicy) or from other policies (intrepolicy), and recover the sum of these limits.

### Standard Premium

Premium based upon the exposure rates and increase limit factors, but without application of premium discount or deductible discounts.

### Stop Gap Liability

Provides Employers Liability coverage for those states where employers must obtain statutory workers compensation insurance from a compulsory state fund.

### Subject Premium

"Subject Premium" is the portion of the Gross Program Premium subject to adjustments in accordance with the adjustment formula shown in this Binder.  At the commencement of the program, it is the amount stated on the Pricing Page.

### Texas Premium Discount

Premium discounts on automobile policies with premiums in excess of $5,000.  These discounts are set when the policy is issued and cannot be changed until an audit of the policy is completed.

### UAIN

Unemployment Account Identification Number

### Ultimate Incurred Loss Plan

Loss Sensitive program in which you are paying, in advance of actual loss dollar payment, for the ultimate cost of expected losses and expenses that will occur during the policy period.

### Ultimate Losses

Paid losses and expense dollars, and reserve loss and expense dollars developed using  Loss Development Factor(s) to establish the maximum expected  total loss and expense amount.

### UM/UIM/PIP

Uninsured Motorist Coverage, Underinsured Motorist Coverage and Personal Injury Protection.  All three are specific coverage available under a Business Auto, Truckers' or Garage Liability Policy.  UM and UIM coverage provides an insured with bodily injury (and in some states, property damage) coverage from its own carrier as if collecting from the tortfessor's carrier.  PIP is a statutorily provided coverage that has insurers provide first party benefits for medical expenses, loss of income, funeral expenses and such without regard to fault.

### Valuation Date

The cut off date for adjustments made to paid claims and reserve estimates in a loss report.

# SECTION 7     -     AIG CLAIM SERVICE

**AIG Claim Services, Inc.**

### OVERVIEW

Mitch Harless, located in our Houston Office and can be reached at 713-268-8764, is our Energy Claims Specialists who acts as Liaison for us with AIGCS on all Energy Claim issues.

28

COMPLAINT 072

AIG Claim Services, Inc. (AIGCS) was established in 1977 for American International Group, Inc.'s domestic companies. Since then, our expertise and expansion have grown along with our parent company.

AIGCS manages claims with two guiding principles: reduce our customer's total cost of risk and provide superior service to our customers. We have 2,400 claims professionals managing more than 100,000 property & casualty and 240,000 workers' compensation claims annually. Our teams of technical, medical, and litigation professionals work to provide efficient, cost-effective claims handling. We also offer leading-edge information systems technology that allows our clients to manage their claims programs and reduce costs.

AIGCS' focus on cutting our client's cost of risk while offering superior customer service, along with our specialized claims management model, distinguishes us from our competitors.

## ACCOUNT MANAGEMENT

Director of National Accounts
The primary role of the Director of National Accounts (DNA) is to ensure that AIGCS satisfies the claims service requirements regarding claims management, managed care, and all other insurance services. Our DNAs continually work with our customers to identify business process improvements to fit their individual needs.

ACCOUNT COORDINATION TEAM
The goal of the Account Coordination Team is to support the DNA and provide proactive customer service by educating, training and communicating with our customers.

Special Account Instructions
During AIGCS' initial claims setup meeting, we establish Special Account Instructions to provide information to claim specialists regarding the custom claims management, reporting, and threshold requirements of the customer. All service centers managing claims are trained on their specific customers' Special Account Instructions.

## STAFFING

The AIGCS staffing model designates individual claim specialists within units to service their customer's account. All claim specialists are appropriately licensed in the jurisdictions that require such licensure. Our staff ratio is one supervisor for every six technical claim specialists.

## CLAIMS REPORTING

AIGCS Early Notice[b]
AIGCS Early Notice (AIGCS EN) is our toll-free telephonic claims reporting system. Operational 24-hours a day, seven days a week, this service allows claimants to report catastrophic losses or severe injuries immediately, ensuring our instantaneous response at all times. Claims are electronically sent to the appropriate AIGCS handling office, typically within an hour of the completion of the call.

IntelliRisk[b] First Notice of Loss
AIGCS also offers its customers the IntelliRisk First Notice of Loss (FNL) system for reporting claims through the Internet. The FNL service allows registered customers to report claims directly to AIGCS over the Internet - 24 hours a day, seven days a week.

# SECTION 7    -    AIG CLAIM SERVICE

 **Claim Services, Inc.**

CLAIMS MANAGEMENT

29

AIGCS' national network of workers' compensation and property & casualty service centers is structured around two claims processing hubs, located in Alpharetta, GA and Overland Park, KS. These hub offices are supported by nationwide service centers. We have implemented a dynamic document management system called iClaims, which electronically scans and routes all claims documents to the appropriate claim specialist. iClaims is integrated with our workers' compensation and property and casualty claims management system. All new claims are handled in this paperless claim environment.

Our model provides our service center managers great flexibility, allowing them to modify their structures into teams of experts configured around particular industry types (manufacturing, transportation, etc.) or size of account. Our highly trained technicians are specialists in their respective disciplines. Our specialized approach ensures that all cases, from the simplest medical to the most complex catastrophe, receive the focused care and attention needed for prompt and proper disposition.

Our unit managers (supervisors) do not carry a caseload. They assign and monitor claims and provide mentoring for their staffs.

### RESERVING/SETTLEMENT

We evaluate and set reserves based on the specific risks of the client's program. Our philosophy is to reserve for "probable ultimate cost": the probable cost of case disposition based on the present investigative and technical evaluation of the specific exposure presented.

### INVESTIGATION

Our in-house Investigative Services Division (ISD) encompasses a nationwide staff of over 100 claim investigators strategically located throughout the United States. Our ISD staff has been carefully selected and trained to work in partnership with our claim specialists.

All claims are scanned and reviewed for indicators of suspicious activity. Any potentially suspicious claims are then referred to AIG World Investigative Resources (AIG WIR), our fraud investigations department. When fraud is discovered, AIG WIR will prosecute to the extent allowable by law. They will also follow up for restitution whenever it is feasible. Similarly, all claims that present a high financial exposure are promptly investigated.

### LITIGATION MANAGEMENT

AIG's Litigation Management Program prescribes policies and procedures with which all counsel must comply. Our guidelines encourage aggressive, cost-effective file handling without sacrificing indemnity payments. All attorneys handling AIGCS files are required to follow these guidelines in all property, casualty and workers' compensation matters.

Our program is comprised of:

- Staff Counsel - more than 160 attorneys with experience defending all areas of negligence law
- Panel Counsel - a nationwide network of approved attorneys
- Claims Counsel - technical and strategic advisors in our property & casualty offices
- Hearing Representatives - used in Texas, California and Kentucky as part of our legal expense reduction initiative

# SECTION 7    -    AIG CLAIM SERVICE

 Claim Services, Inc.

### MEDICAL MANAGEMENT

The success of our cost containment program is based on the joint efforts of our technical and medical staff. AIGCS' medical management division is an integral part of our claims operation.

Features of our medical management program include:

30

COMPLAINT 074

- Telephonic Case Management
- Field Based Case Management
- Online Medical Provider Listing
- Pre-Injury Management Program
- Preferred Provider Organizations
- Utilization Review
- Medical Bill Review
- Prescription Drug Program

### RISK MANAGEMENT INFORMATION SYSTEMS

Our Risk Management Information Services (RMIS) Division provides a valuable source of claims information solutions for today's demanding risk management concerns. Through our suite of IntelliRisk® e-Services and the support of our designated business and technology professionals, we help the policyholders of AIG member companies manage their claims program and reduce costs.

Our suite of IntelliRisk e-Services includes:

IntelliRisk NetSource[D] - Our Internet-based online claim analysis and reporting system provides real-time claim, payment and adjuster activity information for companies of all types and sizes.

IntelliRisk NetData[9] - Our online loss report distribution service "pushes" an electronic version of the loss report as a file attachment to an e-mail or onto CD-ROM. NetData can also send data via File Transfer Protocol, tape, cartridge or diskette.

IntelliRisk® First Notice of Loss (FNL) - Our online claims reporting service allows customers to report workers' compensation and property & casualty claims anytime, from any Internet-linked desktop.

IntelliRisk® Medical Provider Listing (MPL) - Our online directory provides easy, fully searchable access to information on nearby network doctors, hospitals, or specialists.

AIG Claim Services, Inc. is a member company of American International Group, Inc.

31

## SECTION 8     -     AIG LOSS CONSULTANTS

 **AIG Consultants, Inc.**

A Member Company of American International Group, Inc.

### Executive Summary

George Strapulos, located in our Houston Office and can be reached at 713-268-8836, is our Energy Loss Control Manager who acts as Liaison for us with AIG Consultants on all Energy Loss Control issues.

AIG Consultants, Inc.®, (AIGC), a member company of American International Group, Inc., provides comprehensive safety, healthcare, environmental, and property loss control services and crisis management services. AIGC has been providing clients with quality service for over two decades. AIGC provides professional services that not only meet, but exceed your company's quality performance expectations. In today's competitive business environment, insurance costs due to employee or third party injury is a critical issue for every organization. AIGC provides effective strategies for controlling and managing loss costs associated with accidents and liability incidents. Through Best Practices comparative analysis, AIGC focuses on the cause of loss and develops intervention strategies based on the needs of the account. These services provide practical business solutions for loss exposures identified within your organization.

Our services are consultative in nature and focus on loss drivers and your specific needs. To begin, we conduct an analysis of past losses in order to identify primary loss types and sources responsible for frequency and severity loss issues. This, combined with an evaluation of your organization, facilities and loss potential, is used to prioritize critical issues that drive, or have the potential to drive, the majority of claims and/or costs. The following key planning elements are offered for your review and consideration:

- From a workers compensation standpoint, it is imperative that we focus on managing your loss costs. Historically, losses in this type of industry result in sprains and strains, vehicle accidents, forklift accidents, and slips and falls. A risk assessment of the company programs to reduce these types of losses will be done. In addition to the corporate program assessments, onsite evaluations will be determined based on experience from a frequency and severity standpoint with recommendations generated in areas where deficiencies may be noted.
- Loss Control efforts will focus on fleet safety evaluations and controls. This will include evaluations of fleet policies and procedures, driver qualifications, driver training, MVR checks, MVR grading, vehicle replacement policies, tire programs, vehicle inspections, maintenance programs and record-keeping, driver logs, accident investigations, etc.
- From a general liability standpoint, loss control evaluations will focus on the premises exposures and life safety issues. Areas of concentration will be on slips/trips/falls, emergency planning, crisis management, access and egress, employee training, incident investigations and products liability.
- "Safety Videos" of your choice in Spanish or English can be provided to you free of charge from a library of over 450 titles. Subject matter includes Fleet Safety, Back Injury Prevention/Safe Lifting, Bloodborne Pathogens, Chemical Hazards, Emergency Preparedness, Ergonomics, Forklift Safety, Human Resources, Personal Protection, Supervisory Training, Lockout/Tagout, and many other subjects.
- A "Threat & Vulnerability Risk Assessment" will be provided evaluating key exposures to Vulnerability, Corporate Security Planning, Physical Security, Personnel Security, Training, Services, Location, and Industry, Sabotage & Terrorism, Incident Command and Control, Workplace Violence, Employee Inventory, Incident /Evacuation Drills, Natural Disasters, and Chemical/Bio-terrorism.
- Additional key services can be utilized as required to provide business solutions to issues including Slip and Fall Evaluations, Industrial Hygiene Surveys, Regulatory Audits, Return to Work Programs, Safety Accountability and Incentive Programs, Behavioral Safety, Fleet Training (on line and in person), and many other services. Please call us for additional information.

*Note:* The charge for AIGC has been included in your program.

## SECTION 9     -     ATTACHMENTS

32

COMPLAINT 076

LETTER OF CREDIT SAMPLE WORDING

BANK NAME

Page 1 of 2

<u>FOR INTERNAL IDENTIFICATION</u>
<u>PURPOSES ONLY</u>

OUR NO.: _____ OTHER_____

APPLICANT: _____

ISSUE DATE: _____

IRREVOCABLE LETTER OF CREDIT NO. _____

TO:
National Union Fire Insurance Co. of Pittsburgh, PA, and
American Home Assurance Company, and
American International Specialty Lines Insurance Company, and
The Insurance Company of the State of Pennsylvania, and
Commerce and Industry Insurance Company, and
AIU Insurance Company, and
Birmingham Fire Insurance Company of Pennsylvania, and
Illinois National Insurance Company, and
American International South Insurance Company, and
National Union Fire Insurance Company of Louisiana, and
American International Pacific Insurance Company, and
Granite State Insurance Company, and
New Hampshire Insurance Company, and
Lexington Insurance Company, and
Landmark Insurance Company, and
Starr Excess Liability Insurance Company Limited,

P.O. Box 923
Wall Street Station
New York, N.Y. 10268
Attn: Mr. Art Stillwell

WE HEREBY ESTABLISH THIS IRREVOCABLE LETTER OF CREDIT IN FAVOR OF THE AFORESAID ADDRESSEES (EACH, THE "BENEFICIARY") FOR DRAWINGS UP TO UNITED STATES DOLLARS ( <u>AMOUNT IN WORDS</u> ) EFFECTIVE IMMEDIATELY. THIS LETTER OF CREDIT IS ISSUED, PRESENTABLE AND PAYABLE AT OUR OFFICE AT (<u>ISSUING BANK'S ADDRESS</u>) AND EXPIRES WITH OUR CLOSE OF BUSINESS ON , 20 .THE TERM "BENEFICIARY" INCLUDES ANY SUCCESSOR BY OPERATION OF LAW OF EACH NAMED BENEFICIARY, INCLUDING, WITHOUT LIMITATION, ANY LIQUIDATOR, REHABILITATOR, RECEIVER OR CONSERVATOR.

WE HEREBY UNDERTAKE TO PROMPTLY HONOR YOUR SIGHT DRAFT(S) DRAWN ON US, INDICATING OUR CREDIT NO. _____, FOR ALL OR PART OF THIS CREDIT IF PRESENTED AT OUR OFFICE SPECIFIED IN PARAGRAPH ONE ON OR BEFORE THE EXPIRY DATE OR ANY

<u>SECTION 9</u>    -    <u>ATTACHMENTS</u>

33

LETTER OF CREDIT SAMPLE WORDING (Continued)

Page 2 of 2

AUTOMATICALLY EXTENDED EXPIRY DATE. ANY ONE BENEFICIARY OR COMBINATION OF BENEFICIARIES, ACTING INDIVIDUALLY OR COLLECTIVELY, MAY DRAW ON THIS LETTER OF CREDIT IN FULL OR IN PART, AND ANY ACTION TAKEN BY ANY OR ALL BENEFICIARIES HEREUNDER SHALL BIND EACH OF THEM.

EXCEPT AS EXPRESSLY STATED HEREIN, THIS UNDERTAKING IS NOT SUBJECT TO ANY AGREEMENT, CONDITION OR QUALIFICATION. THE OBLIGATION OF (ISSUING BANK) UNDER THIS LETTER OF CREDIT IS THE INDIVIDUAL OBLIGATION OF (ISSUING BANK), AND IS IN NO WAY CONTINGENT UPON REIMBURSEMENT WITH RESPECT THERETO.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ONE YEAR FROM THE EXPIRY DATE HEREOF, OR ANY FUTURE EXPIRATION DATE, UNLESS AT LEAST THIRTY DAYS PRIOR TO ANY EXPIRATION DATE WE NOTIFY YOU BY REGISTERED MAIL THAT WE ELECT NOT TO CONSIDER THIS LETTER OF CREDIT RENEWED FOR ANY SUCH ADDITIONAL PERIOD.

THIS LETTER OF CREDIT IS SUBJECT TO AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, AND THE 1993 REVISION OF THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS OF THE INTERNATIONAL CHAMBER OF COMMERCE (PUBLICATION 500) AND, IN THE EVENT OF ANY CONFLICT, THE LAWS OF THE STATE OF NEW YORK WILL CONTROL. IF THIS CREDIT EXPIRES DURING AN INTERRUPTION OF BUSINESS AS DESCRIBED IN ARTICLE 17 OF SAID PUBLICATION 500, THE BANK HEREBY SPECIFICALLY AGREES TO EFFECT PAYMENT IF THIS CREDIT IS DRAWN AGAINST WITHIN THIRTY (30) DAYS AFTER THE RESUMPTION OF BUSINESS.

VERY TRULY YOURS,

ISSUING BANK

COMMISSION

AGENCY
Acordia of WV

34

COMPLAINT 078

AGENCY ACCOUNT CODE
11657

ACCOUNT

**THE UNITED COMPANY**

Commission

Worker's Compensation        9%

Commission is payable:

Commissions if applicable will be paid as Company receives payment.

Unless otherwise indicated, Final adjustment of commission will take place after collection of Final Audit(s) or, if applicable, at the time of the first Plan Adjustment. In the event of the Final Audit(s) resulting in a return to the insured, you shall be obligated to return the appropriate portion of your commission as represented in such return.

Payment Of Counter Signature Fees ( If Any) Shall Be The Responsibility Of The Agency.

35

COMPLAINT 079

# EXHIBIT D

# Insurance Program Policy Kit

prepared for:



## The United Company

**Date Prepared: January 19, 2007**

presented by:

Acordia

Glenn McQuate, CPCU, ARM
Senior Vice President
276.619.6055
glenn_mcquate@acordia.com

This document was prepared for your convenience in reviewing the protection afforded by your insurance policies. Policies issued are based upon risk information supplied by you. These general descriptions are not intended to represent, supersede, or amend the actual terms, conditions, exclusions, or other provisions of insurance contracts. For full details, reference should be made to the specific policies involved. We remain available to discuss any additional coverages or increased limits you deem necessary.

**Acordia Confidential. © 2006 Acordia, Inc. All rights reserved.**



320 Federal Street, P.O. Box 1439 (ZIP 24701), Bluefield, WV 24701

COMPLAINT 081

# TABLE OF CONTENTS

INTRODUCTION..................................................................................1
   Overview........................................................................................1
   Insurance Coverages......................................................................1
   Supplemental Information ..............................................................1

NOTIFICATION GUIDELINES ..........................................................2
   Claims and Occurrence Reporting.................................................2
   Property Acquisition and Changes .................................................2
   Business Operation Changes .........................................................2

GLOSSARY OF TERMS ....................................................................3
   First Named Insured.......................................................................3
   Coinsurance ...................................................................................3
   Occurrence Form Liability...............................................................3
   Claims Made Liability .....................................................................3
   Exclusions......................................................................................3
   Surplus Lines Company..................................................................3

NAMED INSURED DISPLAY .............................................................4

IMPORTANT NOTICES ......................................................................6
   Third-Party Liability Responsibility.................................................6
   Legal Responsibility for Employees of Others................................6
   Premium Audit................................................................................6
   Certificates of Insurance ................................................................6
   Indemnification Agreements...........................................................6
   Additional Insureds........................................................................7

THE UNITED COMPANY'S INSURANCE PROGRAM INDEX .............8
   Workers Compensation..................................................................9

SUPPLEMENTAL INFORMATION.....................................................11



COMPLAINT 082

# INTRODUCTION

This Insurance Program Policy Kit has been prepared for *The United Company* to provide a single repository for your insurance policies and insurance program management information.

## Overview

The names and telephone numbers of your **Account Team** have been included for your convenience. The **Notification Guidelines** serve as a reminder to you of certain events in your operation that require you to notify a member of your Account Team. The **Glossary of Terms** provides a brief description of certain insurance terms you may encounter in your policies or in the Coverage Descriptions. **Insurance Coverages**

The Insurance Coverages section contains your policies and related information. The **Important Notices** section contains optional information that may be valuable in the day-to-day management of your business operations. An **Insurance Program Index** precedes the individual policies. If any of your policies contain additional named insureds, a **Named Insured Display** is included. **Coverage Descriptions** *highlighting* the coverage amounts, deductibles, major exclusions and special conditions accompany each policy.

## Supplemental Information

The **Supplemental Information** section may be used to organize certificates, correspondence, binders, claim notices, etc.

If you have any questions regarding your Insurance Program or require claims or loss control service, do not hesitate to contact us.

Main Telephone Number ..............................304.327.3421
Fax Number ...................................................304.325.8443

Written correspondence should be sent to:
320 Federal Street, P.O. Box 1439, Bluefield, WV 24701



1

# NOTIFICATION GUIDELINES

Certain events may occur in your operation that require you to notify a member of your Account Team. Although there are many events that may impact your Insurance Program, we have included the following as a guide. Should any other event or change occur which you believe may impact your Insurance Program, *immediately* notify a member of your Account Team.

## Claims and Occurrence Reporting

*Any event* which causes injury or damage to any person or property or which could give rise to an allegation that injury or loss has occurred *should be reported immediately* to a member of your Acordia Account Team. **Failure to do so may jeopardize your coverage or the ability of your insurance company to defend you at a future date.**

## Property Acquisition and Changes

- Purchasing, leasing, or occupying new buildings or premises
- Acquisition of new property, vehicles, machines, etc.
- Additions or improvements in present structures
- Improvements in buildings you do not own
- Sale of a building
- Improvements in fire or theft protection
- Change in occupancy at any location
- Vacant or unoccupied structure for 30 days or more
- Large increase or decrease in inventory
- Larger amounts of money and securities on or off your premises
- Change in employee responsibility, which may affect your employee fidelity bond

## Business Operation Changes

- New operations not related to your present business
- Purchase of another business
- Formation or acquisition of any new corporation, partnership, trade name, joint ventures, etc.
- Any increase in hazard of which you are aware
- New contracts or purchase orders under which you may assume liability for another
- Dependence upon a single supplier or leader property



COMPLAINT 084

# GLOSSARY OF TERMS

As you review your proposed Insurance Program, you may encounter some of the following terms. We will be glad to discuss any terminology requiring further explanation.

## First Named Insured

Many policies provide coverage for more than one insured. In that case, certain rights and responsibilities are granted to the First Named Insured. The First Named Insured is: (1) responsible for the payment of premiums, (2) authorized to request changes in the policy terms with the company's consent, (3) the only insured authorized to cancel the policy, and (4) the only insured designated to receive a notice of cancellation issued by the company.

## Coinsurance

Many property and marine policies contain a coinsurance provision. These policies, in return for a reduced rate, require the insured to carry insurance equal to a certain percentage of the property's value, usually 80, 90 or 100%. Failure to carry the required amount can result in a penalty in the event of a loss. Under certain circumstances, the coinsurance clause may be inapplicable due to state statutes.

## Occurrence Form Liability

An Occurrence Form is a liability coverage form that responds to covered losses that result from occurrences during the policy period regardless of when the claim or demand for damages is presented, even if the policy has expired.

## Claims Made Liability

A Claims Made Form is a liability coverage form that responds to covered losses for which a claim or demand for payment is presented during the policy period regardless of when the injury or damage occurred. There is no coverage for claims reported after the expiration or cancellation date unless an extended reporting period is purchased.

## Exclusions

Prominent causes of loss for which there is no coverage under the policy are referred to as exclusions. Exclusions are usually present in all policies because the cause of loss is: (1) catastrophic in nature, (2) not contemplated by the premium charged, or (3) more specifically insured under another policy. Please refer to the policies themselves for a complete list of exclusions, which we will be glad to discuss with you upon request.

## Surplus Lines Company

A surplus lines company is used to provide coverage or terms not available in the standard market. They are not licensed by your state and are not covered by guaranty funds. They are not under the regulation and control of the state insurance department. *Surplus lines companies used in our Policy Kit will be designated as such on the Insurance Program Index page.* We will provide the A.M. Best rating of any company used in our Policy Kit upon request.



3

COMPLAINT 085

## NAMED INSURED DISPLAY

The Named Insured Display lists all named insureds and the policies under which each is named. **Only those insureds shown are afforded coverage under your policy(ies) for which they are indicated.** Immediately notify a member of your Account Team if any other individuals, partnerships, organizations, joint ventures, etc. require insurance coverage, or if any are formed or acquired during the policy term.

|  | Worker's Compensation |
|---|:---:|
| The United Company | X |
| United Coal Co., LLC | X |
| Wellmore Coal Co. | X |
| Wellmore Coal Co., LLC | X |
| Banner Blue Coal Co. | X |
| The Banner Co. | X |
| Hokie Mining Co., Inc. | X |
| Access Coal Co. | X |
| Highwall Energy Co. | X |
| Surface Minerals Co. | X |
| Hilltop Energy Corp. | X |
| Patrick Coal Corp. | X |
| The Black Diamond Co. | X |
| Norton Coal Co., LLC | X |
| United Coal Support Services, LLC | X |
| Wellmore Energy Co., LLC | X |
| Sapphire Coal Co. | X |
| United Coal Handling, LLC | X |
| Kentar Energy Co. | X |
| Black Diamond Coal Co., LLC | X |
| Largso Resources, Inc. | X |
| Compac, Inc. | X |



4

## NAMED INSURED DISPLAY...*CONTINUED*

| | Worker's Compensation |
|---|---|
| Black Watch Coal Co., LLC | X |
| Mountain Empire Energy Co. | X |
| United Equipment Leasing Co. | X |
| United Underground Management, LLC | X |
| North Star One, LLC | X |



5

## IMPORTANT NOTICES

### Third-Party Liability Responsibility

Governing law may hold you responsible for injuries or damages to third parties caused by actions of independent contractors, subcontractors, or service providers. Make sure all entities performing work for you or on your premises furnish you with Certificates of Insurance as evidence of their General Liability insurance. Certificates are provided without cost by insurers through their agents. You should keep these certificates on file.

### Legal Responsibility for Employees of Others

Governing law may hold you responsible for injuries to employees of independent contractors, subcontractors, or service providers working for you, on your behalf, or on your premises. Be sure to obtain Certificates of Insurance confirming they have Workers Compensation insurance. Certificates are provided without cost by insurers through their agents. You should keep these certificates on file.

### Premium Audit

Some rating classifications shown on your policy(ies) may be based on an estimate of the exposures you will have during the policy period. If your actual exposures are not properly described by these classifications, the proper classifications, rates, and premium basis may be changed by endorsement to or upon audit of the policy(ies). An audit may result in additional or return premium.

### Certificates of Insurance

The purpose of a Certificate of Insurance is to provide evidence to an interested third party that insurance is in force at the time of issuance. It is not a contract between the holder and the insurer and conveys no rights to the holder. When requested, we will issue Certificates of Insurance on your behalf at no charge; however, alterations to Certificates of Insurance may require prior approval of the insurance company, and any required amendments to your coverage may result in additional premium.

### Indemnification Agreements

In the course of conducting business, you may sign contracts, leases or agreements in which you assume obligations and/or liabilities of others. In some cases, you may assume responsibility for damages not covered by your insurance policy(ies). We recommend that your legal counsel review all contracts and insurance policies and advise us when changes are necessary.



6

## IMPORTANT NOTICES...*CONTINUED*

**Additional Insureds**

When you provide products or services to another, in addition to requesting a Certificate of Insurance, your client or customer may request that they be named as an Additional Insured on your insurance policy(ies). While this may be possible with the approval of your insurance company (and in some cases, the payment of an additional premium), you should consider the following when doing so:

> ➤ Your policy limits are shared with other entities, and claims will reduce or exhaust your aggregates
>
> ➤ You may provide higher limits than required by contract since your full policy limits are available to the Additional Insured
>
> ➤ There may be conflicts in defense when an insurer has to defend both you and the Additional Insured

Consult with your legal counsel and consider these ramifications prior to signing agreements that require you to provide insurance to another entity.



COMPLAINT 089

# THE UNITED COMPANY'S INSURANCE PROGRAM INDEX

The Insurance Program Index page lists each individual policy and references its specific tab number location. It also displays other policy-related information.

| TAB | COVERAGE | INSURANCE COMPANY POLICY NUMBER EXPIRATION DATE | ANNUAL PREMIUM AT INCEPTION |
|---|---|---|---|
| 1 | Workers Compensation Policy | A.I. South Ins. Co. WC7209431 11/1/07 | $1,383,416.00 |
| | | TOTAL | $1,383,416.00 |

**Disclaimer and Notice**

This Insurance Program Policy Kit serves only as a highlight of coverages contained in your insurance policies. It is not intended to replace, supersede, or amend the policies or the coverages and exclusions contained therein. Policy language controls the coverage provided.

We will be available to address any questions you may have. Questions regarding policy interpretation will be referred to your insurance company.



8

COMPLAINT 090

## COVERAGE DESCRIPTION
## WORKERS COMPENSATION

| | |
|---|---|
| First Named Insured: | **THE UNITED COMPANY** |
| Insurer: | A.I. South Insurance Company |
| Term: | 11/1/06 - 11/1/07 |
| Policy No: | WC7209431 |
| Premium: | $1,383,416.00 |

**Coverage/Amounts:**

*Part One–Workers Compensation*
Provides statutory benefits as required by the state(s) of VA & KY.

*Part Two–Employers Liability*
$ 1,000,000   Bodily Injury by Accident/Each Accident
$ 1,000,000   Bodily Injury by Disease/Policy Limit
$ 1,000,000   Bodily Injury by Disease/Each Employee

Covers sums which you become legally liable to pay as damages arising out of bodily injury sustained by an employee in the course of employment.

*Part Three–Other States Insurance*
Applies to states, other than those listed under *Part One* and the monopolistic states, in which you begin work *after* the effective date.

**Premium Basis:**

The following classifications are an estimate of the exposures you will have during the policy period. If your actual exposures are not properly described by these classifications, the proper classes, rates, and premium bases may be adjusted upon audit of the policy. The audit may result in additional or return premium.

| State | Classification | Payroll | Rate | Unmodified Premium ($) |
|---|---|---|---|---|
| VA & KY | Work Comp Deductible Program | $18,725,801 | $5.57 | $1,043,027 |
| VA & KY | Work Comp Aggregate Stop | $18,725,801 | $1.154 | $216,096 |

*This description does not contain complete insurance coverage details.*
Acordia Confidential. © 2006 Acordia, Inc. All rights reserved.



9

## COVERAGE DESCRIPTION
## WORKERS COMPENSATION...*CONTINUED*

|  |  |  |
|---|---|---|
| 2006 Experience Modification |  | 1.00 |
| Kentucky Tax | $ | 124,293 |
| **Total Estimated Annual Premium** | $ | 1,383,416 |

**Exclusions:**

Insurance policies contain exclusions that reduce or eliminate coverage for certain types of losses and must be referred to for complete insurance coverage details. Contact a member of your account team with any questions you may have.

**Comments:**

➢ Make sure all entities performing work for you, on your behalf, or on your premises furnish you with a Certificate of Insurance evidencing their Workers Compensation insurance. Keep these certificates on file for insurance auditors. In their absence, the cost of independent or subcontractors may be included in your audited payroll.

➢ Notify a member of your Account Team if you establish any work sites in states not listed under Part One or Part Three.

➢ Many health insurance plans do not cover injuries incurred on the job. If your owners or officers have elected to be excluded from your Workers Compensation coverage, it is important to confirm that your health insurance plan covers work-related injuries.

➢ Deductible - $1,000,000

➢ AIG is requiring collateral of $2,323,000

➢ See policy regarding deductible, ALAE, and definitions.

➢ NCCI has not promulgated an experience modification. When received AIG will endorse to policy with adjustments at audit.

*This description does not contain complete insurance coverage details.*
Acordia Confidential. © 2006 Acordia, Inc. All rights reserved.



COMPLAINT 092

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aigproducercompensation.com or by calling AIG at 1-800-706-3102.

91222 (7/06)

ISSUED BY THE STOCK INSURANCE COMPANY HEREIN CALLED THE COMPANY

AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY
18139

| AGENT NUMBER | POLICY NUMBER |
|---|---|
| 11657-0000 | WC  720-94-31 |
| | 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-00 |

INCORPORATED UNDER THE LAWS OF · PENNSYLVANIA
ITEM 1.    NAMED INSURED:  MAILING ADDRESS   IDENTIFICATION NO.:

THE UNITED COMPANY
1005 GLENWAY AVENUE
BRISTOL, VA 24201-3473

SEE NAME AND ADDRESS SCHEDULE - WC990610
I.D#

Member Companies of
American International Group

EXECUTIVE OFFICES:
70 PINE STREET, NEW YORK, N.Y. 10270

PRODUCERS NAME AND ADDRESS

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY POLICY INFORMATION PAGE

ACORDIA OF WV-BLUEFIELD
320 FEDERAL ST
BLUEFIELD, WV 24701-3006

INSURED IS
CORPORATION

PREVIOUS POLICY NUMBER
NEW

OTHER WORKPLACES NOT SHOWN ABOVE: SEE NAME AND ADDRESS SCHEDULE - WC990610

ITEM 2 POLICY PERIOD 12:01 A.M. standard time at the insured's mailing address    FROM  11/01/06  TO  11/01/07

ITEM 3   A. Workers Compensation Insurance: Part One of the policy applies to the Workers Compensation Law of the states listed here:

KY VA

B. Employers Liability Insurance: Part Two of the policy applies to the work in each state listed in item 3.A.
The limits of our liability under Part Two are:

| | | |
|---|---|---|
| Bodily Injury by Accident $ | 1,000,000 | each accident |
| Bodily Injury by Disease $ | 1,000,000 | policy limit |
| Bodily Injury by Disease $ | 1,000,000 | each employee |

C. Other States Insurance: Part Three of the policy applies to the states, if any, listed here:
AK AR AZ CO CT DC GA HI IA ID IL IN KS LA MD MO MS NC NE NH NM NV OK OR PA RI SC SD TN
TX UT WI

ITEM 4   The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans.
All information required below is subject to verification and change by audit.

| Classifications | Code Number | Estimated Total Remuneration [X] Annual  ☐ 3 Year | Rate Per $100 OF Remuneration | Estimated Premium [X] Annual  ☐ 3 Year |
|---|---|---|---|---|
| SEE EXTENSION OF INFORMATION PAGE - WC7754 TAXES/ASSESSMENTS/SURCHARGES | | | | $124,293 |

| | | | |
|---|---|---|---|
| EXPENSE CONSTANT (EXCEPT WHERE APPLICABLE BY STATE) | $160 VA | | |
| MINIMUM PREMIUM | $750 KY | TOTAL ESTIMATED PREMIUM | $2,052,835 |

If indicated below, interim adjustments of premium shall be made:

☐ Semi-Annually   ☐ Quarterly   ☐ Monthly   DEPOSIT PREMIUM   $2,052,835

ENDORSEMENTS (FORM NUMBER)    SEE ATTACHED FORM SCHEDULE - WC990612

| | | | |
|---|---|---|---|
| 11/28/06 CLEVELAND | 21 | | WC 00 00 01 |
| Issue Date | Issuing Office | Authorized Representative | |
| 29967 | | | |

INSURED'S COPY

FORMS SCHEDULE

Policy Number: WC   720-94-31                    Effective Date:  11/01/2006

| | |
|---|---|
| FORTRSM | FOREIGN TERRORISM POLHOLDR NOT-PREM DTMN |
| WC000102 | FEDERAL COAL MINE HEALTH AND SAFETY ACT |
| WC000106A | LONGSHORE AND HARBOR WC ACT COVERAGE |
| WC000113 | TRIA EXTENSION ACT ENDT. |
| WC000406 | PREMIUM DISCOUNT ENDORSEMENT |
| WC000414 | NOTIFICATION OF CHANGE IN OWNERSHIP ENDT |
| WC000421A | D-TEC PREMIUM ENDT. |
| WC000422 | FOREIGN TERRORISM PREMIUM ENDT. |
| WCOFAC | NOTICE REG OFFICE OF FOREIGN ASSET CTRL |
| WC58509A | WC - PREMIUM CREDIT APPLICATION |
| WC990002A | LOSS REIMBURSEMENT ENDT |
| 78052C | PRIVACY POLICY |
| WC000419 | PREMIUM DUE DATE ENDORSEMENT |
| WC990011A | UNINTENTIONAL ERRORS AND OMISSIONS |
| WC990008A | AMENDMENT OF YOUR DUTIES IF INJURY OCCUR |
| 60713WC | KY ADDENDUM TO APPLICATION |
| LWNKYNOTE | KY NOTICE OF RATE INCREASE |
| WC160601 | KY CANCELLATION AND NON-RENEWAL ENDT. |
| WC991601A | KY AMENDTORY ENDT. ADDENDUM TO WC990002A |
| LWNINPH | VA NOTICE TO POLICYHOLDERS |
| WC450401 | VA TERRORISM RISK INSURANCE EXT ACT ENDT |
| WC450602 | VA AMENDATORY ENDORSEMENT |
| WC450604 | VA CONTRACTING CLASS PREMIUM ADJUSTMENT |
| WC990610 | NAMED INSUREDS/ADDRESSES |
| 81461 | LARGE RISK RATING PLAN ENDORSEMENT |

WC 99 06 12

COMPLAINT 095

# WORKERS COMPENSATION AND EMPLOYERS LIABILITY

# INSURANCE POLICY

**New Hampshire Insurance Company**
2704 Commerce Drive, Suite B, Harrisburg, PA 17110

**New Hampshire Indemnity Company, Inc.**
2704 Commerce Drive, Suite B, Harrisburg, PA 17110

**American International South Insurance Company**
2704 Commerce Drive, Suite B, Harrisburg, PA 17110



Member Companies of
American International Group, Inc.

EXECUTIVE OFFICES
70 PINE STREET
NEW YORK, N.Y. 10270

Coverage is provided by the Company designated on the Information Page
A Stock Insurance Company

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY
### QUICK REFERENCE

|  | BEGINNING ON PAGE |
|---|---|
| Information Page | i |
| **GENERAL SECTION** | 1 |
| A. The Policy | 1 |
| B. Who Is Insured | 1 |
| C. Workers Compensation Law | 1 |
| D. State | 1 |
| E. Locations | 1 |
| **PART ONE-WORKERS COMPENSATION INSURANCE** | 1 |
| A. How This Insurance Applies | 1 |
| B. We Will Pay | 1 |
| C. We Will Defend | 1 |
| D. We Will Also Pay | 1 |
| E. Other Insurance | 2 |
| F. Payments You Must Make | 2 |
| G. Recovery From Others | 2 |
| H. Statutory Provisions | 2 |

THESE POLICY PROVISIONS WITH THE INFORMATION PAGE AND ENDORSEMENTS,
IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THIS POLICY.

"INCLUDES COPYRIGHT MATERIAL OF THE NATIONAL COUNCIL ON COMPENSATION
INSURANCE, USED WITH ITS PERMISSION.

COPYRIGHT 1983 NATIONAL COUNCIL ON COMPENSATION INSURANCE"

56405WC (06/94)

INSURED'S COPY

# QUICK REFERENCE – CONTINUED

BEGINNING ON
PAGE

PART TWO - EMPLOYERS LIABILITY INSURANCE ................................................................. 2
    A. How This Insurance Applies ................................................................. 2
    B. We Will Pay ................................................................. 3
    C. Exclusions ................................................................. 3
    D. We Will Defend ................................................................. 3
    E. We Will Also Pay ................................................................. 4
    F. Other Insurance ................................................................. 4
    G. Limits of Liability ................................................................. 4
    H. Recovery From Others ................................................................. 4
    I. Action Against Us ................................................................. 4

PART THREE - OTHER STATES INSURANCE ................................................................. 4
    A. How This Insurance Applies ................................................................. 4
    B. Notice ................................................................. 5

PART FOUR - YOUR DUTIES IF INJURY OCCURS ................................................................. 5

PART FIVE - PREMIUM ................................................................. 5
    A. Our Manuals ................................................................. 5
    B. Classifications ................................................................. 5
    C. Remuneration ................................................................. 5
    D. Premium Payments ................................................................. 5
    E. Final Premium ................................................................. 5
    F. Records ................................................................. 6
    G. Audit ................................................................. 6

PART SIX - CONDITIONS ................................................................. 6
    A. Inspection ................................................................. 6
    B. Long Term Policy ................................................................. 6
    C. Transfer of Your Rights and Duties ................................................................. 6
    D. Cancellation ................................................................. 6
    E. Sole Representative ................................................................. 6

IMPORTANT: This Quick Reference is **not** part of the Workers Compensation and Employers Liability Policy and does **not** provide coverage. Refer to the Workers Compensation and Employers Liability Policy itself for actual contractual provisions.

## PLEASE READ THE WORKERS COMPENSATION AND EMPLOYERS LIABILITY POLICY CAREFULLY

INSURED'S COPY

COMPLAINT 097

ATTACH FORM AND ENDORSEMENTS (IF ANY) HERE

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

In return for the payment of the premium and subject to all terms of this policy, we agree with you as follows.

### GENERAL SECTION

**A.  The Policy**

This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between you (the employer named in Item 1 of the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.

**B.  Who Is Insured**

You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

**C.  Workers Compensation Law**

Workers Compensation Law means the workers or workmen's compensation law and occupational disease law of each state or territory named in Item 3.A. of the Information Page. It includes any amendments to that law which are in effect during the policy period. It does not include any federal workers or workmen's compensation law, any federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

**D.  State**

State means any state of the United States of America, and the District of Columbia.

**E.  Locations**

This policy covers all of your workplaces listed in Items 1 or 4 of the Information Page; and it covers all other workplaces in Item 3.A states unless you have other insurance or are self-insured for such workplaces.

### PART ONE - WORKERS COMPENSATION INSURANCE

**A.  How This Insurance Applies**

This workers compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1.  Bodily injury by accident must occur during the policy period.

2.  Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

**B.  We Will Pay**

We will pay promptly when due the benefits required of you by the workers compensation law.

**C.  We Will Defend**

We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

**D.  We Will Also Pay**

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:

1.  reasonable expenses incurred at our request, but not loss of earnings;

2.  premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;

WC 00 00 00 A

COMPLAINT 098

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

### E. Other Insurance

We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that may apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance will be equal until the loss is paid.

### F. Payments You Must Make

You are responsible for any payments in excess of the benefits regularly provided by the workers compensation law including those required because:

1. of your serious and willful misconduct;

2. you knowingly employ an employee in violation of law;

3. you fail to comply with a health or safety law or regulation; or

4. you discharge, coerce or otherwise discriminate against any employee in violation of the workers compensation law.

If we make any payments in excess of the benefits regularly provided by the workers compensation law on your behalf, you will reimburse us promptly.

### G. Recovery From Others

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

### H. Statutory Provisions

These statements apply where they are required by law.

1. As between an injured worker and us, we have notice of the injury when you have notice.

2. Your default or the bankruptcy or insolvency of you or your estate will not relieve us of our duties under this insurance after an injury occurs.

3. We are directly and primarily liable to any person entitled to the benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.

4. Jurisdiction over you is jurisdiction over us for purposes of the workers compensation law. We are bound by decisions against you under that law, subject to the provisions of this policy that are not in conflict with that law.

5. This insurance conforms to the parts of the workers compensation law that apply to:

   a. benefits payable by this insurance or;

   b. special taxes, payments into security or other special funds, and assessments payable by us under that law.

6. Terms of this insurance that conflict with the workers compensation law are changed by this statement to conform to that law.

Nothing in these paragraphs relieves you of your duties under this policy.

### PART TWO - EMPLOYERS LIABILITY INSURANCE

### A. How This Insurance Applies

This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you.

2. The employment must be necessary or incidental to your work in a state or territory listed in Item 3.A. of the Information Page.

3. Bodily injury by accident must occur during the policy period.

4. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

5. If you are sued, the original suit and any related legal actions for damages for bodily injury

**WC 00 00 00 A**

COMPLAINT 099

by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

( B.  **We Will Pay**

We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

The damages we will pay, where recovery is permitted by law, include damages:

1. for which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee;

2. for care and loss of services; and

3. for consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee;

provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and

( 4. because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

C.  **Exclusions**

This insurance does not cover:

1. liability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner;

2. punitive or exemplary damages because of bodily injury to an employee employed in violation of law;

3. bodily injury to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your executive officers;

4. any obligation imposed by a workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

( 5. bodily injury intentionally caused or aggravated by you;

6. bodily injury occurring outside the United States of America, its territories or possessions, and Canada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America or Canada who is temporarily outside these countries;

7. damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions.

8. bodily injury to any person in work subject to the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950), the Nonappropriated Fund Instrumentalities Act (5 USC Sections 8171-8173), the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), the Defense Base Act (42 USC Sections 1651-1654), the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942), any other federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws.

9. bodily injury to any person in work subject to the Federal Employers' Liability Act (45 USC Sections 51-60), any other federal laws obligating an employer to pay damages to an employee due to bodily injury arising out of or in the course of employment, or any amendments to those laws.

10. bodily injury to a master or member of the crew of any vessel.

11. fines or penalties imposed for violation of federal or state law.

12. damages payable under the Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872) and under any other federal law awarding damages for violation of those laws or regulations issued thereunder, and any amendments to those laws.

D.  **We Will Defend**

We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.

WC 00 00 00 A

COMPLAINT 100

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

### E.  We Will Also Pay

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim proceeding, or suit we defend;

1.  reasonable expenses incurred at our request; but not loss of earnings;

2.  premiums for bonds to release attachments and for appeal bonds in bond amounts up to the limit of our liability under this insurance;

3.  litigation costs taxed against you;

4.  interest on a judgment as required by law until we offer the amount due under this insurance; and

5.  expenses we incur.

### F.  Other Insurance

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

### G.  Limits of Liability

Our liability to pay for damages is limited. Our limits of liability are shown in Item 3.B. of the Information Page. They apply as explained below.

1.  Bodily Injury by Accident. The limit shown for "bodily injury by accident-each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.

A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

2.  Bodily Injury by Disease. The limit shown for "bodily injury by disease-policy limit" is the most we will pay for all damages covered by this insurance and arising out of bodily injury by disease, regardless of the number of employees who sustain bodily injury by disease. The limit shown for "bodily injury by disease-each employee" is the most we will pay for all damages because of bodily injury by disease to any one employee.

Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3.  We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

### H.  Recovery From Others

We have your rights to recover our payment from anyone liable for an injury covered by this insurance. You will do everything necessary to protect those rights for us and to help us enforce them.

### I.  Actions Against Us

There will be no right of action against us under this insurance unless:

1.  You have complied with all the terms of this policy; and

2.  The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability. The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Part.

PART THREE - OTHER STATES INSURANCE

### A.  How This Insurance Applies

1.  This other states insurance applies only if one or more states are shown in Item 3.C. of the Information Page.

2.  If you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as

though that state were listed in Item 3.A. of the Information Page.

3.  We will reimburse you for the benefits required by the workers compensation law of that state if we are not permitted to pay the benefits directly to persons entitled to them.

4.  If you have work on the effective date of this policy in any state not listed in Item 3.A. of the

WC 00 00 00 A

COMPLAINT 101

Information Page, coverage will not be afforded for that state unless we are notified within thirty days.

**B. Notice**

Tell us at once if you begin work in any state listed in Item 3.C. of the Information Page.

## PART FOUR - YOUR DUTIES IF INJURY OCCURS

Tell us at once if injury occurs that may be covered by this policy. Your other duties are listed here.

1. Provide for immediate medical and other services required by the workers compensation law.

2. Give us or our agent the names and addresses of the injured persons and of witnesses, and other information we may need.

3. Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit.

4. Cooperate with us and assist us, as we may request, in the investigation, settlement or defense of any claim, proceeding or suit.

5. Do nothing after an injury occurs that would interfere with our right to recover from others.

6. Do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

## PART FIVE - PREMIUM

### A. Our Manuals

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

### B. Classifications

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

### C. Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1. All your officers and employees engaged in work covered by this policy; and

2. All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof

that the employers of these persons lawfully secured their workers compensation obligations.

### D. Premium Payments

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

### E. Final Premium

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise.

1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short rate

WC 00 00 00 A

COMPLAINT 102

cancellation table and procedure. Final premium will not be less than the minimum premium.

F.  Records

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

G.  Audit

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

## PART SIX - CONDITIONS

A.  Inspection

We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate only to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards. Insurance rate service organizations have the same rights we have under this provision.

B.  Long Term Policy

If the policy period is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force.

C.  Transfer of Your Rights and Duties

Your rights or duties under this policy may not be transferred without our written consent.

If you die and we receive notice within thirty days after your death, we will cover your legal representative as insured.

D.  Cancellation

1.  You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2.  We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

3.  The policy period will end on the day and hour stated in the cancellation notice.

4.  Any of these provisions that conflicts with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

E.  Sole Representative

The insured first named in Item 1 of the Information Page will act on behalf of all insureds to change this policy, receive return premium, and give or receive notice of cancellation.

WC 00 00 00 A

COMPLAINT 103

**In Witness Whereof,**  the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the company.

President
New Hampshire Indemnity Company, Inc.

President
American International South
Insurance Company

President
New Hampshire Insurance Company

Secretary
American International South
Insurance Company
New Hampshire Insurance Company, Inc.
New Hampshire Indemnity Company, Inc.

WCS9901
(Ed. 1-97)

7 of 7

COMPLAINT 104

Page 1 of 1

## STANDARD WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY EXTENSION FORM

| WC 720-94-31 | VIRGINIA | INTRA/Independent State Risk ID |
|---|---|---|
| Policy Prefix & No. | Schedule | |
| 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-00 | THE UNITED COMPANY | |

| Item 4. Classification of Operations | Code No. | Premium Basis Estimated Total Annual Remuneration | Rates Per $100 of Remuneration | Estimated Annual Premiums |
|---|---|---|---|---|
| Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | | | | |
| RATING GROUP:  0001-01 | | | | |
| COAL MINE SURFACE - FEDERAL | 0156 | 1,500,000 | 1.96 | 29,400 |
| COAL MINE NOC - FEDERAL | 0158 | 4,000,000 | 5.08 | 203,200 |
| FOR REPORTING SUPPLEMENTAL DISEASE | 0179 | 2,000,000 | 2.00 | 40,000 |
| EXPERIENCE IN CONNECTION WITH EXPOSURE NOC | | | | |
| COAL MINING-SURFACE & DRIVERS | 1005 | 1,500,000 | 8.38 | 125,700 |
| COAL MINE NOC - TRAUMATIC | 1016 | 4,000,000 | 38.41 | 1,536,400 |
| COAL MINE NOC - TRAUMATIC | 1016F | IF ANY | 72.98 | |
| MACHINE SHOP NOC | 3632 | 300,000 | 3.27 | 9,810 |
| GRADING OF LAND NOC & DRIVERS | 6217 | 300,000 | 5.27 | 15,810 |
| COAL MERCHANT & LOCAL MANAGERS, DRIVERS | 8233 | 2,000,000 | 5.76 | 115,200 |
| ENGINEER OR ARCHITECT-CONSULTING | 8601 | 450,000 | 0.79 | 3,555 |
| CLERICAL OFFICE EMPLOYEES NOC. | 8810 | 400,000 | 0.17 | 680 |
| STATE OF VIRGINIA TOTALS | | | | |
| TOTAL CLASSIFICATION PREMIUM | | | | 2,079,755 |
| INCREASE LIMITS                3.30% | 9812 | | | 59,636 |
| JG FREE PROGRAM               -5.00% | 9841 | | | -93,340 |
| TOTAL UNMODIFIED PREMIUM | | | | 1,773,451 |
| MODIFIED STANDARD PREMIUM | | | | 1,773,451 |
| UNDISCOUNTED PREMIUM | | | | 2,046,051 |
| LOSS REIMB PLAN (NON-FEDERAL)  -47.58% | 9866 | | | -67,730 |
| LOSS REIMB PLAN (FEDERAL)      -36.39% | 9866 | | | -593,558 |
| PREMIUM DISCOUNT              -13.90% | 0063 | | | -246,510 |
| DISCOUNTED PREMIUM | | | | 1,138,253 |
| TAX PROVISION IN PREMIUM        3.84% | 9719 | | | 33,241 |
| EXPENSE CONSTANT | 0900 | | | 160 |
| TOTAL ESTIMATED PREMIUM | | | | 1,171,654 |
| TOTAL DUE | | | | 1,171,654 |
| TOTAL FOREIGN TERRORISM (TRIA) PREMIUM INCLUDED IN TOTAL ESTIMATED PREMIUM          $54,158 | | | | |

WC 7754 (Ed. 4-81)      See Name and Address Schedule - WC990610

COMPLAINT 105

Page 1    of  1

## STANDARD WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY EXTENSION FORM

| WC 720-94-31 | KENTUCKY | |
|---|---|---|
| Policy Prefix & No. | Schedule | INTRA/Independent State Risk ID |
| 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-00 | THE UNITED COMPANY | |

| Item 4. Classification of Operations<br>Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy. | Code No. | Premium Basis<br>Estimated Total Annual Remuneration | Rates<br>Per $100 of Remuneration | Estimated Annual Premiums |
|---|---|---|---|---|
| RATING GROUP: 0002-01 | | | | |
| COAL MINE SURFACE - FEDERAL | 0156 | 1,972,806 | 2.75 | 54,252 |
| COAL MINE NOC - FEDERAL | 0158 | 6,865,502 | 5.75 | 394,766 |
| FOR REPORTING SUPPLEMENTAL DISEASE EXPERIENCE IN CONNECTION WITH EXPOSURE NOC | 0179 | 338,001 | 2.00 | 6,760 |
| COAL MINING-SURFACE & DRIVERS | 1005 | 1,972,806 | 6.67 | 131,586 |
| COAL MINING-SURFACE & DRIVERS | 1005F | IF ANY | 9.27 | |
| COAL MINING - NOC. | 1016 | 6,865,502 | 17.47 | 1,199,403 |
| COAL MERCHANT & LOCAL MANAGERS, DRIVERS | 8233 | 338,001 | 6.92 | 23,390 |
| WAREHOUSING NOC | 8292 | 172,364 | 4.56 | 7,860 |
| AUTOMOBILE: SERVICE OR REPAIR CENTER & DRIVERS. | 8380 | 184,675 | 5.19 | 9,585 |
| CLERICAL OFFICE EMPLOYEES NOC. | 8810 | 242,453 | 0.34 | 824 |
| STATE OF KENTUCKY TOTALS | | | | |
| TOTAL CLASSIFICATION PREMIUM | | | | 1,828,426 |
| INCREASE LIMITS 2.80% | 9812 | | | 38,434 |
| LOSS REIMB PLAN (NON-FEDERAL) -39.76% | 9966 | | | -17,027 |
| LOSS REIMB PLAN (FEDERAL) -26.43% | 9966 | | | -361,630 |
| TOTAL UNMODIFIED PREMIUM | | | | 1,032,425 |
| SCHEDULE MODIFICATION -50.00% | 9887 | | | -516,213 |
| MODIFIED STANDARD PREMIUM | | | | 516,212 |
| UNDISCOUNTED PREMIUM | | | | 971,990 |
| PREMIUM DISCOUNT -19.00% | 0063 | | | -98,080 |
| DISCOUNTED PREMIUM | | | | 873,910 |
| TAX PROVISION IN PREMIUM 0.10% | 9719 | | | 418 |
| FOREIGN TERRORISM (TRIA) 0.30% | 9740 | | | 5,485 |
| DOMESTIC TERRORISM, ET AL 0.014 | 9741 | | | 1,368 |
| TOTAL ESTIMATED PREMIUM | | | | 881,181 |
| KY SF (NON-COAL) SURCHARGE 6.50% | 9688 | | | 2,641 |
| KY SF (COAL) SURCHARGE 6.50% | 9687 | | | 112,775 |
| KY COAL WORKERS PNEUMOCONIOSIS FUND 0.50% | 9698 | | | 8,877 |
| TOTAL DUE | | | | 1,005,474 |

WC 7754 (Ed. 4-81)    **See Name and Address Schedule – WC990610**

COMPLAINT 106

## FOREIGN TERRORISM (TRIA) POLICYHOLDER NOTICE - PREMIUM DETERMINATION

As indicated in Form No. WC 00 04 22, your Foreign Terrorism (TRIA) premium is shown in Form WC 7754. The schedule below shows how the premium for Foreign Terrorism (TRIA) is determined.

### Schedule

| State | Premium Determination Method |
|---|---|
| Arizona | Rate per $100 of Remuneration in addition to rate included in Arizona premium as set forth below**. |
| Colorado, Connecticut, Florida, New Jersey, New Mexico and Wisconsin | Rate per $100 of Remuneration. |
| New York | Rate per $100 of Remuneration and rate applied to Total Classification Premium. |
| Idaho, Kansas, Maine, New Hampshire and Virginia | Included in Rates applied to Premium Basis (Remuneration) for calculation of annual premium for each applicable classification of operations. |
| Alabama, Alaska, Arkansas, Iowa, Montana, Nevada, Tennessee and Texas | Rate per $100 of Remuneration in addition to charge included in rates applied to Premium Basis (Remuneration) for calculation of annual premium for each applicable classification of operations. |
| All Other States | Rate applied to Total Classification Premium. |

Refer to item 4 of the Information Page and State Schedule Pages form WC 7754 for the premium charged for the coverage provided for workers' compensation losses caused by an act of foreign terrorism. This premium is included in your Total Estimated Premium and is an estimate. The final premium for this coverage will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.

The rates and rating methodologies used to calculate the premium charged for this coverage are subject to change. This means that the rates and rating methodologies applied when your policy was issued may be different from those applied when computing your premium after the issuance of the policy, for example, at time of audit

** For policies issued by Commerce and Industry Insurance Company, AIU Insurance Company or New Hampshire Insurance Company the total premium for Arizona also includes a charge for this coverage in the rates applied to Premium Basis (Remuneration) for each applicable classification of operations.

For policies issued by American Home Assurance Company, American International South Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, Illinois National Insurance Co., National Union Fire Insurance Company of Pittsburgh, Pa. or The Insurance Company of the State of Pennsylvania the total premium for Arizona also includes a charge for this coverage determined by applying a rate against the Schedule Modification factor.

FORTRSM
(Ed. 01/06)

**FEDERAL COAL MINE HEALTH AND SAFETY ACT COVERAGE ENDORSEMENT**

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM 11/01/2006          forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement applies only to work in a state shown in the Schedule and subject to the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 931-942). Part One (Workers Compensation Insurance) applies to that work as though that state were shown in Item 3.A of the Information Page.

The definition of workers compensation law includes the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 931-942) and any amendment to that law that is in effect during the policy period.

Part One (Workers Compensation Insurance), section A.2., How This Insurance Applies, is replaced by the following:

Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period or, when the last exposure occurred prior to July 1, 1973, a claim based on that disease must be first filed against you during the policy period shown in item 2 of the Information Page.

Schedule

**State**

KY    VA

WC 00 01 02          Countersigned by _____
(Ed. 4-84)

**Authorized Representative**

LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT COVERAGE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006         forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement applies only to work subject to the Longshore and Harbor Workers' Compensation Act in a state shown in the Schedule. The policy applies to that work as though that state were listed in Item 3.A. of the Information Page.

General Section C. Workers' Compensation Law is replaced by the following:

C.   Workers' Compensation Law

Workers' Compensation Law means the workers or workmen's compensation law and occupational disease law of each state or territory named in Item 3.A. of the Information Page and the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950). It includes any amendments to those laws that are in effect during the policy period. It does not include any other federal workers or workmen's compensation law, other federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

Part Two (Employers Liability Insurance), C. Exclusions    exclusion 8, does not apply to work subject to the Longshore and Harbor Workers' Compensation Act.

This endorsement does not apply to work subject to the Defense Base Act, the Outer Continental Shelf Lands Act, or the Nonappropriated Fund Instrumentalities Act.

## Schedule

| State | Longshore and Harbor Workers' Compensation Act Coverage Percentage |
|---|---|
| Kentucky | 39.00 % |
| Virginia | 90.00 % |

The rates for classifications with code numbers not followed by the letter "F" are rates for work not ordinarily subject to the Longshore and Harbor Workers' Compensation Act. If this policy covers work under such classifications, and if the work is subject to the Longshore and Harbor Workers' Compensation Act, those non-F classification rates will be increased by the Longshore and Harbor Workers' Compensation Act Coverage Percentage shown in the Schedule.

WC 00 01 06A          Countersigned by _____
(Ed. 4/92)

Authorized Representative

COMPLAINT 109

## TERRORISM RISK INSURANCE EXTENSION ACT ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006         forms a part of Policy No. WC   720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement addresses the requirements of the Terrorism Risk Insurance Act of 2002 as amended and extended by the Terrorism Risk Insurance Extension Act of 2005.

**Definitions**

The definitions provided in this endorsement are based on the definitions in the Act and are intended to have the same meaning. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply. "Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments resulting from the Terrorism Risk Insurance Extension Act of 2005.

"Act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States as meeting all of the following requirements:

    a.  The act is an act of terrorism.

    b.  The act is violent or dangerous to human life, property or infrastructure.

    c.  The act resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels.

    d.  The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism or war loss" means any loss resulting from an act of terrorism (including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means:

    a.  For the period beginning on November 26, 2002 and ending on December 31, 2002, an amount equal to 1% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding November 26, 2002.

    b.  For the period beginning on January 1, 2003 and ending on December 31, 2003, an amount equal to 7% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2003.

    c.  For the period beginning on January 1, 2004 and ending on December 31, 2004, an amount equal to 10% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2004.

    d.  For the period beginning on January 1, 2005 and ending on December 31, 2005, an amount equal to 15% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2005.

    e.  For the period beginning on January 1, 2006 and ending on December 31, 2006, an amount equal to 17.5% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2006.

COMPLAINT 110

f.   For the period beginning on January 1, 2007 and ending on December 31, 2007, an amount equal to 20% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2007.

**Limitation of Liability**

The Act may limit our liability to you under this policy. If annual aggregate insured terrorism or war losses of all insurers exceed $100,000,000,000 during the applicable period provided in the Act, and if we have met our insurer deductible, the amount we will pay for insured terrorism or war losses under this policy will be limited by the Act, as determined by the Secretary of the Treasury.

**Policyholder Disclosure Notice**

1.   Insured terrorism or war losses would be partially reimbursed by the United States Government under a formula established by the Act. Under this formula, the United States Government would pay 90% for Program Year 4 and 85% for Program Year 5 of our insured terrorism or war losses exceeding our insurer deductible.

2.   The premium charged for the coverage this policy provides for insured terrorism or war losses is included in the amount shown in Item 4 of the Information Page or in the Schedule in the Foreign Terrorism Premium Endorsement. (WC 00 04 22), attached to this policy.

Countersigned by _____

*Englbrecht*

**Authorized Representative**

COMPLAINT 111

## PREMIUM DISCOUNT ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006      forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

The premium for this policy and the policies, if any, listed in Item 3 of the Schedule may be eligible for a discount. This endorsement shows your estimated discount in Items 1 or 2 of the Schedule. The final calculation of premium discount will be determined by our manuals and your premium basis as determined by audit. Premium subject to retrospective rating is not subject to premium discount.

### Schedule

| 1. | State | First $5,000 | Estimated Eligible Premium | | |
|----|-------|-------|-------|-------|-------|
| | | | Next $95,000 | Next $400,000 | Balance |
| | Kentucky | | 10.90 | 12.60 | 14.40 |
| | Virginia | | 10.90 | 12.60 | 14.40 |

2. Average percentage discount: See Extension of Information Page

3. Other policies:

4. If there are no entries in Items 1, 2 and 3 of the Schedule, see Premium Discount Endorsement attached to your policy number:

WC 00 04 06
(Ed. 4-84)

Countersigned by _____      _JH Englbrecht_ _____

Authorized Representative

COMPLAINT 112

## NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM 11/01/2006          forms a part of Policy No. WC     720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

Experience rating is mandatory for all eligible insureds. The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes. Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity and other changes provided for in the applicable experience rating plan manual.

You must report any change in ownership to us in writing within 90 days of such change. Failure to report such changes within this period may result in revision of the experience rating modification factor used to determine your premium.

THIS ENDORSEMENT IS NOT APPLICABLE IN NEW JERSEY, PENNSYLVANIA,
ALASKA, CALIFORNIA, DELAWARE OR TEXAS.

WC 00 04 14                    Countersigned by _____    _____
(Ed. 07/90)

Authorized Representative

**DOMESTIC TERRORISM, EARTHQUAKES, AND CATASTROPHIC INDUSTRIAL ACCIDENTS PREMIUM ENDORSEMENT**

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement is notification that your insurance carrier is charging premium to cover the losses that may occur in the event of domestic terrorism, earthquakes, and/or a catastrophic industrial accident.

The premium charge provides funding for the risk of earthquakes, catastrophic industrial accidents, and certain acts of domestic terrorism. It does not provide funding for acts of terrorism certified as such by the Terrorism Risk Insurance Act of 2002 and any amendments resulting from the Terrorism Risk Insurance Extension Act of 2005 (the Act), or acts of foreign terrorism as that term is defined in the Foreign Terrorism Premium Endorsement (WC 00 04 22), attached to this policy.

For purposes of this endorsement, the following definitions apply:

Domestic terrorism: All acts of terrorism outside the scope of the Act or the Foreign Terrorism Premium Endorsement (WC 00 04 22), with aggregate workers compensation losses in excess of $50 million.

Earthquake: The shaking and vibration at the surface of the earth resulting from underground movement along a fault plane or from volcanic activity where aggregate workers compensation losses from the single event are in excess of $50 million.

Catastrophic Industrial Accident: Any single event resulting in aggregate workers compensation losses in excess of $50 million.

**Schedule**

Refer to State Schedule Pages Form WC7754

WC 00 04 21A
(Ed. 01/06)
© 2004 National Council on Compensation Insurance, Inc.

Countersigned by _____

_JH Englbrecht_

**Authorized Representative**

## FOREIGN TERRORISM PREMIUM ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC   720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement is notification that your insurance carrier is charging premium for losses that may occur in the event of an act of foreign terrorism.

Your policy provides coverage for workers compensation losses caused by acts of foreign terrorism, including workers compensation benefit obligations dictated by state law.  Coverage for such losses is still subject to all terms, definitions, exclusions, and conditions in your policy, and any applicable federal and/or state laws, rules, or regulations.

For purposes of this endorsement, an "act of foreign terrorism" is defined as:

   a.  Any act that is violent or dangerous to human life, property or infrastructure; and

   b.  The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The premium charge for the coverage your policy provides for workers compensation losses caused by an act of foreign terrorism is shown in Item 4 of the Information Page or in the Schedule below.

### Schedule

Refer to Item 4 of the Information Page and State Schedule Pages form WC 7754 for the premium charged for the coverage your policy provides for workers compensation losses caused by an act of foreign terrorism. This premium is included in your Total Estimated Premium and is an estimate. The final premium for this coverage will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.

The rates and rating methodologies used to calculate the premium charged for this coverage are subject to change. This means that the rates and rating methodologies applied when your policy was issued may be different from those applied when computing your premium after the issuance of the policy, for example, at time of audit.

WC 00 04 22          Countersigned by _____
(Ed. 01/06)
© 2005 National Council on Compensation Insurance, Inc.

                                                              **Authorized Representative**

## IMPORTANT NOTICE TO OUR CUSTOMERS
## REGARDING THE
## OFFICE OF FOREIGN ASSETS CONTROL

Your rights as a policyholder and payments to you, any insured, additional insured, loss payee, mortgagee, or claimant, for loss under this policy may be affected by the administration and enforcement of U.S. economic embargoes and trade sanctions by the OFFICE OF FOREIGN ASSETS CONTROL ("OFAC").

**WHAT IS OFAC?**

OFAC is an office of the Department of the Treasury and acts under presidential wartime and national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze foreign assets under U.S. jurisdiction. OFAC administers and enforces economic embargoes and trade sanctions primarily against:

- Targeted foreign countries and their agents
- Terrorism sponsoring agencies and organizations
- International narcotics traffickers

**PROHIBITED ACTIVITY**

- OFAC enforces certain embargoes and sanctions against certain designated countries. No U.S. business or person may enter into certain transactions in or connected to such designated "sanctioned" countries.
- OFAC maintains a directory known as the "Specially Designated Nationals and Blocked Persons" ("SDNBP") list. No U.S. business or person may transact business with any person or entity named on the SDNBP list.

Additional and more in-depth information on OFAC is available at the following website: http://www.ustreas.gov/offices/eotffc/ofac.

**OBLIGATIONS PLACED ON US BY OFAC**

If we determine that you or any insured, additional insured, loss payee, mortgagee, or claimant are on the SDNBP list or are connected to a sanctioned country as described in the regulations enforced by OFAC, we must block or "freeze" property and payment of any funds transfers or transactions and report all blocks to OFAC within ten (10) days.

**POTENTIAL ACTIONS BY US**

1. We may immediately cancel your coverage effective on the day that we determine that we have transacted business with an individual or entity associated with your policy on the SDNBP list or connected to a sanctioned country as described in the regulations enforced by OFAC.

2. If we cancel your coverage, you will not receive a return premium unless approved by OFAC. All funds will be placed in an interest bearing blocked account established on the books of a U.S. financial institution.

3. We will not pay a claim, accept premium or exchange monies or assets of any kind to or with individuals, entities or companies (including a bank) on the SDNBP list or connected to a sanctioned country as described in the regulations enforced by OFAC. And, we will not defend or provide any other benefits under your policy to individuals, entities or companies on the SDNBP list or connected to a sanctioned country as described in the regulations enforced by OFAC.

**YOUR RIGHTS AS A POLICYHOLDER**

If funds are blocked or frozen by us in conjunction with the OFFICE OF FOREIGN ASSETS CONTROL, you may complete an "APPLICATION FOR THE RELEASE OF BLOCKED FUNDS" and apply for a specific license to request their release. Forms are available for download at the OFAC website. See http://www.ustreas.gov/offices/eotffc/ofac/legal/forms/license.pdf

WCOFAC
(Ed. 07/05)

## WORKERS COMPENSATION - PREMIUM CREDIT APPLICATION

STATE _____     BUREAU FILE #: _____

INSURED _____

POLICY #: _____     EFFECTIVE DATE _____     CARRIER _____

Notice:  Unless Code(s), total wages paid, total hours worked, calendar quarter reported are indicated and application is signed, it cannot be processed. Must include non-construction class code payrolls. Corporate officers should be included in the appropriate class. Contact your agent or carrier if assistance is desired.

Is this a new business:  _____ No  _____ Yes

If no, submit information for the third calendar quarter (July, August, September) of the preceding calendar year as reported to taxing authorities.  If yes, submit information for the first complete quarter following the effective date of your workers compensation policy.

| CLASSIFICATION: | CLASS CODE | TOTAL WAGES PAID* | TOTAL HOURS WORKED (Incl. O.T.) |
|---|---|---|---|
| Example: Electrical Wiring Contracting Classification: | 5190 | $8,000 | 520 |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| Non-contracting Classification: | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

*  EXCLUDING OVERTIME PREMIUM PAY, for each classification code, combine all wages for that code in a single entry. Employee names are not required.

DELAWARE & PENNSYLVANIA ONLY: Total Wages includes overtime premium pay.

ALASKA, FLORIDA, HAWAII, ILLINOIS, MARYLAND, MINNESOTA, NEW MEXICO, OKLAHOMA, AND OREGON ONLY: Exclude from Total Wages overtime premium pay as well as all other exclusions in accordance with Rule V of the Basic Manual.

VIRGINIA ONLY: Include Total Wages as reported to the Virginia Employment Commission.

ILLINOIS, MISSOURI: Exclude the entire pay for any sole proprietor, partner, or executive officer.

The foregoing is based on actual wages and hours worked, as reflected in our payroll records for the complete calendar quarter ending _____.

SIGNATURE _____     POSITION _____

TELEPHONE NUMBER _____     DATE _____

ADDRESS _____     CITY _____     STATE _____

### PLEASE MAIL APPLICATION TO THE APPROPRIATE BUREAU

WC58509A
(Ed. 07/01)

INSURED'S COPY

COMPLAINT 117

## LOSS REIMBURSEMENT ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   11/01/2006          forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This Endorsement applies solely between you and us. It does not affect the rights of others.

I. Payment and Reimbursement Conditions

A. We will pay:

1. all benefits and costs payable under PART ONE - WORKERS COMPENSATION INSURANCE; and

2. up to our limit of liability, all sums you legally must pay as damages and other costs for which PART TWO - EMPLOYERS LIABILITY applies; and

3. all benefits and costs payable under PART THREE - OTHER STATES INSURANCE; and

4. all benefits or damages and costs payable under any endorsements attached to the policy.

B. You will reimburse us promptly up to the applicable reimbursement limit shown in the Schedule for any amounts we have so paid.

C. You will further reimburse us promptly for the following:

1. any "allocated loss adjusting expense" we pay, according to one of the Options described below and selected in the Schedule. If no selection is indicated, Option A applies. Your obligation to reimburse us for "allocated loss adjusting expense" applies separately to "each accident" or, for bodily injury by disease, to "each claim".

a) **Option A:** All "allocated loss adjusting expenses" up to the amount by which the applicable reimbursement limit exceeds the amount you must reimburse us for benefits or damages we pay.

b) **Option B:** All "allocated loss adjusting expenses".

c) **Option C:** A part of all "allocated loss adjusting expenses" in the proportion that the sum you must reimburse us for benefits or damages bears to all benefits and damages we pay. If we make no payment of benefits or damages, you must reimburse us for all "allocated loss adjusting expenses" we pay up to the applicable Reimbursement Amount.

d) **Option D:** No "allocated loss adjusting expenses".

D. Aggregate Limit: If a Limit is shown in the Schedule as "Aggregate Limit", subject to items 1 and 2 below, that Limit is the most you must reimburse us in the aggregate for all benefits and damages and "allocated loss adjusting expenses" that we pay under this policy and the other policies described in the Schedule. If no Aggregate Limit is shown in the Schedule, no aggregate limit applies to your reimbursement obligation.

1. The Aggregate Limit (if any) shown in the Schedule is an estimate. Subject to item 2 below, the final Aggregate Limit will be determined after this policy ends by using the actual, not the estimated, Aggregate Limit Basis for all policies to which it applies and the rate shown in the Schedule.

2. The final Aggregate Limit will not be reduced if this or any other such policy is issued for a term of less than one year, or if this or any other such policy or this endorsement is canceled by you before the end of the policy period for any reason except your retirement from business.

E. No limit on the Company's liability under the policy or any endorsement is increased or reinstated by this endorsement or by any reimbursement to us under the terms of this endorsement.

II. General Conditions

A. Duties

1. The first Named Insured shown in the Information Page agrees and is authorized to reimburse us for any reimbursable amounts we pay on behalf of any Insureds, and to deliver to us the collateral described in Section B below.

2. Each Named Insured is jointly and severally liable for all reimbursable amounts under this policy.

3. All other terms of the policy, including those under PART FOUR of the policy ("YOUR DUTIES IF INJURY OCCURS") and those which apply to our right and duty to defend any claim, proceeding or suit against you, and our duties if injury or disease occurs, apply without change on account of this endorsement.

WC 99 00 02A
(Ed. 01/02)

Page 1 of 3

INSURED'S COPY

COMPLAINT 118

## LOSS REIMBURSEMENT ENDORSEMENT

B. Loss Fund Deposit

In addition to the premium, you must pay us in cash at the inception of the policy the amount shown in the Schedule as the Loss Fund Deposit. We may commingle those funds with any other of our funds and use them in any lawful manner. We will have a possessory security interest in those funds. We will return the Loss Fund Deposit to you when you have paid us the premium under our offer to commute your remaining reimbursement obligations, if any, to a fixed payment of premium.

C. Payment of Reimbursable Amounts and Delivery of Collateral

1. You must reimburse us within twenty (20) days of your receipt of an invoice from us up to the applicable reimbursement limit for any amounts that we pay as benefits or damages and for your share of the "allocated loss adjusting expense" and "unallocated loss adjusting expense".

2. You must deliver to us within thirty (30) days of the inception of this policy collateral acceptable to us in the forms and the amounts shown in the Schedule. We will have a possessory security interest in any property you deliver to us to secure such obligations. We will review the collateral as soon as practicable after the second anniversary of the inception of this policy, and annually thereafter. If we find that we require increased collateral, you will provide us such an increase within thirty (30) days of our request. If we find that we hold a surplus of collateral, we will return the surplus to you within thirty (30) days of our finding.

3. If you fail to reimburse us when due, we may liquidate any collateral in our possession and take ownership of the proceeds to the extent of all your debts to us. Any surplus of such proceeds in excess of your debt will remain in our possession as collateral until the commutation of your remaining reimbursement obligations under Paragraph D of this Section II.

D. Cancellation

Part Six of the policy — "CONDITIONS", Section D. "Cancellation" is amended to include the following:

If you fail to reimburse us or to deliver collateral to us when due, we may cancel this policy by mailing or delivering written notice to you not less than 10 days prior to the effective date of such cancellation stating the day and hour the cancellation is to take effect. Proof of the mailing of such notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to provide notice.

E. Commutation

Upon your request, but not earlier than the second anniversary of the inception of this policy and not more often than annually thereafter, we must offer to commute your remaining reimbursement obligations, if any, to a fixed payment of premium. We may offer such terms at any time. You will have no obligation to accept our offer.

F. Recovery From Others

We have your rights and the rights of persons entitled to the benefits of this insurance to recover all payments, including those within your reimbursement limit, from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

If we recover any payment we made under this policy from anyone liable for the injury, the amount we recover will first be applied to any payments we made as benefits, damages and allocated loss adjusting expenses in excess of your reimbursement obligations, and to our expenses in obtaining the recovery. The remainder of the recovery, if any, will be applied to reduce the amount that is reimbursable by you.

G. Unallocated Loss Adjusting Expense:

If an "unallocated loss adjusting expense" (ULAE) percentage is shown in the Schedule, an estimated provision for the "unallocated loss adjusting expense" we incur is included in the premium. We will determine the final provision in premium for "unallocated loss adjusting expense" by multiplying the ULAE percentage by the amount you must reimburse us for benefits and damages we have paid. We will recompute the premium for this insurance annually, beginning 18 months after the inception of this policy, to include the adjusted provision for ULAE. You must pay us any additional premium so computed. We will repay you any return premium so computed.

III. Definitions

A. "Allocated loss adjusting expense" means claim adjusting expense allocated by us directly to particular claims. Such expenses shall include, but not be limited to, attorneys' fees for claims in suit, court costs, and other specific items of expense such as fees for medical examinations, expert testimony, laboratory, x-ray and autopsy services, stenographic services, witnesses and summonses, and copies of documents.

B. "Unallocated loss adjusting expense" means all claims adjusting expenses we incur other than "allocated loss adjusting expense".

C. "Claim" means each demand you receive for:

1. benefits required of you by the Workers' Compensation law, including a filing by your employee or by others legally entitled to do so on his or her behalf for such benefits with an agency authorized by law, and suit or other proceedings brought by your employee for such benefits or damages; or

2. damages covered by this policy.

D. "Standard Premium", if used as the Aggregate Limit Basis, means the premium for the policies described in the Schedule to which the Aggregate Reimbursable Limit applies, determined on the basis of authorized rates and bases of premium, applicable experience modification, and applicable schedule modification. Standard Premium does not included the following items: Expense Constant, Premium Discount; any Surcharge; Credit or Discount for any Loss Reimbursement or Deductible Program; Retrospective Rating premium adjustment; or any other item.

COMPLAINT 119

LOSS REIMBURSEMENT ENDORSEMENT

SCHEDULE

1. Reimbursement Limits for each Accident or each Claim

| Named Insureds | States | Reimbursement Limits | | | ULAE % of Reimbursable Losses |
|---|---|---|---|---|---|
| | | Bodily Injury by Accident: each Accident | Bodily Injury by Disease: each Claim | ALAE Option | |
| SEE NAME AND ADDRESS SCHEDULE | See Below | 1,000,000 | 1,000,000 | See Below | |

| ALAE Option | States |
|---|---|
| A | KY VA |
| | |
| | |
| | |
| | |

2. Aggregate Reimbursement Limit

| Estimated Aggregate Limit Basis | Rate | Estimated Aggregate Reimbursement Limit |
|---|---|---|
| $18,725,801 | 18.61 | $3,484,500 |

The Aggregate Reimbursement Limit and Estimated Aggregate Limit Basis apply to the following policies combined:

| Policy Number | Issued by |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

3. Collateral

| Type of Collateral | Amount of Collateral | Due Date |
|---|---|---|
| REFER TO PAYMENT AGREEMENT | | |

4. Loss Fund Deposit

| Loss Fund Deposit | REFER TO PAYMENT AGREEMENT |
|---|---|

Countersigned by _____

Authorized Representative

COMPLAINT 120

## PRIVACY POLICY

( **Our Commitment to Privacy:**

The AIG Companies (AIG) believe one of our most important assets is the trust consumers place in us to respect and properly handle nonpublic personal information received by us in connection with providing our products and services. To continue earning your trust and enhance the products and services offered to you, the companies listed below have adopted the following privacy policy to govern how we treat your nonpublic personal information including such information about our former customers.

It's important for you to know that this privacy policy applies only to the product or service you have just obtained or the insurance policy under which you are seeking or receiving benefits.  As a large worldwide leader in the delivery of financial products and services, we offer numerous products and services to many types of consumers and clients in many different states and countries around the world.  Therefore, each of our companies may issue different privacy policies to fit the specific products and services they offer.

**Information We Collect:**

We collect information about you that is necessary to tailor our products and services to meet your individual needs, provide effective customer service, and comply with legal requirements.

We may collect nonpublic personal information about you, from one or more of the following sources:
- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates or others;
- Information we receive from a consumer-reporting agency; and
- Information received in handling claims.

**Sharing Information Within Our Family of Companies:**

( We may share some or all of the nonpublic personal information we collect with our affiliates - the members of the AIG family of companies, unless such sharing of information is prohibited by law.  In many cases, the information that is shared may be at your request or is necessary to administer, process or otherwise handle your transactions with us or settle a claim on your behalf.  In addition, we may provide this information to our affiliates in order to offer you products and services in which you may be interested.

Our family of companies includes many insurance companies (e.g., auto, home, and life insurance), insurance claims handling companies, other financial institutions (e.g., savings bank), and non-financial institutions.

**Sharing Information Outside the AIG Family:**

Sometimes, we use companies or businesses outside the AIG family to administer, process, or otherwise handle your transactions with us, such as for claims handling or customer service.  Other times, we may enter into contracts with nonaffiliated companies to perform services on our behalf, such as marketing our products and services, or we may enter into joint marketing agreements with other financial institutions.  In these and other circumstances permitted by law, we may share some or all of the information we collect above with these nonaffiliated third parties.  However, whenever we utilize a nonaffiliated third party to provide these services, they are required to follow federal privacy laws governing this notice.  We also may share information to combat fraud, in response to a court order, or at the request of government regulators.

**Nonpublic Personal Health Information:**

We will not disclose nonpublic personal health information about you without obtaining prior written authorization from you, except as permitted by applicable law or regulation.

( 

78052C
(Ed. 11/05)

COMPLAINT 121

**Protecting and Safeguarding Your Information:**

To help prevent unwarranted disclosure of your nonpublic information and secure it from theft, we utilize secure computer networks and restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. In addition, we maintain physical, electronic, and procedural safeguards that comply with applicable laws and regulations to guard our customers' nonpublic personal information.

**Maintaining Accurate Information:**

We also maintain procedures to ensure that the information we collect is accurate, up-to-date, and as complete as possible. If you believe the information we have about you in our records or files is incomplete or inaccurate, you may request that we make additions or corrections, or if it is feasible, that we delete this information from our files. You may make this request in writing to (include your name, address and policy number):

Chief Privacy Officer
AIG - Domestic Brokerage Group
175 Water Street, 3rd Floor
New York, NY 10038

FAX: 212-785-9495

e-mail: DBG.Privacy@AIG.com

*Special notice for policyholders who reside in any of the following states: Arizona, California, Connecticut, Georgia, Illinois, Kansas, Maine, Massachusetts, Minnesota, Montana, Nevada, New Jersey, North Carolina, Ohio, Oregon, Virginia or Wisconsin: You can obtain access to any nonpublic personal information we have about you if you properly identify yourself and submit a written request to us at the address above describing the information you want to review (include your name, address and policy number). Once we have received your request, and if the information is reasonably locatable and retrievable, we will, within 30 business days, take the following actions:*

- *Inform you of the nature and substance of the recorded information;*
- *Allow you to see and copy, in person, such recorded personal information; or*
- *Send you a copy of the recorded personal information by mail (we may charge you a reasonable fee to cover the cost of this service).*

*We will also tell you at this time the identity, if recorded, of persons to whom we have disclosed the nonpublic personal information within the preceding two years.*

*If you ask us to correct, amend or delete any information about you, we will, within 30 business days, either correct, amend or delete the nonpublic personal information in dispute or notify you of our refusal to take such action along with the reasons for our decision. If we make the correction, amendment or deletion you've requested, we will also notify you along with any person you designate who has received the information about you within the preceding two years, together with any insurance support organization(s) which provided us with the disputed information.*

*If we refuse to make the requested correction, amendment or deletion, you are permitted to file a concise statement setting forth what you think is the correct, relevant or fair information along with a statement of the reasons why you disagree with our refusal to correct, amend or delete the information subject to dispute. We will file your statement with the disputed personal information and make any person who reviews your file aware of your statement. We will also furnish your statement to any person who has received personal information from us within the two preceding years and any insurance support organization whose primary source of personal information is an insurer.*

78052C
(Ed. 11/05)

COMPLAINT 122

**Important Information Concerning the Applicability and Future Changes to this Privacy Policy:**

This privacy policy applies, with respect to nonpublic personal financial information, to products or services provided primarily for personal, family, or household purposes in the United States by the AIG Companies listed below, and it applies to all nonpublic personal health information these Companies may have. Although we may change this policy at any time, please rest assured that you will be notified of any changes as required by law.

**AIG Companies Covered by this Policy:**

AIG Hawaii Insurance Company
AIU Insurance Company
American Home Assurance Company
American International Pacific Insurance Company
American International South Insurance Company
Birmingham Fire Insurance Company of Pennsylvania
Commerce and Industry Insurance Company
Granite State Insurance Company
Illinois National Insurance Co.
National Union Fire Insurance Company of Louisiana
National Union Fire Insurance Company of Pittsburgh, Pa.
New Hampshire Insurance Company
The Insurance Company of the State of Pennsylvania
American International Specialty Lines Insurance Company
American Pacific Insurance Company, Inc.
Landmark Insurance Company
Lexington Insurance Company
Agency Management Corporation
A. I. Risk Specialists Insurance, Inc.
A. I. Risk Specialists of Missouri, Inc.
American International Entertainment, Inc.
Eastern Risk Specialists, Inc.
Florida Risk Specialists, Inc.
The Gulf Agency, Inc.
Louisiana Risk Specialists, Inc.
Medical Excess Insurance Services, Inc.
Michigan Risk Specialists, Inc.
Midwestern Risk Specialists, Inc.
Nevada Risk Specialists, Inc.
New England Risk Specialists, Inc.
Northwestern Risk Specialists, Inc.
Risk Specialists Companies, Inc.
Risk Specialists Company (Bermuda), Ltd.
Risk Specialists Company of Colorado, Inc.
Risk Specialists Company of Kentucky, Inc.
Risk Specialists Company of Minnesota, Inc.
Risk Specialists Company of New Jersey, Inc.
Risk Specialists Company of New York, Inc.
Risk Specialists Company of Ohio, Inc.
Risk Specialists of the Carolinas, Inc.
Southeastern Risk Specialists, Inc.
Southern Risk Specialists, Inc.
Western Risk Specialists, Inc.
American International Surplus Lines Agency, Inc.
AIG Warranty Services and Insurance Agency, Inc.

and other member companies of the AIG family who sent you this privacy policy statement.

`78052C
(Ed. 11/05)

COMPLAINT 123

## PREMIUM DUE DATE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006         forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

### PART FIVE
### PREMIUM

D.   **Premium** is amended to read:

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid. **The due date for audit and retrospective premiums is the date of the billing.**

WC 00 04 19
(Ed. 01/01)

Countersigned by _____

*Jff Englbrecht*

**Authorized Representative**

INSURED'S COPY

COMPLAINT 124

## UNINTENTIONAL ERRORS AND OMISSIONS

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

**PART SIX - CONDITIONS** is amended by the addition of the following:

F.    Unintentional errors or omissions in representations made to us or our agent by you or any other insured before the inception of this policy will not impair your rights under this policy.

'WC 99 00 11A
(Ed. 10/03)

Countersigned by _____

_Jeff Englhuckl_

**Authorized Representative**

INSURED'S COPY

COMPLAINT 125

## AMENDMENT OF YOUR DUTIES IF INJURY OCCURS

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006        forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

**PART FOUR - YOUR DUTIES IF INJURY OCCURS** is replaced by the following:

Tell us at once if injury occurs that may be covered by this policy. Knowledge of an injury by your agent, your servant, or your employee shall not in itself constitute knowledge by you unless your director of risk management or his/her designee, at the address shown in the policy declarations, will have received such notice. Your other duties are listed here.

1.  Provide for immediate medical and other services required by the workers compensation law.

2.  Give us or our agent the names and addresses of the injured persons and of witnesses, and other information we may need.

3.  Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit.

4.  Cooperate with us and assist us, as we may request, in the investigation, settlement or defense of any claim, proceeding or suit.

5.  Do nothing after an injury occurs that would interfere with our right to recover from others.

6.  Do not voluntarily make payments, assume obligations or incur expenses, except at your own costs.

**WC 99 00 08A**
**(Ed. 10/03)**

Countersigned by _____

**Authorized Representative**

INSURED'S COPY

**KENTUCKY**
**ADDENDUM TO APPLICATION**

**POLICYHOLDER'S NOTICE**

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

WARNING:  Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

60713WC          Countersigned by _____          _Jff Englbrecht_
(Ed. 07-94)

                                                              **Authorized Representative**

COMPLAINT 127

NOTICE OF RATE INCREASE

KENTUCKY

This endorsement increases the rates on your policy from its inception.

In December 2005, the State of Kentucky Labor Cabinet, Office of Workers' Claims, issued a new Workers' Compensation Medical Fee Schedule for Physicians. It becomes effective on February 15, 2006. It replaces the 2001 Fee Schedule.

Because of the increased physicians' fees, higher rates have been approved by the Kentucky Department of Insurance for Workers' Compensation policies becoming effective on or after February 15, 2006. This endorsement shows the new rates that apply to your policy, and the revised estimated annual premium.

**LWNKYNOTE**
**(Ed. 02/06)**

INSURED'S COPY

## KENTUCKY CANCELATION AND NONRENEWAL ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

*(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).*

This endorsement, effective 12:01 AM  11/01/2006        forms a part of Policy No. WC   720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement applies only to the insurance provided by the policy because Kentucky is shown in Item 3.A. of the Information Page.

The **Cancelation** Condition of the policy is replaced by the following:

### Cancelation

1. You may cancel this policy. You will deliver or mail advance written notice to us, stating when the cancelation is to take effect.

2. We may cancel this policy. We will deliver or mail to you not less than 75 days advance written notice stating when the cancelation is to take effect and our reason or reasons for cancelation. If we cancel for nonpayment of premium or within 60 days of the date of issuance of the policy, we will deliver or mail this notice not less than 14 days prior to the effective date of cancelation. Proof of mailing of this notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

3. After coverage has been in effect more than 60 days or after the effective date of a renewal policy, we may not cancel the policy unless cancelation is based on one or more of the following reasons:

   a. nonpayment of premium;

   b. discovery of fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy, or presenting a claim under the policy;

   c. discovery of willful or reckless acts or omissions on your part increasing any hazard originally insured;

   d. changes in conditions after the effective date of the policy or any renewal substantially increasing any hazard originally insured;

   e. a violation of any local fire, health, safety, building, or construction regulation or ordinance at any of your covered workplaces substantially increasing any hazard originally insured;

   f. our involuntary loss of reinsurance for the policy;

   g. a determination by the commissioner that the continuation of the policy would place us in violation of Kentucky insurance laws.

### Nonrenewal

1. We may elect not to renew the policy. We will deliver or mail to you not less than 75 days advance written notice stating our intention not to renew and our reason or reasons for nonrenewal. Proof of mailing of this notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

2. If we fail to provide the notice of nonrenewal as required, the policy will be deemed to be renewed for the ensuing policy period upon payment of the appropriate premium, and coverage will continue until you have accepted replacement coverage with another insurer, until you have agreed to the nonrenewal, or until the policy is canceled.

WC 16 06 01
(Ed. 12/97)
© 1997 National Council on Compensation Insurance

1 of 2
INSURED'S COPY

COMPLAINT 129

3. If we have delivered or mailed to you a renewal notice, bill, certificate, or policy not less than 30 days before the end of the current policy period clearly stating the amount and due date of the renewal premium charge, then the policy will terminate on the due date without further notice unless the renewal premium is received by us or our agent on or before the due date. If the policy terminates in this manner, we will deliver or mail to you within 15 days of termination at your mailing address shown in Item 1 of the Information Page a notice that the policy was not renewed and the date on which coverage ceased to exist. Proof of mailing of the renewal premium to us or our agent on or before the due date will constitute a presumption of receipt on or before the due date.

4. If we offer to renew the policy for a premium amount more than 25% greater than the premium amount for the current policy term for like coverage and like risks, we will deliver or mail to you and to your agent not less than 75 days advance written notice of the renewal premium amount. We may at our option, in order to comply with this requirement, extend the period of coverage of the current policy at the expiring premium.

WC 16 06 01
(Ed. 12/97)
©1997 National Council on Compensation Insurance

Countersigned by _____

*Englbrecht*

2 of 2
INSURED'S COPY

**Authorized Representative**

COMPLAINT 130

**KENTUCKY AMENDATORY ENDORSEMENT**
**ADDENDUM TO LOSS REIMBURSEMENT ENDORSEMENT**
**FORM NO. WC990002A (ED. 01/02)**

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   11/01/2006         forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This policy is hereby amended as follows:

In consideration of the premium charged, it is hereby understood and agreed that **Section D. CANCELLATION** is deleted in its entirety and replaced with the following:

**D.   CANCELLATION**

Part Six of the policy - " CONDITIONS ", Section D. "Cancellation" is amended to include the following:

If you fail to reimburse us, or fail to deliver collateral to us when due, or fail to pay us premium when due, we may cancel this policy by mailing or delivering written notice to you, stating the day and hour the cancellation is to take effect as follows:

    a.    not less than 14 days prior to the effective date of such cancellation if cancellation occurs within 60 days of the date of issuance of the policy; or

    b.    not less than 75 days prior to the effective date of such cancellation if the policy has been in effect more than 60 days.

Written notification will be accompanied by a written explanation of the specific reason or reasons for the cancellation.

Proof of the mailing of such notice to you at your mailing address shown in item 1 of the Information Page will be sufficient to prove notice.

All other terms, conditions and exclusions remain unchanged.

WC 89 16 01A
(Ed. 02/02)

Countersigned by _____

_Jff Englbrukt_

INSURED'S COPY

**Authorized Representative**

COMPLAINT 131

## ENDORSEMENT

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC    720-94-31

Issued to: THE UNITED COMPANY

By: AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

### IMPORTANT NOTICE TO POLICY HOLDERS

In the event you need to contact someone about this policy for any reason please contact your agent. If you have additional questions you may contact the insurance company issuing this policy at the following address and telephone number:

A Member Company of American International Group Inc.
70 Pine Street
New York, N.Y. 10270
Telephone  1-212-770-7000

If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact the Virginia Bureau of Insurance at:

Property and Casualty Division
Bureau of Insurance
P.O. Box 1157
Richmond, Virginia 23218

In state toll-free calls 1-800-552-7945
Out-of-state calls 1-804-371-9741

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company or the Bureau of Insurance, have your policy number available.

_____
Authorized Representative

Issue Date: 11/28/06

LWNINPH

INSURED'S COPY

## VIRGINIA TERRORISM RISK INSURANCE EXTENSION ACT ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   11/01/2006              forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement addresses requirements of the Terrorism Risk Insurance Act of 2002 as amended by the Terrorism Risk Insurance Extension Act of 2005.

### Definitions

The definitions provided in this endorsement are based on the definitions in the Act and are intended to have the same meaning. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply.

"Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments resulting from the Terrorism Risk Insurance Extension Act of 2005.

"Act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States as meeting all of the following requirements:

a.  The act is an act of terrorism.

b.  The act is violent or dangerous to human life, property or infrastructure.

c.  The act resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels.

d.  The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Insured terrorism or war loss" means any loss resulting from an act of terrorism (including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

"Insurer deductible" means:

a.  For the period beginning on November 26, 2002 and ending on December 31, 2002, an amount equal to 1% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding November 26, 2002.

b.  For the period beginning on January 1, 2003 and ending on December 31, 2003, an amount equal to 7% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2003.

c.  For the period beginning on January 1, 2004 and ending on December 31, 2004, an amount equal to 10% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2004.

d.  For the period beginning on January 1, 2005 and ending on December 31, 2005, an amount equal to 15% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2005.

e.  For the period beginning on January 1, 2006 and ending on December 31, 2006, an amount equal to 17.5% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2006.

f.  For the period beginning January 1, 2007 and ending on December 31, 2007, an amount equal to 20% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2007.

### Limitation of Liability

The Act may limit our liability to you under this policy. If annual aggregate insured terrorism or war losses of all insurers exceed $100,000,000,000 during the applicable period provided in the Act, and if we have met our insurer deductible, the amount we will pay for insured terrorism or war losses under this policy will be limited by the Act, as determined by the Secretary of the Treasury.

WC 45 04 01
(Ed. 01/06)
© 2005 National Council on Compensation Insurance, Inc.

INSURED'S COPY

COMPLAINT 133

**Policyholder Disclosure Notice**

1. Insured terrorism or war losses would be partially reimbursed by the United States Government under a formula established by the Act. Under this formula, the United States Government would pay 90% for Program Year 4 and 85% for Program Year 5 of our insured terrorism or war losses exceeding our insurer deductible.

2. The premium charged for the coverage this policy provides for insured terrorism or war losses is included in the amount shown in Item 4 of the Information Page or the Schedule below.

Schedule

Refer to Item 4 of the Information Page and State Schedule Pages form WC 7754 for the premium charged for the coverage your policy provides for workers compensation losses caused by an act of foreign terrorism. This premium is included in your Total Estimated Premium and is an estimate. The final premium for this coverage will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.

The rates and rating methodologies used to calculate the premium charged for this coverage are subject to change. This means that the rates and rating methodologies applied when your policy was issued may be different from those applied when computing your premium after the issuance of the policy, for example, at time of audit.

WC 45 04 01
(Ed. 01/06)
© 2005 National Council on Compensation Insurance, Inc.

Countersigned by _____

Page 2 of 2
INSUREDS COPY

Authorized Representative

COMPLAINT 134

## VIRGINIA AMENDATORY ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006      forms a part of Policy No. WC    720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

This endorsement applies only to the Virginia insurance provided by the policy because Virginia is shown in item 3.A. of the Information Page.

For Virginia insurance Part Six.D. (Conditions-Cancelation) is replaced by:

1.  You may cancel this policy. You must mail or deliver advance written notice to us. You must provide written notice of your cancelation, including the date of and reasons for the cancelation, to the Workers Compensation Commission.

2.  We may cancel this policy. We will provide you with 30 days notice of cancelation. We will provide the Workers Compensation Commission with immediate notice of such cancelation. This provision does not apply if you have obtained other insurance and that insurer has notified the Workers Compensation Commission that it is now providing your insurance.

3.  In the event of cancelation by you or us, you must provide 30 days written notice of the cancelation to your covered employees.

4.  We may nonrenew your policy. We will provide 30 days notice to you and to the Workers Compensation Commission of our decision to nonrenew. This provision does not apply if you have obtained other insurance and that insurer has notified the Workers Compensation Commission that it is now providing your insurance.

5.  If you fail to pay the premium due on this policy we may cancel the policy by providing 10 days notice to you and to the Workers Compensation Commission.

'WC 45 06 02                    Countersigned by _____
(Ed. 07-93)

Authorized Representative

INSURED'S COPY

COMPLAINT 135

**VIRGINIA CONTRACTING CLASSIFICATION PREMIUM ADJUSTMENT ENDORSEMENT**

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   11/01/2006        forms a part of Policy No. WC   720-94-31

Issued to THE UNITED COMPANY

By AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

The premium for the policy may be adjusted by a Virginia Contracting Classification Premium Adjustment factor. The factor was not available when the policy was issued. If you qualify, we will issue an endorsement to show the premium adjustment factor after it is calculated.

**WC 45 06 04**
**(Ed. 1-97)**

Countersigned by _____

_Jb Englbrecht_

**Authorized Representative**

INSURER'S COPY

ENDORSEMENT

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC    720-94-31

Issued to: THE UNITED COMPANY

By: AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---------|---------------------------|------|------|
| 0001 | SAPPHIRE COAL COMPANY<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 542024819 | |
| 0002 | UNITED COAL COMPANY, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 542024819 | |
| 0003 | SAPPHIRE COAL COMPANY<br>147 BIG BLUE BLVD<br>WHITESBURG, KY 41858-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 212111 | 542024819 | |
| 0004 | SAPPHIRE COAL COMPANY<br>POLLY MINE<br>WHITESBURG, KY 41858-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 212111 | 542024819 | |
| 0005 | SAPPHIRE COAL COMPANY<br>SANDLICK MINE<br>WHITESBURG, KY 41858-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 212111 | 542024819 | |
| 0006 | SAPPHIRE COAL COMPANY<br>ROUTE 7, 1 MILE NORTH OF ISOM<br>WHITESBURG, KY 41858-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 212111 | 542024819 | |
| 0007 | SAPPHIRE COAL COMPANY<br>7727 HIGHWAY 931N<br>WHITESBURG, KY 41858-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 212111 | 542024819 | |
| 0008 | UNITED COAL HANDLING, LLC<br>NO FIXED ADDRESS<br>ASHLAND, KY 41101-0000<br>BUSINESS TYPE: LIMITED LIABILITY COMPANY<br>NAIC: 212111 | 061798839 | |

CONTINUED NEXT PAGE

Issue Date: 11/28/06

WC990610 (Ed. 1-97)

INSUREDIS COPY

PAGE 2

ENDORSEMENT

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC   720-94-31

Issued to: THE UNITED COMPANY

By: AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---------|---------------------------|------|------|
| 0009 | WELLMORE COAL COMPANY<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0010 | HOKIE MINING COMPANY, INC.<br>ROUTE 83<br>NORA, VA 24272-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0011 | ACCESS COAL COMPANY<br>JEWELL RIDGE<br>TAZWELL, VA 99999-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0012 | HIGHWALL ENERGY COMPANY, INC.<br>SURFACE MINE NEAR DISMAL<br>NORA, VA 24272-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0013 | SURFACE MINERALS COMPANY<br>SURFACE MINE NEAR CONWAY<br>BIG ROCK, VA 24603-0000<br>BUSINESS TYPE: CORPORATION | 541593526 | |
| 0014 | HILLTOP ENERGY CORPORATION<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0015 | PATRICK COAL CORPORATION<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0016 | SURFACE MINERALS COMPANY<br>BORDER OF BUCHANON, CO. VA &<br>PIKE CITY<br>NEAR GRUNDY, VA, KY 41524-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 212111 | 541593526 | |
| 0017 | KENTAR ENERGY COMPANY<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |

CONTINUED NEXT PAGE

Issue Date: 11/28/06

WC990610 (Ed. 1-97)

INSURED'S COPY

COMPLAINT 138

PAGE 3

ENDORSEMENT

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC    720-94-31

Issued to: THE UNITED COMPANY

By: AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---------|---------------------------|------|------|
| 0018 | BLACK DIAMOND COAL COMPANY,LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0019 | NORTON COAL COMPANY, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0020 | LARGO RESOURCES, INC.<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0021 | COMPAC, INC.<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0022 | WELLMORE ENERGY COMPANY, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0023 | BLACK WATCH COAL COMPANY, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0024 | MOUNTAIN EMPIRE ENERGY COMPANY<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0025 | THE BLACK DIAMOND COMPANY<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0026 | BANNER BLUE COAL COMPANY<br>APOLLO MINE #1 STATE ROUTE 609<br>MOUTH OF DEEL FORK<br>HARMAN, VA 24618-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |

CONTINUED NEXT PAGE

Issue Date: 11/28/06

WC990610 (Ed. 1-97)

INSURED'S COPY

COMPLAINT 139

PAGE 4

## ENDORSEMENT

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC    720-94-31

Issued to: THE UNITED COMPANY

By: AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---------|---------------------------|------|------|
| 0027 | BANNER BLUE COAL COMPANY<br>ROUTE 643<br>HURLEY, VA 24620-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0028 | BANNER BLUE COAL COMPANY<br>LICK LOG MINE<br>BIG ROCK, VA 24603-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0029 | BANNER BLUE COAL COMPANY<br>BEE TREE MINE, ROUTE 610<br>BIG ROCK, VA 24603-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0030 | BANNER BLUE COAL COMPANY<br>LOCUST THICKET MINE<br>BREAKS, VA 24607-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0031 | THE BANNER COMPANY<br>BRISTOL #8 NEECE CREEK<br>NEAR DISMAL FORK<br>NORA, VA 24272-0000<br>BUSINESS TYPE: CORPORATION | 541347312 | |
| 0032 | WELLMORE COAL COMPANY, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 541675068 | |
| 0033 | UNITED COAL SUPPORT SERVICES, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: LIMITED LIABILITY COMPANY | 412184935 | |
| 0034 | UNITED EQUIPMENT LEASING COMPANY<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 542024819 | |
| 0035 | UNITED UNDERGROUND MANAGEMENT, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 542024819 | |

CONTINUED NEXT PAGE

Issue Date: 11/28/06

WC990810 (Ed: 1-97)

INSUREDIC COPY

COMPLAINT 140

PAGE 5

## ENDORSEMENT

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC     720-94-31

Issued to: THE UNITED COMPANY

By: AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---------|---------------------------|------|------|
| 0036 | UNITED COAL SUPPORT SERVICES, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 542024819 | |
| 0037 | NORTH STAR ONE, LLC<br>1005 GLENWAY AVENUE<br>BRISTOL, VA 24201-0000<br>BUSINESS TYPE: CORPORATION | 542024819 | |

Authorized Representative

Issue Date: 11/28/06

WC990610 (Ed. 1-97)

INSURED'S COPY

COMPLAINT 141

# LARGE RISK RATING PLAN ENDORSEMENT

### PLAN TYPE ONE YEAR

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" needs to be completed only when this endorsement is issued subsequent to the preparation of the policy.)

This Endorsement, effective 12:01 AM 11/01/2006 forms a part of Policy Number **WC 7209431**

Issued to **THE UNITED COMPANY**

By **AI South Insurance Company**

## PART I. GENERAL TERMS and CONDITIONS

This endorsement determines the *Final Premium* for the insurance provided during the Rating Period by this policy, any other policy described in this endorsement in Section 1 of PART II, and the renewals and replacements of each (the "policies"). The Rating Period begins and ends at 12:01 AM on the respective dates shown in Section 1 of PART II. If the Plan Type of this endorsement states Construction Project, this endorsement applies only to, and for the duration of, the construction project described in Section 1 of PART II.

The rates and the basis types described in PART II will remain fixed for the duration of the Rating Period, except (if applicable) Section 7 "Claims Service Charges on Fee Basis", Section 8 "Taxes, Assessments and Surcharges", and any applicable items set forth in Section 11 "Exceptions". These exceptions will be subject to change at each anniversary of the beginning of the Rating Period.

### Section 1. Premium Calculation

The *Final Premium* for the policies will be the sum of the total *Subject Premium* and the total *Non-Subject Premium*. The way that the total *Subject Premium* will be determined is described below and is shown in Section 9, Item A of PART II. The way that the total *Non-Subject Premium* will be determined is described below and is shown in Section 9, Item B of PART II.

A.  **Total *Subject Premium*:** The total *Subject Premium* for the policies will be determined separately by state and kind of insurance. For each state and kind of insurance, the *Subject Premium* shall be the sum of *Subject Losses* and the Charges for the Insurance Charge, Expenses and Profit divided by the Tax/Assessment Divisor as determined below.

  1.  *Subject Losses*: The first part of the *Subject Premium* will be the sum of all *Subject Losses* under any applicable terms of the policies described in Section 1 of PART II and as identified in Section 5, Item A of PART II.

  2.  Charges for Insurance Charge, Expenses and Profit: The second part of the *Subject Premium* will be the component parts of the *Subject Premium* other than *Subject Losses* that are identified as line items in Section 9, Item A of PART II.

    The entire estimated amount of each such charge can be found in Section 9, Item A of PART II subject to any applicable Minimum Premium shown for it.

    We will apportion the entire amount of each such charge to each kind of insurance and state covered under the policies in proportion to the respective *Standard Premium* of each, except that:

    a.  Charges for claims service expenses will be allocated in proportion to respective *Subject Losses*, and

    b.  Charges for administrative expenses and profit for the kinds of insurance in the states described in Section 2 of PART II will be the difference between:

      i.  the *Final Premium* for such kinds of insurance and states determined as provided for in the policy other than by this Endorsement, and

      ii.  the sum of *Subject Losses*, all other charges for the Insurance Charge, Expenses and Profit included in this item 2, taxes and assessments determined through the application of the Tax/Assessment Divisor, and *Non-Subject Premiums* for such states.

  3.  Tax/Assessment Divisor: One (1.000) less the Tax/Assessment Rate as shown in Section 9 Item A of PART II. The rate is calculated as indicated in Section 8 of PART II.

B.  **Total *Non-Subject Premium*:** The part of the *Final Premium* for the kinds or layers of insurance described in Section 9, Item B of PART II will be calculated as shown therein. If no *Basis* of premium determination for *Non-Subject Premium* is shown in Section 9, Item B of PART II, the *Non-Subject Premium* will be determined as set forth in the policy under which such insurance is provided.

---

INSURED'S COPY

COMPLAINT 142

## LARGE RISK RATING PLAN ENDORSEMENT

### Section 2. Schedule of Premium Adjustments

A. The estimated *Final Premium* is shown in Section 9, Item C of PART II. We will recalculate the estimated *Final Premium* as soon as practicable after the First Valuation Date shown in Section 5 of PART II. We will recalculate the estimated *Final Premium* annually thereafter until you and we agree in writing that no more recalculations will be done.

B. Additional premium due us, or return premium due you, resulting from the calculation or recalculation of the *Final Premium*, will be payable in its entirety promptly unless otherwise specified in a premium finance agreement between you and us.

### Section 3. Expected Total Cost

In addition to *Final Premium*, you may be liable under the terms of the policies for reimbursements of certain losses and *Allocated Loss Adjustment Expenses* we pay, subject to any *Minimum Cost* and *Maximum Cost* as described below, and surcharges. Our estimated amounts for such additional costs, if any, are shown in Section 9, Item C of PART II:

A. **Minimum Cost:** If a *Minimum Cost* is applicable, that amount is the minimum you must pay for the *Subject Premium* and, if applicable, *Non-Subject Premium*, *Reimbursable Losses*, *Deductible Losses*, *Self-Insured Losses* and *ALAE* itemized in Section 6 Item A. c. of PART II. Component items not itemized in Section 6, Item A. c. of Part II are not included in the *Minimum Cost*. If an Adjustment Rate and a *Basis* of Adjustment are shown in Section 6, Item A. a. of PART II, the *Minimum Cost* will be determined by multiplying the Adjustment Rate by the actual *Basis* of Adjustment as determined by our final audit of your books and records.

B. **Maximum Cost:** If a *Maximum Cost* is applicable, that amount is the maximum you must pay for *Subject Premium* and, if applicable, *Non-Subject Premium*, *Reimbursable Losses*, *Deductible Losses*, *Self-Insured Losses* and *ALAE* itemized in Section 6 Item B. c. of PART II. Component items not itemized in Section 6, Item B. c. of Part II are not included in the *Maximum Cost*. If an Adjustment Rate and a *Basis* of Adjustment are shown in Section 6, Item B. a. of PART II, the *Maximum Cost* will be determined by multiplying the Adjustment Rate by the actual *Basis* of Adjustment as determined by our final audit of your books and records.

### Section 4. Definitions

A. *"Aggregate Stop Amount"* means the maximum amount of benefits, damages and *ALAE* payable by you for losses under the policies described in Section I of PART II, subject to any *Aggregate Stop Limit*.

B. *"Aggregate Stop Limit"* means the maximum amount of benefits, damages and *ALAE* above the *Aggregate Stop Amount* that we will not require you to reimburse us for under any Loss Reimbursement or Deductible terms of the policies described in Section I of PART II.

C. *"Allocated Loss Adjustment Expenses"* or *"ALAE"* will include all fees for service of process and court costs and court expenses; pre- and post-judgement interest; attorneys' fees; cost of undercover operative and detective services; costs of employing experts; costs for legal transcripts, copies of any public records, and costs of depositions and court-reported or recorded statements; costs and expenses of subrogation; and any similar fee, cost or expense reasonably chargeable to the investigation, negotiation, settlement or defense of a loss or a claim or suit against you, or to the protection and perfection of your or our subrogation rights.

*ALAE* will not include loss adjustment expenses explicitly included in the premium calculation formula of Section 1, Paragraph A, Item 2 of this PART I or otherwise explicitly included in the rating values shown in PART II; nor the salary, employee benefits, or overhead of any of our employees, nor the fees of any attorney who is our employee or under our permanent retainer; nor the fees of any attorney we retain to provide counsel to us about our obligations, if any, under any policy issued by us or our affiliated companies, with respect to a claim or suit against you.

*ALAE* Option selected and shown in Section 3 of PART II is described below.

a. Option A: *Subject Loss* includes all or a part of all *ALAE* such that the *Subject Loss* will not exceed the applicable *Retained Amount*.

b. Option B: *Subject Loss* includes 100% of all *ALAE*.

c. Option C: *Subject Loss* includes all or a part of *ALAE* calculated according to the following formula:

    i.  if we incur NO obligation under the policies to pay damages, benefits or indemnity resulting from a claim, *Subject Loss* under that claim will include all *ALAE* up to the applicable *Retained Amount* and a percentage of all *ALAE* in excess thereof. That percentage is shown in Section 3 of PART II under "Option C Excess %"; or

---

11/01/2006 003/01 9463903

INSURED'S COPY

COMPLAINT 143

# LARGE RISK RATING PLAN ENDORSEMENT

    ii.   If we DO incur an obligation to pay damages, benefits or indemnity under the policies because of a claim, *Subject Loss* under that claim will include all *ALAE* incurred under that claim, multiplied by the amount of our obligation to pay damages or benefits up to the applicable *Retained Amount*, divided by the total amount of our obligation to pay damages or benefits.

   d.   Option D: *Subject Loss* includes none of the *ALAE*.

D.   *"Basis"* will have the meaning(s) shown in Section 10 of PART II.

E.   *"Deductible Loss"* means any amount that you must reimburse us under a Deductible Endorsement of the policies described in Section 1 of PART II.

F.   *"Final Premium"* means the premium for the insurance afforded under the policies described in Section 1 of PART II and others as may be added by endorsement thereto, upon its final recalculation according to the terms of the policies and this endorsement. Prior to such final recalculation, the premium for such insurance is only the estimated premium.

G.   *"Incurred Loss"* means the total amount we have paid and have reserved for payment as damages or benefits because of an occurrence, accident, claim or suit, and all the *Allocated Loss Adjustment Expenses* we incur in connection therewith under a policy described in PART II, including reserves for occurrences, accidents, claims or suits that have happened but have not been reported to us and for statistically expected loss development on claims that have been reported to us.

H.   *"Minimum Cost"* means the minimum amount payable by you for the Schedule of *Subject Premium* and *Reimbursable Losses* and *Deductible Losses* and *Self-Insured Losses* and *ALAE*, if applicable, described in Section 6 of PART II.

I.   *"Maximum Cost"* means the maximum amount payable by you for the Schedule of *Subject Premium* and *Reimbursable Losses* and *Deductible Losses* and *Self-Insured Losses* and *ALAE*, if applicable, described in Section 6 of PART II.

J.   *"Non-Subject Premium"* means any premium not subject to the premium calculation of this endorsement.

K.   *"Reimbursable Loss"* means any amount that you must reimburse us under a Loss Reimbursement Endorsement of the policies described in Section 1 of Part II.

L.   *"Retained Amount"* means:

   1.   the amount that is specified as your Self-Insured Retention or as the Loss Reimbursement amount or Deductible amount applicable to an *Incurred Loss* in the applicable policy; or

   2.   if the foregoing does not apply, the largest part of any damages or benefits paid or payable under a policy because of any single accident, occurrence, claim or suit, that we will include in the computation of the *Subject Premium.*

Such amount is shown in Section 4 of PART II for each type of insurance afforded under the policies described in Section 1 of PART II.

M.   *"Self-Insured Loss"* or *"SIR"* means any loss you incur under a Self-Insured Retention of the policies described in Section 1 of PART II.

N.   *"Standard Premium"* means the premium as calculated according to the terms of each applicable policy, without application of this Endorsement, subject to the following:

   1.   For Workers Compensation and Employers Liability Insurance, *Standard Premium* means the premium determined on the basis of our rates as approved by regulatory authority, the remuneration of your employees in the coverage period, your Experience Modifications and Schedule Modifications, Loss Constant, and Minimum Premiums. Determination of *Standard Premium* will exclude:

      a.   any discount that recognizes any reduction in our expense ratio based on premium size or other factors; or

      b.   any discount for a Loss Reimbursement or Deductible.

      c.   Expense Constant.

   2.   For all other insurance, *Standard Premium* is the premium as calculated according to the terms of each applicable policy for insurance within the *Retained Amounts*, but without the application of this Endorsement, and without reduction for:

COMPLAINT 144

## LARGE RISK RATING PLAN ENDORSEMENT

a. any discount that recognizes any reduction in our expense ratio based on premium size or other factors; or

b. any discount for a Loss Reimbursement or Deductible.

O. *"Subject Loss"* means the entire *Incurred Loss* (including any reimbursable or deductible portion of it) up to the sum of:

1. the damages or benefits we must pay or have paid up to the *Retained Amount*, and

2. all or a part of the *Allocated Loss Adjustment Expenses* we incur in accordance with the *ALAE* Option shown in Section 3 of PART II and defined in Item C of this section.

P. *"Subject Premium"* means the premium subject to retrospective adjustment on the basis described in Section 1, Paragraph A of this PART I.

### Section 5. Exceptions and Changes

All exceptions and changes, if any, to the provisions of PART I, PART II or PART III of this endorsement are set forth in Section 11 of PART II or in a written addendum hereto.

Copyright 2004 American International Group, Inc.
11/01/2006 003/01 9463903

INSURED'S COPY

COMPLAINT 145

## LARGE RISK RATING PLAN ENDORSEMENT

### PART II. *SCHEDULE* of POLICIES and RATING VALUES

**Section 1. APPLICATION of this Endorsement**

RATING PERIOD: This Endorsement applies to the period beginning **11/01/2006** and ending **11/01/2007**.

The *Basis* of Premium, *Subject Losses, Self-Insured Losses, Minimum Cost, Maximum Cost*, Minimum Premiums and Estimated Premiums shown in Section 5, Section 6, Section 7 and Section 9 of this PART II are estimated amounts for:

☐ the first year of the Rating Period, or ☒ the **entire** Rating Period.

POLICIES: ☒ This Endorsement applies to the policies described below, and to their replacements and renewals effective during the Rating Period, or

☐ This Endorsement applies to the policies described below, and to their replacements and renewals, and all subcontractor policies issued under a **Construction Project**. The Construction Project is described as follows:

N/A

a. Workers Compensation and Employers Liability Insurance policies:
   **WC 7209431.**

b. Commercial General Liability Insurance policies:

c. Automobile Liability Insurance policies:

d. Other Insurance policies (described):

**Section 2. Premiums for insurance on risks in states described below will be determined in accordance with the terms of the applicable policy other than this endorsement.**

| Kinds of Insurance | States |
|---|---|
| None | NONE |

**Section 3. *Allocated Loss Adjustment Expenses* Options**

| ALAE Option (enter ALAE Option A, B, C or D as applicable) | If ALAE Option C, enter Excess % | Applies to |
|---|---|---|
| A | 0% | WC 7209431 . |

11/01/2006 003:04 9463903

INSURED'S COPY

COMPLAINT 146

# LARGE RISK RATING PLAN ENDORSEMENT

**Section 4.** *Retained Amounts:* ☒ applicable to all Insureds; or ☐ refer to Extension Schedule

| Kind of Insurance | Retained Amount | Applicable to | Limitations or Descriptions |
|---|---|---|---|
| **Workers Compensation** | | | |
| Workers Compensation and Employers Liability under State Law - Insured States | $1,000,000 | Each Accident or each Person for Disease | |
| Workers Compensation and Employers Liability under Federal Law - Insured States | $1,000,000 | Each Accident or each Person for Disease | |
| Workers Compensation and Employers Liability - Self-Insured States | $0 | Each Accident or each Person for Disease | |
| Employers Liability - Monopolistic States | | Each Accident or each Person for Disease | |
| | | Each Accident or each Person for Disease | |
| **Commercial General Liability** | | | |
| Premises, Operations, Personal and Advertising Injury, Medical Payments, or Damage to Property Liability | $0 | Each Occurrence | |
| Products or Completed Operations Liability | $0 | Each Occurrence | |
| [Other] | | Each Occurrence | |
| **Commercial Automobile Liability, including UM/UIM and PIP/No Fault, if any** | | | |
| Automobile Liability | $0 | Each Accident | |
| Garage Liability | $0 | Each Accident | |
| [Other] | | Each Accident | |
| Combined Kinds Retention | | Each Occurrence | |

## Section 5. Forecast of *Subject Losses*

We have shown our forecast of your *Subject Losses* below.

a. Reimbursable and deductible portion of covered *Incurred Losses* (except amounts insured under "Deductible Liability Protection" policies, if any, subject to this Endorsement)     $2,323,000

b. All other covered *Subject Losses* (including amounts insured under "Deductible Liability Protection" policies, if any, subject to this Endorsement)     $0

**First Loss Valuation Date:** 05/31/2007 and annually thereafter until all claims are closed or mutually agreed upon as to value.

## Section 6. *Minimum Cost* and *Maximum Cost*

The *Minimum Cost* and *Maximum Cost*, if any, will be applied as explained below.

**Item A. *Minimum Cost:*** ☐ applicable, or ☒ not applicable

Line of Insurance:     None

a. *Minimum Cost*, adjustable on the *Basis* and rate shown below:     $0
    *Basis* of Adjustment:    None      Per    0
    Estimated *Basis* amount:    $0      Adjustment Rate:    0.0000

---

11/01/2006 003/01 9453903

INSURED'S COPY

COMPLAINT 147

## LARGE RISK RATING PLAN ENDORSEMENT

b. *Self-Insured Losses* you incur to which no insurance under the policies described in Section 1 of this PART II applies will NOT be included in determining whether or when the *Minimum Cost* has been reached, except as described herein:

Exceptions:    N/A

Our forecast of your *Self-Insured Losses* included in paragraph a. above    $0

c. The following *Minimum Cost* itemization schedule applies:

### Item B. *Maximum Cost:* ☐ applicable, or ☒ not applicable

Line of Insurance:        None

The *Maximum Cost* will not be less than the estimated amount shown below, unless otherwise set forth in Section 11 of PART Two.

a. *Maximum Cost*, adjustable on the *Basis* and rate shown below:        $0

*Basis* of Adjustment:        None              Per        0

Estimated *Basis* amount:        $0                    Adjustment Rate:        0.0000

b. *Self-Insured Losses* you incur to which no insurance under the policies described in Section 1 of this PART II applies will NOT be included in determining whether or when the *Maximum Cost* has been reached, except as described herein:

Exceptions:    N/A

Our forecast of your *Self-Insured Losses* included in paragraph a. above    $0

c. The following *Maximum Cost* itemization schedule applies:

COMPLAINT 148

## LARGE RISK RATING PLAN ENDORSEMENT

**Section 7. Claims Service Charges**

☐ Charge shown in Section 9, Item A *Subject Premium* of PART II, or ☐ fee schedule described below.

**The Claims Service Provider is:**

### FEE SCHEDULE

☐ If X'ed here, the following fee schedule applies:

**Claims Services Fee Schedule - Rates per Claimant**

| Type of Claim | Rate per Claimant | Estimated No. of Claimants | Estimated Fee |
|---|---|---|---|
| Workers Comp | | | |
| Medical | 0.00 | 0 | $0 |
| Indemnity | 0.00 | 0 | $0 |
| California | 0.00 | 0 | $0 |
| Texas | 0.00 | 0 | $0 |
| AOS | 0.00 | 0 | $0 |
| Surcharge Claims | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| General Liability | | | |
| Bodily Injury | 0.00 | 0 | $0 |
| Property Damage | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| Product Liability | | | |
| Bodily Injury | 0.00 | 0 | $0 |
| Property Damage | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| Automobile Liability | | | |
| Bodily Injury | 0.00 | 0 | $0 |
| Property Damage | 0.00 | 0 | $0 |
| Physical Damage | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| Incident Reports | 0.00 | 0 | $0 |
| Int. to Designated States | 0.00 | 0 | $0 |
| Other | 0.00 | 0 | $0 |
| | **Estimated Total Rate-per-Claimant Fee** | | **$0** |

⊕ 11/01/2006 003:01 9463903

INSURED'S COPY

COMPLAINT 149

# LARGE RISK RATING PLAN ENDORSEMENT

☐ If X'ed here, the following fee schedule applies:

## Additional Service Fees Details

| Additional Service Fees | Item Count | Rate/Item | Estimated Fee |
|---|---|---|---|
| Quarterly Loss Report | 0 | 0.00 | $0 |
| Subcontractor Interoffice Supervision | 0 | 0.00 | $0 |
| Magnetic Tape Fee | 0 | 0.00 | $0 |
| Subrogation | 0 | 0.00 | $0 |
| Appraisals | 0 | 0.00 | $0 |
| TPA Expenses | 0 | 0.00 | $0 |
| GAB Expenses | 0 | 0.00 | $0 |
| Cash Management Account Services | 0 | 0.00 | $0 |
| Claim File Reviews | 0 | 0.00 | $0 |
| Contingency Recovery Fees | 0 | 0.00 | $0 |
| Incoming Quality Control | 0 | 0.00 | $0 |
| Legal Cost Control | 0 | 0.00 | $0 |
| Location Visits | 0 | 0.00 | $0 |
| Semiannual Client Meetings | 0 | 0.00 | $0 |
| RMIS Reports | 0 | 0.00 | $0 |
| Customized Account Servicing | 0 | 0.00 | $0 |
| Structured Settlement Program | 0 | 0.00 | $0 |
| Reporting | 0 | 0.00 | $0 |
| Conversion | 0 | 0.00 | $0 |
| Minimum Adjusting Fee | 0 | 0.00 | $0 |
| Intellirisk Charges | 0 | 0.00 | $0 |
| Administration Fee | 0 | 0.00 | $0 |
| **Estimated Additional Services Fee** | | | **$0** |

## Tail Fees Details

| Tail Fees | Item Count | Rate/Item | Estimated Fee |
|---|---|---|---|
| Workers Comp Med. Only | 0 | 0.00 | $0 |
| Workers Comp. Indemnity | 0 | 0.00 | $0 |
| General Liability | 0 | 0.00 | $0 |
| Products Liability | 0 | 0.00 | $0 |
| Auto Liability | 0 | 0.00 | $0 |
| Maintenance | 0 | 0.00 | $0 |
| **Estimated Tail Fee** | | | **$0** |

COMPLAINT 150

## LARGE RISK RATING PLAN ENDORSEMENT

☐ If X'ed here, the following fee schedules applies:

**Fee Schedule - Time and Expenses**

| Type of Charge | Rate | Per | Est. Units | Estimated Fee |
|---|---|---|---|---|
| Investigating Service by Employed Staff | | Hour | | |
| Adjuster | | Hour | | |
| General Adjuster | | Hour | | |
| Executive General Adjuster | | Hour | | |
| Heavy Equipment Appraiser | | Hour | | |
| Auto Damage Appraiser | | Hour | | |
| Property Damage Appraiser | | Hour | | |
| Supervisor | | Hour | | |
| Examiner | | Hour | | |
| Account Manager | | Hour | | |
| | | Hour | | |
| | | Hour | | |
| Subcontracted Investigations And Appraisals | | Hour | | |
| Clerical and Statistical Processing | | Hour | | |
| Other Expenses, including | | | | |
| Telephone | | Minute | | |
| Postage & Express Mail | | Cost | | |
| Auto Mileage, Rental, Tolls, Parking | | Mile | | |
| Photocopies | | Copy | | |
| Photography | | Photo | | |
| Public Transportation | | Cost | | |
| Overhead | | Flat | | |
| Services Outside of USA | | | | |
| **Estimated Total Time and Expense** | | | | **$0** |
| **Estimated Total Claims Service Expenses** | | | | **$0** |

COMPLAINT 151

## LARGE RISK RATING PLAN ENDORSEMENT

### Section 8. Taxes and Assessments

The taxes and assessments determined by the method indicated by the box "X'd" below shall apply in determining the *Final Premium* earned under the policies described in Section 1 of Part II during the first annual term of this endorsement. If the Rating Period under this endorsement is longer than 1 year, we will provide you written notice of the applicable taxes and assessments for the subsequent term of the Rating Period not less than thirty (30) days prior to each anniversary of this endorsement.

### ☒ Item A. Fixed Rates

The Average Rates for taxes and assessments are shown in Item A. of Section 9 of PART II. The Average Rates will be fixed and applied without change in determining the *Final Premiums* earned under the policies described in Section I of PART II during the first annual period of this Endorsement.

### ☐ Item B. Rates to be Recalculated

The Average Rates for taxes and assessments are shown in Item A. of Section 9 of Part II. The Average Rates will be recalculated to determine the *Final Premium* under the policies described in Section I of PART II, based on the rates shown in the chart below.

COMPLAINT 152

# LARGE RISK RATING PLAN ENDORSEMENT

**Section 9. The Rating Values and Amounts** shown below apply as the *Basis* of the *Final Premium* for the policies described in Section 1 of this Part II.

If the Rating Period exceeds one year, and if the estimated *Basis* of Premium, Minimum Premiums and Estimated Premiums shown below apply only to the first year, on or about each anniversary of the beginning of the Rating Period, we will issue an extension of this Section to show the rating values and amounts for each subsequent year of the Rating Period.

## Item A. *Subject Premium*, part of *Final Premium*

| Line Items | Rates | Per | *Basis* Types | Estimated Basis | Minimum Premium | Estimated Premium |
|---|---|---|---|---|---|---|
| $1Mill WC Deductible Premium | 5.5700 | 100 | WC PAYROLL | 18,725,801 | $0 | $1,043,027 |
| Aggregate Stop Premium | 1.1540 | 100 | WC PAYROLL | 18,725,801 | $216,096 | $216,096 |
| | | | | | Subtotal | $1,259,123 |
| Taxes/Assessments % | 0.0000% | or | Taxes/Assessments Divisor: | 0.000000 | | $0 |
| | | | | Estimated Total *Subject Premiums* | | $1,259,123 |

## Item B. Non-*Subject Premiums*, part of *Final Premium*

| Coverage Description | Rates | Per | *Basis* Types | Estimated Basis | Minimum Premium | Estimated Premium |
|---|---|---|---|---|---|---|
| | 0.0000 | 1 | | 0 | $0 | $0 |
| | | | Estimated Total Non-*Subject Premiums* | | | $0 |

## Item C. Summary of Expected Total Cost

| | | | | | | |
|---|---|---|---|---|---|---|
| Estimated *Final Premium* (Part A. plus Part B) | | | | | | $1,259,123 |
| Expected *Reimbursable Losses* and *Deductible Losses* and *Self-Insured Losses* and *ALAE*, if applicable | | | | | | $2,323,000 |
| Minimum Cost from Section 6. If not applicable, show $0 | | | | | | $0 |
| Maximum Cost from Section 6. If not applicable, show $0 | | | | | | $0 |
| Surcharges: | 0.0000 | 1 | STANDARD PREMIUM | 0 | $0 | $124,293 |
| | | | | EXPECTED TOTAL COST | | $3,706,416 |

11/01/2006 003:01 9463963

INSURED'S COPY

COMPLAINT 153

# LARGE RISK RATING PLAN ENDORSEMENT

**Section 10. Basis of Premium:**

**Payroll:**  means all of the money or the substitute for money earned during the terms of the policies described in Section 1 of this PART II by you if you are the proprietor of the insured business, by all partners or joint venturers if you are a partnership or joint venture, by all members if you are a limited liability company, and by all employees including temporary employees and workers leased by you from any employee leasing organization for their services to you during the policy period, subject to limitations set forth in the New York Workers Compensation Rating Bureau's manual rules, if applicable.

**Sales:**  means the gross amount of money you or others trading in your name have charged for all goods and services you or they have sold or distributed during the terms of the policies described in Section 1 of this PART II, including charges for delivery, installation, service and repair, and including taxes other than taxes which you or such others collect as a separate item and remit directly to a government division.

**Receipts:**  means the gross amount of money you have charged others for work that you, your partners, your employees, your contractors and subcontractors at all levels have performed during the terms of the policies described in Section 1 of this PART II, including taxes other than taxes which you or such others collect as a separate item and remit directly to a government division.

**Cost:**  means the total cost to you for all work performed for you during the terms of the policies described in Section 1 of this PART II by independent contractors and their subcontractors at all levels, including the cost of all labor, materials, equipment and supplies furnished, used or delivered for use in the execution of such work, whether furnished by the owner, by contractors, or subcontractors at any level, including but not limited to all fees, allowances, bonuses, and commissions either made, paid or due, as well as taxes other than taxes which you collect as a separate item and remit directly to a government division.

**Units:**  means the number of items of the type specified in this endorsement. Units that you hold for use in your business will mean the sum of their number at the inception of the terms of the policies described in Section 1 of this PART II plus their number at their expiration or termination, times 50% of the fraction of a full year that such policies were in force. Units that you sell to others whether for your own account or the account of another means the total number of such units that you sell during the term of such policies.

**Indemnity Losses:**  means the total amount we have paid and have reserved for payment as Workers Compensation benefits other than Medical benefits under a policy described in this PART II, including reserves for accidents or illness that have happened but have not been reported to us and for statistically expected loss development on claims that have been reported to us.

**Other:**  (Other)

**Section 11. Exceptions**

---

COMPLAINT 154

## LARGE RISK RATING PLAN ENDORSEMENT

### PART III. AGGREGATE STOP

The *Aggregate Stop Amount* and the *Aggregate Stop Limit*, if any, shown in the Schedule below will be applied as explained below.

### Section I. Aggregate Stop Amount

1. If an *Aggregate Stop Amount* is shown in the Schedule below, we will not include more than the *Aggregate Stop Amount* in the computation of the *Final Premium* and determination of maximum benefits, damages and "ALAE" payable or reimbursable by you under the terms of the policies described in Section I of PART II, subject to any *Aggregate Stop Limit* shown in the Schedule below.

   The maximum benefits, damages and *ALAE* to be included in the computation of the *Final Premium* will be the *Aggregate Stop Amount* shown in the Schedule below, less the following:

   a) all *Subject Losses* that you must reimburse us for under any Loss Reimbursement or Deductible terms applicable to the policy covering the *Incurred Loss*, and

   b) such amounts as described in Section III below that you have paid as *Self-Insured Losses*.

2. **Adjustment:** If an Adjustment Rate and an Adjustment *Basis* are shown in the Schedule below, the *Aggregate Stop Amount* shown in the Schedule below is only an estimate. The *Aggregate Stop Amount* will be finally determined by multiplying the Adjustment Rate by the final Adjustment *Basis* as determined by our audit of your books and records. The *Aggregate Stop Amount* will not be less than the estimated amount shown in the Schedule below, unless otherwise set forth in Section 11 of PART Two

3. The *Aggregate Stop Amount* will not be reduced on account of the cancellation of any policy to which this Endorsement applies.

### Section II. Aggregate Stop Limit

1. If an *Aggregate Stop Limit* is shown in the Schedule below, that Limit is the most *Subject Losses* above the *Aggregate Stop Amount* that will be excluded from the computation of the *Final Premium* and which you will not be required to reimburse us for under any Loss Reimbursement or Deductible terms of the policies described in Section I of PART II.

2. The *Aggregate Stop Limit* will not be reduced on account of the cancellation of any policy to which this Endorsement applies.

### Section III. Self-Insured Losses

*Self-Insured Losses:* Losses you incur to which no insurance applies under the policies described in Section I of PART II will NOT be included in determining whether or when the *Aggregate Stop Amount* or *Aggregate Stop Limit* have been reached, except as described herein:

Exceptions: None

### SCHEDULE

#### *Aggregate Stop Amount* and *Aggregate Stop Limit*

Line of Insurance:    Workers Compensation - Insured.

The *Aggregate Stop Amount* and the *Aggregate Stop Limit* apply to the ☐ first year of, or ☒ entire Rating Period.

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | *Aggregate Stop Amount*, adjustable on the *Basis* and rate shown below. | | | | | $3,484,000 |
| b. | *Basis* of Adjustment Amount: | **WC PAYROLL** | Per | 100 | Estimated *Basis* | $18,725,801 |
| | | | | | Adjustment Rate: | 18.6053 |
| c. | *Aggregate Stop Limit* | | | | | $0 |

Countersigned by _____    Date _____

(Authorized Signature)

11/01/2006 003:01 943903

INSURED'S COPY

COMPLAINT 155

## SUPPLEMENTAL INFORMATION

This section has been provided for *The United Company* to facilitate the collection of important Insurance Program information such as:

- ➢ Binders
- ➢ Certificates
- ➢ Claims Loss Notices
- ➢ Correspondence
- ➢ Meeting Minutes
- ➢ Premium Finance Agreement, if applicable



11

# EXHIBIT E

## CROSS-COLLATERALIZATION AGREEMENT

Effective the 1st day of November 2006

by and between

### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.
**In its own behalf and on behalf of other American International Companies, including but not limited to:**

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Vermont
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
Granite State Insurance Company
New Hampshire Insurance Company

(hereinafter called "Company", "us" or "our")

and

### SAPPHIRE COAL COMPANY

(hereinafter called "Sapphire")

and

### THE UNITED COMPANY

(hereinafter called "United")

**WHEREAS,** for the policy term commencing November 1, 2005, Company issued to Sapphire certain policies of insurance providing coverage on a deductible basis for commercial general liability, automobile liability, workers' compensation and employer's liability, ("Sapphire Policies"); and,

**WHEREAS,** in order to properly document all relevant components of Sapphire's deductible insurance program, including but not limited to Sapphire's financial and reimbursement obligations, the Company and Sapphire executed a payment agreement that, together with any and all addenda and schedules thereto, are hereinafter collectively referred to as the "Sapphire Agreements"; and,

**WHEREAS,** the Sapphire Policies in conjunction with the Sapphire Agreements collectively set forth the various obligations, including, but not limited to deductible obligation of Sapphire to Company ("Sapphire Obligations"); and,

**WHEREAS** in order to secure Company for the Sapphire Obligations, Sapphire has, pursuant to the terms and conditions of the Sapphire Agreements, provided to Company cash collateral, ("Sapphire Security"); and,

1 of 3

COMPLAINT 158

**WHEREAS,** for the policy term commencing November 1, 2006, Company issued to United, the parent company of Sapphire, certain policies of insurance providing coverage on a deductible basis for commercial general liability, automobile liability, workers' compensation and employer's liability, ("United Policies"); and,

**WHEREAS,** in order to properly document all relevant components of United's deductible insurance program, including but not limited to United's financial and reimbursement obligations, the Company and United executed a payment agreement that, together with any and all addenda and schedules thereto, are hereinafter collectively referred to as the "United Agreements"; and,

**WHEREAS,** the United Policies in conjunction with the United Agreements collectively set forth the various obligations, including, but not limited to, deductible obligation of United to Company ("United Obligations"); and,

**WHEREAS** in order to secure Company for the United Obligations, United is, pursuant to the terms and conditions of the United Agreements, required to procured for the benefit of the Company certain collateral in a form acceptable to Company, ("United Security"); and,

**WHEREAS,** Sapphire, United and Company (Collectively the "Parties") seek to have the Sapphire Security and United Security available to Company to secure both the Sapphire Obligations as well as the United Obligations; and,

**WHEREAS,** Company is agreeable to use of the Sapphire Security and United Security as collateral for both the Sapphire Obligations as well as the United Obligations.

**NOW THEREFORE,** in consideration of the payment of premium and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Nothing herein will serve to amend, alter or eliminate any right Company has under the Sapphire Agreements or United Agreements including, but not limited to, Company's ability to collect from Sapphire or United security under either Agreement as Company deems necessary.

2. This Cross Collateralization Agreement will not alter, amend or eliminate any of the terms and conditions of either the Sapphire or United Agreements.

3. In the event United divests itself of Sapphire, or the Sapphire Security or United Security is reduced to an amount that Company, at its sole discretion, contends is insufficient to adequately permit cross collateralization of the Sapphire Obligations or United Obligations, United will be required pursuant to the terms of the United Obligations, to procure for the benefit of the Company acceptable collateral as required by Company.

4. Nothing herein will serve to alter or amend the terms and conditions by which the Sapphire Security or United Security earn interest. Any and all interest applied to the Sapphire Security or United Security is subject to the terms of this Cross Collateralization Agreement. By the terms of this Cross Collateralization Agreement, Sapphire Security is not subject to the accruement of any additional interest over and above the interest earned on the United Security.

2 of 3

COMPLAINT 159

5. This Cross Collateralization Agreement will terminate only upon the mutual written consent of the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives in New York, New York, this 11th day of December, 2006.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.**
On behalf of itself and its affiliated companies first named above

BY: _Michael Suly_

TITLE: _____ Assistant Vice President

ADDRESS: 70 Pine Street
New York, New York 10270

and in _____, _____, this ____ day of December 2006.

**SAPPHIRE COAL COMPANY**

BY: _____

TITLE: _____

ADDRESS: _____
_____

and in _____, _____, this ___ day of December 2006.

**THE UNITED COMPANY**

BY: _____

TITLE: _____

ADDRESS: _____
_____

3 of 3

# EXHIBIT F

Message

## Pete Lunati

| From: | Tom Griffin [TGriffin@unitedco.net] |
|---|---|
| Sent: | Wednesday, April 04, 2007 10:06 AM |
| To: | Pete Lunati |
| Subject: | FW: United/Sapphire Cross Collateralization Agreement-PROBLEMS |
| Importance: High | |

Thomas D. Griffin,
Vice President of Risk Management,
The United Company

Phone: (276) 645-1416
Mobile: (423) 534-8352
Fax: (276) 645-1404
email: tgriffin@unitedco.net

**From:** Tom Griffin
**Sent:** Wednesday, February 14, 2007 9:47 AM
**To:** 'Pete Lunati'; 'Janet Bradley'; 'Jack Stewart'
**Subject:** FW: United/Sapphire Cross Collateralization Agreement-PROBLEMS
**Importance:** High

Thomas D. Griffin,
Vice President of Risk Management,
The United Company

Phone: (276) 645-1416
Mobile: (423) 534-8352
Fax: (276) 645-1404
email: tgriffin@unitedco.net

**From:** Tom Griffin
**Sent:** Thursday, January 25, 2007 1:46 PM
**To:** 'Harvey, Jimbill'; 'Mcquate, Glenn'
**Subject:** FW: United/Sapphire Cross Collateralization Agreement-PROBLEMS
**Importance:** High

Glenn: As you can see there is a problem with AIG's proposed language.While we very much want to accommodate them we cannot do it in the manner required in the agreement in it's present form.Paragraph 3 is of major concern & we could not agree to those conditions.AIG needs to get real on this.-TDG

4/4/2007

COMPLAINT 162

Thomas D. Griffin,
Vice President of Risk Management,
The United Company

Phone: (276) 645-1416
Mobile: (423) 534-8352
Fax: (276) 645-1404
email: tgriffin@unitedco.net

---

**From:** Anita Gilliam
**Sent:** Thursday, January 25, 2007 1:35 PM
**To:** Tom Griffin; Kenny Dockery
**Cc:** Brian Sullivan
**Subject:** RE: United/Sapphire Cross Collateralization Agreement

Tom—

Typically in a cross-collateralization agreement the parties just agree that their respective collateral covers the obligations of both parties. The Cross-Collateralization Agreement that National Union proposes frankly doesn't quite do that while at the same time its terms go far beyond the typical cross-collateralization agreement. Paragraph 3 provides that if either the Sapphire Security or the United Security is reduced to the point that National Union deems itself insecure, then United must provide collateral acceptable to National Union; it also requires United to provide collateral acceptable to National Union if we sell Sapphire. Have we agreed to the terms of Paragraph 3, particularly the latter item obligating us to provide collateral even if we no longer own Sapphire?

Anita

---

**From:** Tom Griffin
**Sent:** Thursday, January 18, 2007 3:36 PM
**To:** Kenny Dockery
**Cc:** Brian Sullivan; Anita Gilliam
**Subject:** FW: United/Sapphire Cross Collateralization Agreement
**Importance:** High

Thomas D. Griffin,
Vice President of Risk Management,
The United Company

Phone: (276) 645-1416
Mobile: (423) 534-8352
Fax: (276) 645-1404
email: tgriffin@unitedco.net

---

**From:** Mcquate, Glenn [mailto:glenn_mcquate@acordia.com]
**Sent:** Thursday, January 18, 2007 7:42 AM

1/18/2007

**To:** Tom Griffin
**Cc:** Shiley, Michael; Harvey, Jimbill
**Subject:** FW: United/Sapphire Cross Collateralization Agreement

Tom,

I received the note below form Mike Shiley concerning the cross-collateralization agreement. I've attached another copy of the agreement.

Please have the agreement signed/executed and return to me.

Thanks for all of your assistance.

Glenn

---

**From:** Shiley, Michael [mailto:Michael.Shiley@AIG.com]
**Sent:** Wednesday, January 17, 2007 2:17 PM
**To:** Mcquate, Glenn; Harvey, Jimbill
**Cc:** Lappe, Les
**Subject:** FW: United/Sapphire Cross Collateralization Agreement

Glenn, can you check with Tom Griffin and update us on the status of this? Thanks.

Mike Shiley
Assistant Vice President
AIG Global Marine and Energy - Casualty
1375 E. 9th St., Suite 3000
Cleveland, OH 44114
(216) 479-8948
(216) 696-2842 fax

-----Original Message-----
**From:** Philippides, Thomas
**Sent:** Wednesday, January 17, 2007 11:02 AM
**To:** Lappe, Les; Shiley, Michael
**Cc:** Pasko, Mark; Horner, Harry; Philippides, Thomas
**Subject:** United/Sapphire Cross Collateralization Agreement

Do we need more time to receive this document signed?
Can we follow-up with a confirmation date?

Thanks,
   Tom....
=================================================
-----Original Message-----
**From:** Philippides, Thomas
**Sent:** Thursday, January 04, 2007 9:00 AM
**To:** Lappe, Les; Shiley, Michael
**Cc:** Pasko, Mark; Philippides, Thomas; Horner, Harry
**Subject:** United/Sapphire Cross Collateralization Agreement
**Importance:** High

4/4/2007

Please remind our good friends that this item is still O/S and I would appreciate it signed by 1/12/07. Our entire security structure is based on the cross collateralization agreement.

Thanks,
Tom....
=================================================
-----Original Message-----
**From:** Philippides, Thomas
**Sent:** Friday, December 08, 2006 4:56 PM
**To:** Lappe, Les; Shiley, Michael
**Cc:** Pasko, Mark
**Subject:** United/Sapphire Cross Collateralization Agreement

OK to go, see attached.

Tom....
=================================================
-----Original Message-----
**From:** Pasko, Mark
**Sent:** Tuesday, November 14, 2006 5:04 PM
**To:** Philippides, Thomas
**Subject:** United/Sapphire Cross Collateralization Agreement

Tom:

Please see the attached draft. Please look at the last sentence in para 4 and determine whether that is still necessary. Let me know if you have any edits. Thanks.

_____

Mark T. Pasko
Division Counsel
AIG Global Marine and Energy
175 Water Street, 15th Floor
New York, NY 10038
Tel: (212) 458-5707
Fax: (212) 458-5687

PRIVILEGED AND CONFIDENTIAL:.
The information in this email (and any attachments hereto) is confidential and may be protected by legal privileges and work product immunities. If you are not the intended recipient, you must not use or disseminate the information. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. If you have received this email in error, please immediately notify me by "Reply" command and permanently delete the original and any copies or printouts thereof. Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by American International Group, Inc. or its subsidiaries or affiliates either jointly or severally, for any loss or damage arising in any way from its use.

414/2007

# EXHIBIT G

**Pete Lunati**

| | |
|---|---|
| **From:** | Tom Griffin [TGriffin@unitedco.net] |
| **Sent:** | Wednesday, April 04, 2007 10:07 AM |
| **To:** | Pete Lunati |
| **Subject:** | FW: AIG Cross Collateralization Agreement |

Thomas D. Griffin,
Vice President of Risk Management,
The United Company

Phone: (276) 645-1416
Mobile: (423) 534-8352
Fax: (276) 645-1404
email: tgriffin@unitedco.net

-----Original Message-----
From: Horner, Harry [mailto:Harry.Horner@AIG.com]
Sent: Wednesday, February 14, 2007 11:55 AM
To: Shiley, Michael; Tom Griffin
Cc: 'Mcquate, Glenn'; 'jimbill_harvey@acordia.com'; Anita Gilliam; Philippides, Thomas;
Ford, Brian; Horner, Harry
Subject: RE: AIG Cross Collateralization Agreement

Tom, this is a very serious issue here and will be addressed by this Friday, February
16th.  One we receive from United the signed cross-collateralization agreement or AIG will
send out a bill for the amount of the current Letter of Credit.  We have attempted
numerous times to resolve issues that you and/or United may have but, our attempts have
failed.

Tom, we value our relationship with you and United but, in this situation we MUST have the
signed cross-collateralization agreement   - PERIOD.

Regards
Harry


Harry Horner
Senior Vice President
AIG Global Energy Casualty
215-255-6258 - Phone
215-255-6542 - Fax
215-519-8974 - Cell
harry.horner@aig.com

-----Original Message-----
From: Shiley, Michael
Sent: Wednesday, February 14, 2007 11:35 AM
To: 'Tom Griffin'; Horner, Harry
Cc: Mcquate, Glenn; jimbill_harvey@acordia.com; Anita Gilliam
Subject: RE: AIG Cross Collateralization Agreement

Tom, as per my phonemail message, we need this cross-collateralization agreement by this
Friday.  In speaking to our Chief Credit Officer, Tom Philippides today, he advised that
he never received a call on the specific issues raised by Anita in her e-mail to you dated
1/25/07.  He also confirmed that this is AIG's standard CC agreement that all insured's
that provide cross-collateralization, sign without modification. Finally, United, is our
only insured that has a cross-collateralization agreement.  Please call me today so we can
discuss.  Thanks.

1

Mike Shiley
Assistant Vice President
AIG Global Marine and Energy
1375 E. 9th St., Suite 3000
Cleveland, OH 44114
phone   (216) 479-8948
fax     (216) 696-2842


-----Original Message-----
From: Tom Griffin [mailto:TGriffin@unitedco.net]
Sent: Wednesday, February 14, 2007 9:43 AM
To: Shiley, Michael
Cc: Mcquate, Glenn; jimbill_harvey@acordia.com; Anita Gilliam
Subject: RE: AIG Cross Collateralization Agreement
Importance: High

Mike: We have major problems with it in present form as discussed before. Glen has been
made aware of our concerns & I could not envision anyone signing such a document  with the
evergreen wording in present form. I have discussed with other coal co's who have similar
deals with AIG & none say they have the wording that gives us concern. We very much want to
to work with you on this but there needs to be some consideration on AIG's part in an effort
to resolve this. I have been a very big customer of AIG's for years & have paid
SIGNIFICIANT $ to various AIG entities resulting in a VERY PROFITABLE  book of business
for your companies. We have always worked very well together whether it be in London thru
LEX or domestically thru National Union ect. The United Co is a very profitable company
which back-stops all UCC obligations in this program thus I would assume AIG could
accommodate our  concerns in this area. Thank you in advance for all of your efforts on
this.-TDG


Thomas D. Griffin,
Vice President of Risk Management,
The United Company

Phone: (276) 645-1416
Mobile: (423) 534-8352
Fax: (276) 645-1404
email: tgriffin@unitedco.net

-----Original Message-----
From: Shiley, Michael [mailto:Michael.Shiley@AIG.com]
Sent: Wednesday, February 14, 2007 9:14 AM
To: Tom Griffin
Cc: 'Glenn McQuate'
Subject: RE: AIG Cross Collateralization Agreement

Tom, it is imperative that we have this cross-collateralization agreement in hand by this
Friday.

Mike Shiley
Assistant Vice President
AIG Global Marine and Energy
1375 E. 9th St., Suite 3000
Cleveland, OH 44114
phone   (216) 479-8948
fax     (216) 696-2842


-----Original Message-----
From: Mcquate, Glenn [mailto:Glenn_Mcquate@wellsfargois.com]
Sent: Tuesday, February 13, 2007 8:24 PM
To: tgriffin@ucbristol.com
Cc: agilliam@unitedco.net; Harvey, Jimbill; Michael.Shiley@AIG.com
Subject: AIG Cross Collateralization Agreement

Tom,

2

Following up on my voice mail message.

AIG would like to have a conference call with Anita and yourself to discuss your issues with the cross collateral agreement.

Please let me know Anita and your availibility either tomorrow or Thursday.

I appreciate your assistance.

Glenn
--------------------------
Glenn W. McQuate CPCU,ARM
Senior Vice President

276.619.6055  Office
276.676.0152  Fax
276.594.8187  Mobile

3

COMPLAINT 169

# EXHIBIT H



**UNDERWRITERS**

Jack D. Stewart                                                March 20, 2007
Executive Vice President


Mr Jim Bill Harvey
Senior Managing Vice President
Accidia
P.O Box 1567
Abington, VA 24210

RE: United Coal Company LLC, et al

Dear Jim Bill:

As I'm sure you are aware, we have replaced the current AIG Workers' Compensation contract with one from Old Republic. I'm sure Tom Griffin has informed you of this, at least informally, and asked me to write you directly to bring you up-to-date on these actions

Enclosed is a copy of a binder from Old Republic evidencing this coverage. The certificates have been sent to the workers' compensation authorities in both Virginia and Kentucky to affect this coverage effective November 1, 2006.

With this evidence of coverage in place from Old Republic, Tom Griffin and United is requesting the return of the associated letters of credit and premium for the period of time beginning November 1, 2006. I think that you may know that Tom is out of the city at this time but will be returning on Thursday. I'm sure he will be in contact with you concerning these issues

Underwriters Safety & Claims will be taking over all claim service with claims with dates of occurrence after November 1, 2006 Gary Gilmour in my office will be contacting you very soon about the transfer of the current files to our office in Big Stone Gap, VA Meanwhile, any new claim that is reported will be reported to our office here in Louisville

Jim Bill, there may be other issues to handle. If so, I will be in touch with you by telephone.

                                                Very truly,

                                                Jack D. Stewart
                                                Executive Vice President

mlt

cc:   Gary Gilmour
      Tom Griffin
      Gary Mongilutz


A Full Service Insurance Agency

1700 Eastpoint Parkway  •  P.O. Box 23790  •  Louisville, KY 40223-0790  •  Phone (502) 244-1348  •  Fax (502) 244-1411

Insurance  •  Bonds  •  Third Party Administration

COMPLAINT 171

## ACORD™ INSURANCE BINDER

DATE 03/16/2007

THIS BINDER IS A TEMPORARY INSURANCE CONTRACT, SUBJECT TO THE CONDITIONS SHOWN ON THE REVERSE SIDE OF THIS FORM.

| PRODUCER | | COMPANY |
|---|---|---|
| UNDERWRITERS SAFETY & CLAIMS<br>1700 EAST POINT PARKWAY<br>LOUISVILLE, KY 40223 | | OLD REPUBLIC INSURANCE COMPANY |

BINDER# POLICY 080-917777 02

| | EFFECTIVE | | | EXPIRATION | |
|---|---|---|---|---|---|
| | DATE | TIME | | DATE | TIME |
| | 11/01/2006 | 12:00 | X AM / PM | 11/01/2007 | X AM / NOON |

THIS BINDER IS ISSUED TO EXTEND COVERAGE IN THE ABOVE NAMED COMPANY PER EXPIRING POLICY#

CODE: SUB CODE:

INSURED
UNITED COAL LLC ET AL
1099 CRENNAW AVENUE
BRISTOL, VA 34201

DESCRIPTION OF OPERATIONS/VEHICLES/PROPERTY (including Location)

## COVERAGES

| TYPE OF INSURANCE | COVERAGE/FORMS | DEDUCTIBLE | COINS % | LIMITS AMOUNT |
|---|---|---|---|---|
| **PROPERTY** CAUSES OF LOSS<br>□ BASIC □ BROAD □ SPEC | | | | |
| **GENERAL LIABILITY**<br>□ COMMERCIAL GENERAL LIABILITY<br>□ CLAIMS MADE □ OCCUR | RETRO DATE FOR CLAIMS MADE | EACH OCCURRENCE<br>DAMAGE TO RENTED PREMISES<br>MED EXP (Any one person)<br>PERSONAL & ADV INJURY<br>GENERAL AGGREGATE<br>PRODUCTS - COMP/OP AGG | | $<br>$<br>$<br>$<br>$<br>$ |
| **AUTOMOBILE LIABILITY**<br>□ ANY AUTO<br>□ ALL OWNED AUTOS<br>□ SCHEDULED AUTOS<br>□ HIRED AUTOS<br>□ NON-OWNED AUTOS | | COMBINED SINGLE LIMIT<br>BODILY INJURY (Per person)<br>BODILY INJURY (Per accident)<br>PROPERTY DAMAGE<br>MEDICAL PAYMENTS<br>PERSONAL INJURY PROT.<br>UNINSURED MOTORIST | | $<br>$<br>$<br>$<br>$<br>$<br>$ |
| **AUTO PHYSICAL DAMAGE** DEDUCTIBLE<br>□ ALL VEHICLES □ SCHEDULED VEHICLES<br>□ COLLISION<br>□ OTHER THAN COL | | ACTUAL CASH VALUE<br>STATED AMOUNT<br>OTHER | | $ |
| **GARAGE LIABILITY**<br>□ ANY AUTO | | AUTO ONLY - EA ACCIDENT<br>OTHER THAN AUTO ONLY<br>EACH ACCIDENT<br>AGGREGATE | | $<br>$<br>$ |
| **EXCESS LIABILITY**<br>□ UMBRELLA FORM<br>□ OTHER THAN UMBRELLA FORM | RETRO DATE FOR CLAIMS MADE | EACH OCCURRENCE<br>AGGREGATE<br>SELF-INSURED RETENTION | | $<br>$<br>$ |
| **WORKERS COMPENSATION AND<br>EMPLOYERS' LIABILITY** | | X WC STATUTORY LIMITS<br>E.L. EACH ACCIDENT<br>E.L. DISEASE - EA EMPLOYEE<br>E.L. DISEASE - POLICY LIMIT | | 1,000,000<br>1,000,000<br>1,000,000 |
| **SPECIAL<br>CONDITIONS/<br>OTHER COVERAGES** | | FEES<br>TAXES<br>ESTIMATED TOTAL PREMIUM | | $<br>$<br>$ |

## NAME & ADDRESS

| | □ MORTGAGEE □ ADDITIONAL INSURED |
|---|---|
| | □ LOSS PAYEE |
| | LOAN # |

AUTHORIZED REPRESENTATIVE _Robert A Floyd_   3-16-07

ACORD 75 (2001/08)    NOTE: IMPORTANT STATE INFORMATION ON REVERSE SIDE    © ACORD CORPORATION 1986

## CONDITIONS

This Company binds the kind(s) of insurance stipulated on the reverse side. The insurance is subject to the terms, conditions and limitations of the policy(ies) in current use by the Company.

This binder may be cancelled by the insured by surrender of this binder or by written notice to the Company stating when cancellation will be effective. This binder may be cancelled by the Company by notice to the insured in accordance with the policy conditions. This binder is cancelled when replaced by a policy. If this binder is not replaced by a policy, the Company is entitled to charge a premium for the binder according to the Rules and Rates in use by the Company.

### Applicable in California

When this form is used to provide insurance in the amount of one million dollars ($1,000,000) or more, the title of the form is changed from "Insurance Binder" to "Cover Note".

### Applicable in Delaware

The mortgagee or Obligee of any mortgage or other instrument given for the purpose of creating a lien on real property shall accept as evidence of insurance a written binder issued by an authorized insurer or its agent if the binder includes or is accompanied by: the name and address of the borrower; the name and address of the lender as loss payee; a description of the insured real property; a provision that the binder may not be cancelled within the term of the binder unless the lender and the insured borrower receive written notice of the cancellation at least ten (10) days prior to the cancellation; except in the case of a renewal of a policy subsequent to the closing of the loan, a paid receipt of the full amount of the applicable premium, and the amount of insurance coverage.

Chapter 21 Title 25 Paragraph 2119

### Applicable in Florida

Except for Auto insurance coverage, no notice of cancellation or nonrenewal of a binder is required unless the duration of the binder exceeds 60 days. For auto insurance, the insurer must give 5 days prior notice, unless the binder is replaced by a policy or another binder in the same company.

### Applicable in Nevada

Any person who refuses to accept a binder which provides coverage of less than $1,000,000.00 when proof is required (A) Shall be fined not more than $500.00, and (B) is liable to the party presenting the binder as proof of insurance for actual damages sustained therefrom.

ACORD 75 (2001/01)

# ACORD. CANCELLATION REQUEST / POLICY RELEASE

DATE (MM/DD/YY)
08/07/2007

| PRODUCER 304-327-3421 | COMPANY NAME AND ADDRESS NAIC CODE |
|---|---|
| ACORDIA OF WV-BLUEFIELD<br>302 FEDERAL STREET<br>P O BOX 1430<br>BLUEFIELD, WV 24201 | AIG - AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY |

| CODE: SUB CODE: | POLICY TYPE | WORKERS COMPENSATION |
|---|---|---|

INSURED NAME AND ADDRESS

UNITED COAL COMPANY
P O BOX 1280
BRISTOL, VA 24203

**CANCELLED POLICY INFORMATION**

| POLICY NUMBER | 7209431 | | |
|---|---|---|---|
| EFFECTIVE DATE AND HOUR OF CANCELLATION | CANCELLATION DATE<br>11/1/06 | TIME<br>12:01 | X AM PM |
| POLICY TERM | EFFECTIVE DATE<br>11/01/2006 | EXPIRATION DATE<br>11/01/2007 | |

| CANCELLATION REQUEST (Policy attached) | [X] POLICY RELEASE (Complete Statement Section Below) |
|---|---|

### POLICY RELEASE STATEMENT

The undersigned agrees that:

The above referenced policy is lost, destroyed or being retained.

No claims of any type will be made against the Insurance Company, its agents or its representatives, under this policy for losses which occur after the date of cancellation shown above.

Any premium adjustment will be made in accordance with the terms and conditions of the policy.

| WITNESS *Barbara L Brown* | DATE 11-1-06 | SIGNATURE OF NAMED INSURED | DATE 11-01-06 |
|---|---|---|---|
| WITNESS | DATE | SIGNATURE OF NAMED INSURED | DATE |
| [ ] LIEN HOLDER [ ] MORTGAGEE [ ] LOSS PAYEE | | AUTHORIZED SIGNATURE TITLE | DATE |
| [ ] LIEN HOLDER [ ] MORTGAGEE [ ] LOSS PAYEE | | AUTHORIZED SIGNATURE TITLE | DATE |

**FOR AGENCY/COMPANY USE**

| REASON FOR CANCELLATION | METHOD OF CANCELLATION |
|---|---|
| [X] NON RENEWAL  [X] OTHER (describe)<br>REQUESTED BY INSURED  REPLACED<br>REQUESTED BY COMPANY<br>COMPANY<br>OLD REPUBLIC INSURANCE COMPANY | [X] FLAT   FULL TERM PREMIUM  $<br>[ ] SHORT RATE<br>[ ] PRO RATA<br>UNEARNED FACTOR<br>RETURN PREMIUM  $ |
| POLICY NUMBER 11108-07 | EFFECTIVE DATE 11/1/06 | RETURN CALCULATION SUBJECT TO AUDIT |
| REMARKS | | |

New York Only: If you do not keep your auto insurance in force during the entire registration period, your motor vehicle registration will be suspended. If your vehicle is still uninsured after 90 days, your driver's license will be suspended. To avoid these penalties, you must surrender your registration certificate and plates before your insurance expires. By law, we must report the termination of auto insurance coverage to the Department of Motor Vehicles.

| NAME AND ADDRESS | REQUEST/RELEASE DISTRIBUTION |
|---|---|
| | INSURED   LOSS PAYEE<br>MORTGAGEE  LIEN HOLDER<br>COMPANY   FINANCE COMPANY |
| | PRODUCER'S SIGNATURE   DATE |

ACORD 35 (1/97)                                    © ACORD CORPORATION 1985

# EXHIBIT I

# OLD REPUBLIC
### Insurance Company

133 Oakland Avenue
P.O. Box 789
Greensburg, Pennsylvania 15601-0789
Phone: (724) 834-5000
Fax: (724)-834-4025

April 19, 2007

Virginia Workers Compensation Commission
1000 DMZ Drive
Richmond VA 23220

RE: United Coal, LLC

Dear Sirs:

I am sending you this letter at the request of our insured United Coal, LLC and our agent Underwriters Safety & Claims, Inc. (US&C) to remove any confusion the Virginia Workers Compensation Commission may have that duplicate coverage is in effect.

Old Republic has issued a Workers Compensation policy effective November 1, 2006 to replace and substitute for a policy that had been provided by National Union Fire (AIG).

I have attached a copy of the information page of our policy OBC 01777702, along with a schedule of locations listed under the policy. A complete copy of the policy is available upon request.

We ask that you also note in your file that we have contracted with US&C to handle all claims, except Occupational Disease, that have or may occur under our policy. To my knowledge all current claims have been transferred to US&C's office in Big Stone Gap Virginia and all payments are current.

Sincerely,

Robert d. Lloyd
Assistant Vice President

ks

cc:    Jack Stewart – Executive Vice President US&C
        Tom Griffen – Vice President – Risk Management United Coal, LLC

# EXHIBIT J



**OLD REPUBLIC**
Insurance Company

133 Oakland Avenue
P.O. Box 789
Greensburg, Pennsylvania 15601-0789
Phone: (724) 834-5000
Fax: (724)-834-4025

April 24, 2007

MS CARLA MONTGOMERY
KENTUCKY OFFICE OF WORKERS CLAIMS
657 CHAMBERLIN AVE
FRANKFORT KY 40601

RE: United Coal, LLC

Dear Ms. Montgomery:

I am sending you this letter at the request of our insured United Coal, LLC and our agent Underwriters Safety & Claims, Inc. (US&C) to remove any confusion the Kentucky Office of Worker Claims may have that duplicate coverage is in effect.

Old Republic has issued a Workers Compensation policy effective November 1, 2006 to replace and substitute for a policy that had been provided by National Union Fire (AIG).

I have attached a copy of the information page of our policy 0BC 01777702, along with a schedule of locations listed under the policy. A complete copy of the policy is available upon request.

We ask that you also note in your file that we have contracted with US&C to handle all claims, except Occupational Disease, that have or may occur under our policy. To my knowledge all current claims have been transferred to US&C's office in Big Stone Gap Virginia and all payments are current.

Sincerely,

Robert D. Lloyd
Assistant Vice President

ks

cc:    Jack Stewart – Executive Vice President US&C
       Tom Griffen – Vice President – Risk Management United Coal, LLC

# EXHIBIT K



ERNIE FLETCHER
GOVERNOR

TERESA J. HILL
SECRETARY

ENVIRONMENTAL AND PUBLIC
PROTECTION CABINET
OFFICE OF LEGAL SERVICES
WORKERS' CLAIMS LEGAL DIVISION
657 CHAMBERLIN AVENUE
FRANKFORT, KENTUCKY 40601
TELEPHONE (502) 564-5840
FAX (502) 564-5841
www.kentucky.gov

May 10, 2007

AIG
American International South Insurance Co.
427 South 4ᵗʰ Street, Suite 400
P. O. Box 70069
Louisville, Kentucky 40202

Dear Sir or Madam:

It has come to the attention of the Kentucky Office of Workers' Claims that an employer, United Coal Company LLC, has obtained workers' compensation coverage from Old Republic effective November 1, 2006. After placing coverage with Old Republic, United Coal requested that their policy with your insurance company be cancelled for the period beginning November 1, 2006.

Pursuant to KRS 342.340(2) and 803 KAR 25:175, AIG is required to file a notice of cancellation with the Office of Workers' Claims. If you fail to comply with these requirements, your company may be subject to a civil penalty pursuant to KRS 342.990(7)(c). Please immediately file the appropriate documents with our agency to avoid a potential civil penalty. Thank you for your immediate attention to this matter.

Sincerely,

Carla H. Montgomery
General Counsel

CHM/mbm

Kentucky
UNBRIDLED SPIRIT

# EXHIBIT L

# The United Company



1005 Glenway Avenue
Bristol, VA 24201

(276) 645-1416 – Tel
(276) 645-1404– Fax
(423) 534-8352– Cell
tgriffin@unitedco.net

June 7, 2007

Mr. Thomas Morelli
President
AIG Global Marine & Energy
AIG Global Energy Casualty
175 Water Street
New York, NY 10038

RE:    The United Company
        United Coal Company
        Policy #:    WC 72094
        Effective:   11-1-06
        Insurer:    American International South Insurance Company
        No Claims Letter

Dear Tom:

I appreciate that you and Mark Pasko called Pete Lunati on May 30, 2007. The conversation was most helpful. An acceptable No Claim letter format has been requested from you and Mark Pasko on a number of occasions. Since United has not been provided the No Claim letter terms of information, this letter is United's agreement.

As previously stated, Old Republic Insurance Company has agreed to assume all liability for any claims from November 1, 2006 forward. The States of Virginia and Kentucky have agreed to accept Old Republic Insurance Company as the Insurer of record for all workers compensation and Black Lung claims occurring on or after November 1, 2006. United Coal Company does not intend to make any claim under the terms of the AIG policy noted above. AIG Global Energy has paid no claims, as Old Republic has effectively agreed to accept all claims from November 1, 2006 forward.

United looks forward to receiving confirmation as to AIG accepting this No Claim letter in an effort to resolve the requested cancellation.

Best regards,

Thomas D. Griffin
Vice President, Risk Management

COMPLAINT 182

# CHARTER
## INSURANCE & CONSULTING, INC.

P. O. Box 421159
Atlanta, GA 30342
(404) 256-7900
(404) 256-9257 FAX
(404)513-9700 Cell
E-mail address: pjl@charterenergy.com
Web Site: www.charterenergy.com

June 7, 2007

Mr. Thomas Morelll
President
AIG Global Marine & Energy
AIG Global Energy Casualty
175 Water Street
New York, NY 10038

RE:       The United Company / United Coal Company
          Insurer:     American International South Insurance Company
          Policy #:    WC 72094
          Effective:   11-1-06
          No Claims Letter

Dear Tom:

The enclosed letter from Tom Griffin, Risk Manager for The United Company, should be the last area of concern regarding the cancellation of the captioned workers comp policy. The United Company had requested an acceptable format to be used as a no claims letter, but since they have not received a response to that request, trust that the attached letter will be accepted.

In United's efforts to have the policy cancelled flat as requested in the Acord 35 Cancellation form sent to AIG on May 7, 2007, they contacted Mike Foglio of AICCO, Inc. Mr. Foglio advised that as per the financing agreement contract, they merely act as the banking entity and take their direction from the insurer. Since the cancellation request had been tendered to AIG Global Energy some time ago, he was surprised that instruction to return premium following policy cancellation processing had not been received. When the instructions are received from AIG, AICCO will process the return premium payment.

The United Company's Chairman has been monitoring this issue since late February. The Risk Manager has been requesting cancellation in letters since February and forwarded the Cancellation Request form 30 days ago.

United would like to maintain a long term relationship with AIG/Lexington, but at present there is a hold on all AIG insurance placements until this can be resolved. Charter Insurance is not the

Page 2

broker on this policy, but since we do place a number of AIG/Lexington policies for them, United has requested our assistance in bringing this to resolution. The current broker has not chosen to become involved in resolving this matter.

We would hope that you will accept this no claims letter as confirmation that AIG will not be responsible for any claims from November 1, 2006 moving forward since coverage was replaced by Old Republic. This needs to come to resolution now so that business can proceed and the relationships can be resumed.

We look forward to receiving your decision as soon as possible.

Sincerely,


Peter J. Lunati

cc:    Mark T. Pasko
       Division Counsel AIG
       175 Water Street, 15th Floor
       New York, NY 10038

       Mike Foglio
       AICCO, Inc.
       101 Hudson Street, Floor 33
       Jersey City, NJ 07302

# EXHIBIT M

**IMPERIAL A.I. CREDIT COMPANIES®**

**NOTICE OF INTENT TO CANCEL INSURANCE POLICIES**

PAGE   1 OF   1



The United Company
1005 Glenway Avenue
BRISTOL VA 24201-3473

000289 V

**Insured**
The United Company
1005 Glenway Avenue
Bristol VA 24201

**Agent or Broker**
Wells Fargo (#3344) Insurance Services o
PO Box 1439
320 Federal St.
Bluefield WV 24701

### Delinquent Payment Information

| Date of Notice and Mailing | Account Number | Installment(s) Past Due | Unpaid Late Charges | Total Due | Expiration Date |
|---|---|---|---|---|---|
| 07/10/2007 | 15-006-041600-3 | 258,363.44 | 12,918.17 | 271,281.61 | 07/22/2007 |

### Schedule of Policies

| Insurance Company | Policy Number | Term In Months | Effective Date | Premium |
|---|---|---|---|---|
| merican Int'l South Ins Co<br>tate Tax | 7209431 | 12 | 11/01/2006 | 1,259,123.00<br>124,293.00 |

of the date of this notice you are in default on your loan and are hereby notified of our intent to cancel. Unless payment is received in our office by the expiration date
wn above, we will effect cancellation of your policy or policies as listed above and on your premium finance agreement with this company. This notice is issued pursuant
ur power of attorney executed by you. Protect your interest by mailing your check for the total due. You may pay the Balance Due online through the IAICC website at
w.iaico.com. Online payments received after 9:00 PM EST will be posted to your account on the next business day. This is your final notice (N.C.G.S.58-36-85; VA.6-4).

portant: In the event the insurance financed under this agreement was previously cancelled, this notice is not a confirmation that coverage
: been reinstated, but only a notice of payment due. Confirmation of reinstatement can only be provided by your insurance carrier/us.

## See Reverse Side For Important Information

PFSUSANTE2005    AIK335

**IMPERIAL A.I. CREDIT COMPANIES®**

## NOTICE OF INTENT TO CANCEL INSURANCE POLICIES

| ate of Notice and Mailing | Account Number | Installment Number | Due Date | Installment(s) Due | Late Charge | Total Due |
|---|---|---|---|---|---|---|
| 7/10/2007 | 15-006-041600-3 | 3 | 07/01/2007 | 258,363.44 | 12,918.17 | 271,281.61 |

AICCO, Inc.
Box 9045
New York NY 10087-9045

Make your check payable to:
AICCO, Inc.
Put your account number on
your check and mail it with this
notice to the appropriate P.O. box

15006041600302583634420271281
6177

000289-000-MD-000001-V

COMPLAINT 186

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

The United Company, Sapphire Coal Company and Wellmore Coal Company

## DEFENDANTS

American International Group, Inc. a/k/a American International South Ins. Co., Imperial A.I. Credit Companies d/b/a A.I Credit Corp., National Union Fire Ins. Co. of Pittsburgh, PA

**(b)** County of Residence of First Listed Plaintiff **Bristol County, VA**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **New York County, NY**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Samuel D. Hinkle IV, Esq., Stoll Keenon Ogden PLLC, 500 W. Jefferson St., 2000 PNC Plaza, Louisville, KY 40202

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☒ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
  **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
Declaration that no contract exists

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ more than $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE **March 7, 2008**

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

COMPLAINT 187

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Eastern | District of | Kentucky |
|---|---|---|

The United Company, Sapphire Coal Company
and Wellmore Coal Company

V.

American International Group, Inc. a/k/a
American International South Ins. Co., Imperial
A.I. Credit Companies d/b/a A.I Credit Corp.,
National Union Fire Ins. Co. of Pittsburgh, PA

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

TO: (Name and address of Defendant)

Imperial A.I. Credit Companies
d/b/a A.I. Credit Corporation
101 Hudson Street
33rd and 34th Floors
Jersey City, New Jersey 07302

Serve: The Prentice Hall Corporation System
421 W. Main Street
Frankfort, KY 40601

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Samuel D. Hinkle IV, Esq.
Stoll Keenon Ogden PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202

an answer to the complaint which is served on you with this summons, within _____ Twenty (20) _____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

_____    _____
CLERK                                DATE

_____
(By) DEPUTY CLERK

COMPLAINT 188

AO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL  $0.00 |
|---|---|---|

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                              Date                          *Signature of Server*


                                              _____
                                                          *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

✎AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

|                    Eastern                    |  District of  |                    Kentucky                    |
|---|---|---|

The United Company, Sapphire Coal Company
and Wellmore Coal Company

V.

American International Group, Inc. a/k/a
American International South Ins. Co., Imperial
A.I. Credit Companies d/b/a A.I Credit Corp.,
National Union Fire Ins. Co. of Pittsburgh, PA

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

TO: (Name and address of Defendant)

American International Group, Inc.          Serve: Kentucky Secretary of State
a/k/a American International South Ins. Co.         700 Capital Avenue, Suite 86
70 Pine Street                                     Frankfort, KY  40601
New York, New York 10270

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Samuel D. Hinkle IV, Esq.
Stoll Keenon Ogden PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202

an answer to the complaint which is served on you with this summons, within _____Twenty (20)_____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

CLERK                                                  DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                Date          *Signature of Server*

                                   _____
                                   *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ Eastern _____ District of _____ Kentucky _____

The United Company, Sapphire Coal Company
and Wellmore Coal Company

**SUMMONS IN A CIVIL ACTION**

V.

American International Group, Inc. a/k/a
American International South Ins. Co., Imperial
A.I. Credit Companies d/b/a A.I Credit Corp.,
National Union Fire Ins. Co. of Pittsburgh, PA

CASE NUMBER:

TO: (Name and address of Defendant)

American International Group, Inc.          Serve: CSC Lawyers Incorporating Service Co.
a/k/a American International South Ins. Co.          421 West Main Street
4201 Congress Street # 455          Frankfort, KY 40601
Charlotte, NC 28209

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Samuel D. Hinkle IV, Esq.
Stoll Keenon Ogden PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202

an answer to the complaint which is served on you with this summons, within _____ Twenty (20) _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

_____          _____
CLERK                                                              DATE

_____
(By) DEPUTY CLERK

COMPLAINT 192

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

  Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                              Date                              *Signature of Server*


                                             _____
                                             *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Eastern | District of | Kentucky |
|---|---|---|

The United Company, Sapphire Coal Company
and Wellmore Coal Company

          V.

American International Group, Inc. a/k/a
American International South Ins. Co., Imperial
A.I. Credit Companies d/b/a A.I Credit Corp.,
National Union Fire Ins. Co. of Pittsburgh, PA

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:

TO: (Name and address of Defendant)

National Union Fire Insurance Company    Serve: CSC Lawyers Incorporating Service Co.
of Pittsburgh, Pennsylvania                       421 West Main Street
70 Pine Street                                 Frankfort, KY 40601
New York, New York 10270

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Samuel D. Hinkle IV, Esq.
Stoll Keenon Ogden PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, Kentucky 40202

an answer to the complaint which is served on you with this summons, within _____Twenty (20)_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

CLERK

DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and complaint was made by me[1] | DATE | |
| NAME OF SERVER *(PRINT)* | TITLE | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL $0.00 |

**DECLARATION OF SERVER**

     I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
               Date          *Signature of Server*

                   _____
                   *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

COMPLAINT 195

# *Civil*
# *Case Assignment*

Case number 7:08CV-43

Assigned : Judge Amul R Thapar
Judge Code : 4317

Assigned on 03/07/2008

Request New Judge

COMPLAINT 196