John G. Nevius, Esq., P.E. (JN-0577)
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, NY  10020
(212) 278-1000

*Attorneys for Respondent*
*The United Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA and AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY, <br><br>           Petitioners, <br><br>     -and- <br><br> THE UNITED COMPANY, <br><br>           Respondent. | Case No.:  08 CV 3147 (J. Cedarbaum) |

## MEMORANDUM OF LAW IN OPPOSITION TO PETITION OF THE AIG COMPANIES TO COMPEL ARBITRATION

### PRELIMINARY STATEMENT

The AIG Companies, National Union Fire Insurance Company of Pittsburgh, Pa. and American International South Insurance Company (collectively referred to herein as "the AIG Companies") bring this petition against one of three plaintiffs in an existing action presently pending in the United States District Court for the Eastern District of Kentucky (the "Kentucky Action").  The AIG Companies base their Order to Show Cause emergency on the existence of a payment agreement containing arbitration language.

It is undisputed that two of the plaintiffs and one of the defendants in the Kentucky Action did not enter into the payment agreement and, thus, never agreed to arbitrate. The Kentucky Action will proceed regardless of the outcome here because the AIG companies only seek relief from this Court involving one of three plaintiffs in the Kentucky Action.

In addition, the Commonwealth of Kentucky is charged with regulating insurance matters such as those at issue here. As discussed in more detail below, Kentucky, one of the two states in which the plaintiffs were seeking workers' compensation coverage, already has administratively determined that no insurance policy contract exists between the Kentucky plaintiffs and the AIG Companies. The payment agreement, which was executed between the AIG Companies and one of three plaintiffs in the Kentucky Action, was a separate agreement from the contract of insurance being negotiated by the parties. There is no dispute that no such contract now exists.

Moreover, there are at least <u>three</u> more reasons why the Kentucky Federal Court is the proper forum to hear and resolve this dispute in addition to the facts that Kentucky has already resolved it and that half of the parties were not involved in the payment agreement. As discussed in more detail below, Plaintiffs were the first to file in Kentucky and should not be denied their choice of forum. Plaintiffs have no contacts with New York and are not subject to personal jurisdiction in this state. The AIG entities, however, all do business in Kentucky and that's where the regulatory activity took place and witnesses are available.

Plaintiffs' case in the Kentucky Action avers that the parties never reached an agreement on a contract of insurance because material terms demanded by AIG were never accepted or finalized.  One plaintiff, The United Company ("United"), provided monetary guarantees to AIG and then signed the payment agreement at the end of December 2006 in the good faith belief that the parties would agree to all material terms of the overall insurance policy.  The planned date of inception of the insurance policy coverage was November 1, 2006.  However, more than five weeks after the planned policy inception date, the parties had not agreed on all material terms of the contract.  When AIG continued to demand changes to such contract during this negotiation period and threatened to change the benefit of plaintiffs' planned bargain, United terminated negotiations and finalized a workers' compensation insurance agreement with another company at a greater cost, and with less coverage.

When the parties failed to reach agreement on all material terms of the contract of insurance, the payment agreement was rendered a nullity.  Among other reasons, there was a failure of consideration.  Respectfully, the payment agreement thus cannot be the basis upon which the Court may compel arbitration between half of the parties in response to plaintiffs' proper filing of the Kentucky Action.

## STATEMENT OF FACTS

**The United Parties**

The United Company ("United") is a Virginia corporation engaged through various subsidiaries and affiliates in the coal and energy business.  United does not

have operations or own property in New York.[1]  United is the majority owner of United Coal Company LLC ("UCC"), a Virginia limited liability company.  UCC has a number of subsidiaries including Sapphire Coal Company ("Sapphire") and Wellmore Coal Company ("Wellmore") and is not a party in any of the actions at issue here.  United, Sapphire and Wellmore are referred to as the "United Parties."  See enclosed Declaration of Thomas D. Griffin ("Griffin Declaration") ¶¶ 3-5.

Sapphire and Wellmore mine and sell high grade steam and metallurgical coals.  Sapphire and Wellmore have mining operations in Kentucky, Virginia, and West Virginia.  Like United, they do not do business or own property in New York.  The workers' compensation insurance policy at issue in this matter was intended to cover only employees of Sapphire and Wellmore located in Kentucky and Virginia.  See Griffin Declaration ¶ 6.

**The Negotiations Over A New Contract For Insurance**

In September of 2006, the United Parties solicited quotes from Acordia of West Virginia ("Acordia") for workers' compensation coverage for Sapphire and Wellmore for the policy year beginning November 1, 2006.  Acordia is an insurance brokerage located in Abingdon, Virginia.  At the time, AIG provided workers compensation coverage for Sapphire and Wellmore under separate policies.  The new combined coverage sought was intended to reduce premium cost through the application of the higher deductible amounts presented by the combined program for Sapphire and Wellmore.  See Griffin Declaration ¶¶ 7-8.

---

[1]    Specifically, United does not solicit business in New York, does not have an office in New York, does not have any employees in New York, holds no property in New York and has no agents in New York.

After much negotiation, Acordia informed the United Parties that AIG was willing to provide workers compensation coverage to Sapphire and Wellmore pursuant to a "high deductible" program. The policy period for the proposed workers' compensation insurance program was to be November 1, 2006 through October 31, 2007. By letter dated November 17, 2006, Acordia summarized the terms of the proposed workers' compensation program. In addition to outlining the terms of coverage, such as the amount of the deductible and the premiums, an attachment to the letter referred to additional proposed terms applicable to the deal. In the attachment, the United Parties were informed that AIG would require, among other things, a so-called cross collateralization agreement. A copy of the November 17, 2007 letter is attached as Exhibit A to the Griffin Declaration (see Numbered Item 4 under the heading "Comments"). Neither Acordia nor AIG provided the United Parties with a copy of the cross collateralization agreement at that time or outlined its proposed terms. See Griffin Declaration ¶¶ 9-10.

In anticipation of finalizing a mutually acceptable contract of insurance, United posted a letter of credit in favor of AIG in the amount of $2,323,000 on December 21, 2006. A copy of the letter credit is attached as Exhibit B to the Griffin Declaration. One week later, again in anticipation of finding a mutually acceptable contract of insurance, United and National Union Fire Insurance Company of Pittsburgh, PA ("AIG/National Union") executed a payment agreement (the "Payment Agreement") in order to finance premium payments required by the anticipated workers' compensation policy being negotiated. While AIG/National Union executed the document on November 14, 2006, United did not sign the document until December 31,

2006. As of December 31, United still had not been provided a copy of the cross collateralization provision that AIG required as security and had not been informed of its terms. However, in good faith expectation of finalizing an insurance policy contract, to keep negotiations moving forward, and at AIG's request given the policy start date of November 1st, UCC made an initial premium payment of $626,000. See Griffin Declaration ¶¶ 11-12.

On January 4, 2007, Thomas Phillippides, an underwriter for AIG, emailed Michael Shiley, Assistant Vice President of AIG Global Marine and Energy in Cleveland, Ohio, and Les Lappe, another AIG employee, informing them that the serious issue of cross collateralization remained outstanding:

> Please remind our good friends [the United Parties] that this item is still O/S [outstanding] and I would appreciate it signed by 1/12/07. Our entire security structure is based on the cross collateralization agreement.

A copy of the January 4, 2007 email is attached as Exhibit C to the Griffin Declaration. By email dated January 18, 2007 Glenn McQuate of Acordia forwarded a copy of the proposed cross collateralization agreement to the United Parties. A copy of the January 18, 2007 email is attached as Exhibit D to the Griffin Declaration. A copy of the proposed cross collateralization language is attached as Exhibit E to the Griffin Declaration. See Griffin Declaration ¶ 13.

By email dated January 25, 2007, Thomas Griffin, Vice President of Risk Management for United, informed Acordia that the language in the proposed cross collateralization provision was not acceptable. The cross collateralization agreement proposed by AIG contained terms that went far beyond the typical type of cross collateralization expected by, and acceptable to, the United Parties. Among other

things, the proposed language required United to provide additional collateral to AIG even if Sapphire (one of the entities whose assets were to be cross collateralized) was sold and none of the other United Parties were responsible for its liabilities. Mr. Griffin also informed Acordia that the United Parties remained willing to negotiate with AIG but could not agree to certain provisions demanded by AIG. A copy of the January 25, 2007 email is attached as Exhibit F to the Griffin Declaration. See Griffin Declaration ¶¶ 14-15.

By email dated February 14, 2007 at 9:14 am, Mr. Shiley of AIG informed Mr. Griffin that AIG needed to have the cross collateralization agreement in hand by Friday, February 16. A copy of the February 14, 2007 email chain is attached as Exhibit G to the Griffin Declaration. Mr. Griffin wrote back a half hour later informing Mr. Shiley that the United Parties still had "major problems" with the cross collateralization language. Mr. Griffin again informed AIG that the cross collateralization agreement needed to be changed to complete the deal. See email chain at Exhibit G. See Griffin Declaration ¶¶ 16-17.

Later that morning, AIG responded to Mr. Griffin. Harry Hoerner, an AIG Senior Vice President, informed Mr. Griffin that AIG would not negotiate the terms of the cross collateralization agreement and that the agreement had to be signed in the form demanded by AIG without change. Mr. Hoerner further informed Mr. Griffin that if the cross collateralization agreement was not signed by February 16, 2007, then AIG would send out a bill for the amount of the letter of credit ($2,323,000):

> Tom, this is a very serious issue here and will be addressed by this Friday, February 16th. One [sic] we receive from United the signed cross collateralization agreement or AIG will send out a bill for the amount of the current Letter of Credit. We have attempted

> numerous times to resolve issues that you and/or United may have but, our attempts have failed.
>
> Tom, we value our relationship with you and United but, in this situation we MUST have the signed cross collateralization agreement – PERIOD. (emphasis in original)

See email chain at Exhibit G; and Griffin Declaration ¶ 18.

By threatening to send out a bill for the amount of the letter of credit, AIG was informing the United Parties that it would no longer offer workers' compensation coverage with a high deductible program, as negotiated by the parties and would only offer a full manuscript program with no deductible at an additional expense of several million dollars, precisely the situation the United Parties had set out to avoid.  In a subsequent telephone conversation, Mr. Horner reiterated the fact that AIG would change the terms of the proposed workers' compensation program if the United Parties did not agree to AIG's terms in the proposed cross collateralization provision.  See Griffin Declaration ¶ 19.

On February 15, 2007, in an effort to salvage the agreement, Mr. Griffin forwarded to Acordia proposed revisions to the language in the cross collateralization agreement.  In the email transmitting the proposed language, Mr. Griffin informed Acordia that he did not want the entire deal to fail because of a dispute over the language in the cross collateralization provision:

> I really hate to see all of this come unraveled because of a couple of sentences in the agreement and AIG [sic] total lack of flexibility to address our concerns. . . .  We are willing to try to work something out if AIG will be reasonable.

A copy of the February 15, 2007 email is attached as Exhibit H to the Griffin Declaration.  AIG refused to make any revisions to the cross collateralization provision. See Griffin Declaration ¶¶ 20-21.

Faced with the fact that they were unable to reach agreement with AIG, the United Parties sought coverage elsewhere. They were successful in obtaining workers' compensation coverage from Old Republic utilizing a high deductible program. Importantly, the coverage obtained from Old Republic was effective as of November 1, 2006, the same date as the coverage that the United Parties had attempted to procure from AIG. See Griffin Declaration ¶ 22.

By letter dated March 20, 2007, Jack Stewart, Executive Vice President of Underwriters Safety and Claims of Louisville, Kentucky, informed Acordia that Old Republic was providing the workers' compensation coverage that the United Parties had tried to obtain from AIG. On behalf of the United Parties, Mr. Stewart requested that AIG return any premiums paid and a release of the irrevocable letter of credit that had been posted by UCC in favor of the AIG Companies. A copy of Mr. Stewart's March 20, 2007 letter is attached as Exhibit I to the Griffin Declaration. Despite the fact that the United Parties and AIG had failed to reach agreement on all terms of the insurance contract and that AIG was not liable for any claims of Sapphire and Wellmore (Old Republic was responsible for all such claims), AIG has refused to return any premiums and to release the letter of credit. See Griffin Declaration ¶¶ 23-24.

The United Parties informed the relevant state and federal agencies that Old Republic, not AIG, was providing workers' compensation coverage for Sapphire and Wellmore as of November 1, 2006. By letter dated May 10, 2007, Carla H. Montgomery, General Counsel for the Workers' Claims Legal Division for the Commonwealth of Kentucky wrote to AIG. Ms. Montgomery informed AIG that it was required by Kentucky statute to file a notice of cancellation as of November 1, 2006 with

the Office of Workers' Claims.  To date, AIG has ignored the directive of the Kentucky

Workers' Claims Legal Division and has failed and refused to file the required notice.  A

copy of the May 10, 2007 Letter is attached as Exhibit J to the Griffin Declaration.  See

Griffin Declaration ¶ 25.

   Since March of 2007, United has been attempting to resolve its dispute

with AIG, but to no avail.  For example, on June 7, 2007, United provided a "No Claims

Letter" to AIG to assure AIG that: (a) AIG was not responsible for any claims that might

occur from November 1, 2006; and (b) that Old Republic was accepting risk and

responsibility for all claims for this period.  A copy of the June 7, 2007 letter from Mr.

Griffin to Thomas Morelli of AIG is attached as Exhibit K to the Griffin Declaration.  The

United Parties also offered to indemnify AIG if anyone attempted to make a claim

against it.  To date, no one has attempted to make a claim against AIG, and AIG is not

responsible for any such claims.  Yet AIG still refuses to return any of the United

Parties' paid premiums or to release their letter of credit.  AIG also refuses to file any

documents with the relevant state agencies to clarify that Old Republic is the insurer of

record for the United Parties, a situation that has caused significant confusion in claims

administration for the state agencies in Kentucky and Virginia and led to disruption for

the business of the United Parties.  After attempting to resolve the matter for

approximately one year, and getting nowhere, United was left with no choice but to file a

lawsuit against AIG.  See Griffin Declaration ¶ 26.

   On March 7, 2008 United, Sapphire and Wellmore filed a lawsuit against

the AIG Companies (the petitioners here) and Imperial A.I. Credit Companies d/b/a A.I.

Credit Corporation (which is not a petitioner in this case) in the United States District

Court for the Eastern District of Kentucky. Among other things, plaintiffs in the Kentucky Action seek a declaration that no contract existed between the United Parties and AIG. A copy of the complaint in the Kentucky Action, without exhibits, is attached as Exhibit L to the Griffin Declaration. In response, the AIG Companies filed a petition in this court against United seeking to compel arbitration. Sapphire and Wellmore are not named as respondents in the AIG Companies' petition, because petitioners' sole basis for seeking to compel arbitration is United's execution of the payment agreement.

For the reasons set forth below, the United Parties are entitled to a trial in the Eastern District of Kentucky on their claims that no contract exists. AIG cannot use contractual provisions from a failed negotiation as a basis to forum shop and defeat the United Parties' proper choice of forum.

## ARGUMENT

### I.  THE AIG COMPANIES' ARGUMENTS TO COMPEL ARBITRATION ONLY RELATE TO ONE OUT OF THREE PLAINTIFFS IN KENTUCKY

#### 1.  There is No Alleged Basis Upon Which To Compel the Other Two Plaintiffs to Arbitrate

Two out of the three plaintiffs in the Kentucky Action are not even alleged to have agreed to arbitrate. The payment agreement that contains the arbitration provisions, even if it does everything the AIG Companies say it does, only would require one plaintiff to arbitrate. Accordingly, even if United is compelled to arbitrate, the Kentucky Action will continue with the other two plaintiffs, Sapphire Coal Company and Wellmore Coal Company.[2]

---

[2]    It also should be noted that one of the three defendants in the Kentucky Action, Imperial A.I. Credit Companies d/b/a/ A.I. Credit Corporation, is also not a party to the payment agreement.

2. **There Is No Personal Jurisdiction In This Court Over Any of the Plaintiffs in the Kentucky Action**

Moreover, the three plaintiffs in the Kentucky Action do not have sufficient minimum contacts with New York and this Court has no jurisdiction over them. The one plaintiff that is the subject of the AIG Companies' Order to Show Cause has no contacts with New York other than the payment agreement. Accordingly, as an initial factual matter, this Court cannot assert personal jurisdiction over the plaintiffs in the Kentucky Action.

## II. KENTUCKY ALREADY HAS ADDRESSED THE ISSUE BEFORE THIS COURT

1. **The Commonwealth Of Kentucky Office Of Worker's Claims Has Already Determined That No Contract Or Agreement To Arbitrate Exists**

Regardless of whether there was or was not ever an insurance contract between the parties, this is an administrative matter that already has been resolved in United's favor by the Commonwealth of Kentucky. AIG improperly continues to ignore the state's prior determination, which is the reason the Kentucky Action was filed in plaintiffs' chosen forum.

It is undisputed that on May 10, 2007, the Commonwealth of Kentucky's Office of Worker's Claims issued a written directive to AIG requiring that AIG file a notice of cancellation of the purported insurance policy with the Office of Workers' Claims, effective November 1, 2006 (the "Kentucky Administrative Directive"). In short, the Kentucky Administrative Directive notified AIG that the relevant Kentucky administrative agency considered there to be no contract of insurance between the United Parties and AIG. November 1, 2006 was the date the purported insurance policy contract was to incept. The letter states that "[p]ursuant to KRS § 342.340(2) and 803

KAR § 25:175, AIG is required to file a notice of cancellation with the Office of Workers' Claims . . . . Please immediately file the appropriate documents with our agency to avoid a potential civil penalty" pursuant to KRS § 342.990(7)(c).  To date, AIG has not complied with the Kentucky Administrative Directive.  KRS § 342.340(2) gives rise to a duty that AIG do so.  See e.g., Travelers, Inc. Co. v. Duvall, 884 S.W.2d 665, 666 (Ky. 1994)

Kentucky has effectively determined that whatever insurance policy contract may or may not have existed, has been cancelled before its inception. Accordingly, there is no basis for compelling arbitration.

2.     **This Court Should Not Interfere With Kentucky's Regulation of Insurance**

The Kentucky Office of Worker's Claims (the "Office") has the authority to direct AIG to act, and further to penalize AIG for noncompliance with such direction. See KRS 342.990(1) ("the executive director shall initiate enforcement of civil and criminal penalties imposed in this section").  Pursuant to this authority, the Office sent AIG a letter directing it to file the notice of cancellation as of the day on which the alleged policy was to become effective.  Thus, Kentucky has determined that no policy contract ever existed.  If there is no policy contract, there can be no payment agreement under such purported insurance policy or, more importantly, an agreement to arbitrate thereunder.  AIG chose to ignore Kentucky's Administrative Directive.  This Court should not.

Federal law leaves regulation of insurance matters such as these to the states.  Specifically, the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq. (the "Act"), specifically authorizes the states to continue serving their traditional role as the

regulators of the insurance industry.  As the Second Circuit has held, in the wake of
Burford v. Sun Oil Co., 319 U.S. 215 (1943), "[t]he federal courts have abstained in
numerous areas where state regulation involved matters of substantial state concern
and where state policies were carried out in a statutorily established regulatory program
by state officials ... the proper respect for the expertise of state officials and the
expeditious and evenhanded administration of state programs counsel restraint on the
part of federal courts."  Levy v. Lewis, 635 F.2d 960, 963-64 (2d Cir. 1980) (Burford
abstention appropriate where question involved interplay between insurance law and
federal law, because federal review threatens to create incoherence and inequities in
administration of state scheme); Corcoran v. Ardra Insurance Co., Ltd., 842 F.2d 31, 36
(2d Cir.1988) ("[Abstention pursuant to Burford is designed to avoid federal court
interference with specialized ongoing state regulatory schemes....").

As the Second Circuit further held in Alliance of American Insurers v.
Cuomo, 854 F.2d 591, 599 (2d Cir. 1988), the Burford rule applies in situations where it
is prudent for a federal court to refrain from interfering in cases presenting state law
issues relating to complex state regulations where the federal court decision may
disrupt important state policies.  Such abstention is appropriate when a federal case
presents a difficult issue of state law, the resolution of which will have a significant
impact on important state policies and for which the state has provided a
comprehensive regulatory system with channels for review by state courts or agencies.
In short, federal courts should "abstain from interfering with specialized, ongoing state
regulatory schemes."  Id., quoting Levy, 635 F.2d at 963.  AIG simply ignores the Act
and the Commonwealth of Kentucky as well as the state's policies and comprehensive

regulatory system. This Court should not condone AIG's behavior and proceed to compel some of the parties to arbitrate. Rather, this Court should allow these matters to be resolved comprehensively in federal court in Kentucky and abstain from interfering pursuant to <u>Burford</u> and its progeny.

### 3.     AIG Has Failed To Pursue Its Proper Administrative Remedies

If AIG did not agree with the Office's determination that the purported contract did not exist, it should have pursued its administrative remedies to protest Kentucky's decision.[3] It did not. Almost a year has passed since AIG's receipt of the Kentucky Administrative Directive. Accordingly, AIG cannot now be heard to argue that a valid contractual agreement to arbitrate between the parties exists, because this issue has already been addressed administratively. The Commonwealth of Kentucky's unchallenged determination must be given preclusive effect. <u>Godbey v. University Hospital</u>, 975 S.W.2d 104, 105 (Ky. App.1998), <u>quoting</u> <u>Barnes v. McDowell</u>, 647 F. Supp. 1307, 1310 (E.D.Ky.1986), <u>rev'd on other grounds</u> by <u>Thompson v. McDowell</u>, 661 F. Supp. 498 (E.D.Ky.1987) ("Kentucky has for many years followed the rule that the decisions of administrative agencies acting in a judicial capacity are entitled to the same *res judicata* effect as judgments of a court.").

In <u>Godbey</u>, an administrative determination of no causation in a workers' compensation action precluded further proceedings in the Commonwealth of Kentucky

---

[3]     The Commonwealth of Kentucky's administrative procedures regarding these matters are set forth at KRS Chapter 13B. KRS §§ 342.260 and 342.990 address the office's regulatory and enforcement authority, respectively. The Supreme Court of Kentucky has held that strict compliance with requirements for perfecting review of written actions taken by Kentucky administrative agencies is required. <u>See</u> <u>Jenny Wiley Healthcare Center v. Commonwealth of Kentucky Cabinet for Human Resources</u>, 828 S.W.2d 657 (Ky. 1992).

Fayette Circuit Court. AIG has similar administrative remedies which it has chosen not to pursue. AIG is precluded from now pursuing arbitration. See also Hysteam Coal Corp. v. Ingram, 141 S.W.2d 570, 573 (Ky. 1940) ("There runs through the decisions of all courts a motif that litigation…must not be prolonged unduly by one procedure when the statutes provide another procedure which protects the rights of litigants just as effectively, and directs a route which will lead to a quicker end of the controversy.") Thus, at a minimum, AIG must pursue and exhaust its state administrative remedies before the AIG Companies are allowed to pursue arbitration under a contract which does not exist.

**4.    The United States District Court For the Eastern District of Kentucky Is A More Appropriate Forum**

In light of the above administrative issues and the fact that Kentucky has found that no contract or agreement to arbitrate exists, a court sitting in Kentucky is a more appropriate forum to resolve the present dispute between the parties. AIG rushed into court in New York without proper notice or opportunity for United to be heard. Certain plaintiffs should not be denied their choice of forum. Certain defendants should not be allowed to forum shop.

**III.    UNITED IS ENTITLED TO A JUDICIAL DETERMINATION OF WHETHER IT ENTERED INTO A CONTRACT WITH AIG**

The law "is well settled that when the existence of the contract from which the obligation to arbitrate arises is itself called into question, it is the obligation of the court, before a dispute is referred for arbitration, to determine, in the first instance, whether the contract itself is valid." The Canada Life Assurance Co. v. The Guardian Life Ins. Co., 242 F. Supp. 3d 344, 349 (S.D.N.Y. 2003); Interocean Shipping Co. v. Nat'l Shipping & Trading Corp., 462 F.2d 673, 676 (2nd Cir. 1972) ("if the making of the

[contract] was in issue...the district court should have proceeded to trial of this question."). This is consistent with 9 U.S.C. § 4 of the Federal Arbitration Act, which provides that a court shall direct the parties to proceed to arbitration only upon being satisfied that the making of the agreement for arbitration is not in issue. Thus, a party cannot be required to contest the existence of a contract in a forum that is dictated by the disputed contract. Rebellion, Inc. v. American Comm. Network, Inc. (In re Maronian), 2008 U.S. Dist. LEXIS 2655, at *23 (W.D.N.Y. Jan. 14, 2008).

The Supreme Court's holding in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967), which requires that claims seeking to avoid or rescind a contract be referred to arbitration, does not apply to situations like the present case where United disputes the existence of a contract. Indeed, "[t]he Second Circuit and the Southern District of New York have squarely addressed [the] question and concluded that the Prima Paint rule does not apply to challenges to the existence of a contract containing an arbitration provision."[4] Accordingly, this Court must decide whether a contract exists before a portion of this matter may be referred to arbitration.

Moreover, United has (1) unequivocally denied a contract was made; and (2) presented "some evidence" to substantiate its denial. Interocean Shipping, 462 F.2d at 676.[5] Courts have equated the required showing with that which is required to

---

[4]    See The Town of Amherst v. Custom Lighting Services, LLC, 2007 U.S. Dist. LEXIS 88296, *20 (W.D.N.Y. 2007) citing Cinney v. BDO Seidman, L.L.P., 412 F.3d 58 (2d Cir. 2005); Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co., 263 F.3d 26 (2nd Cir. 2001); Nuclear Elec. Ins. v. Central Power & Light Co., 926 F. Supp. 428 (S.D.N.Y. 1996); PMC, Inc. v. Atomergic Chemetals Corp., 844 F. Supp. 177 (S.D.N.Y. 1994).

[5]    See also Telenor Mobile Communications v. Storm LLC, 524 F. Supp. 2d 332, 350 (S.D.N.Y. 2007) ("In the Second Circuit, a party challenging the existence or formation of an agreement from which an arbitration proceeding derives is entitled to have those issues decided in court, rather than by the arbitral tribunal, if the party (1) presents 'some

withstand summary judgment in a civil case.  <u>Great Earth Cos. v. Simons</u>, 288 F.3d 878, 889 (6th Cir. 2002).  In evaluating the issue of whether a contract exists, courts generally apply state law principles that govern the formation of contracts.  <u>Mehler v. Terminix Int'l Co., L.P.</u>, 205 F.3d 44, 48 (2d Cir. 2000).  It is well established that "[u]nder the general principles of contact law, there is no contract if the parties fail to agree on all the essential terms . . . ."[6]

As set forth above, the United Parties strongly deny that a contract ever existed between them and the AIG Companies because the parties obviously did not agree on all material terms.  <u>See</u> Griffin Declaration.  Likewise, AIG cannot dispute that the parties never agreed on an essential element of the contract of insurance – the cross collateralization provision.   In the attachment to Acordia's November 17, 2006 letter, the United Parties were informed that AIG would require a cross collateralization agreement.  There was no discussion at that time of the terms of that agreement.  As AIG's internal correspondence reveals, only <u>after</u> United paid the first premium installment did AIG claim that the collateral agreement provided the "basis" of AIG's entire security structure in the proposed workers' compensation insurance policies.

That the collateral agreement was material is highlighted by AIG's response when United failed to execute AIG's proposed form without change.  AIG's

---

evidence' in support of its claim; and (2) has unequivocally denied that an agreement was made.").

[6]    <u>Interocean Shipping</u>, 462 F.2d at 676; <u>see also</u> <u>Brooks v. Smith,</u> 269 S.W.2d 259, 260 (Ky. 1954) ("As long as there is an essential term yet to be agreed on, there is no contract."); <u>Cranbrock Investors, Ltd. v. Great Atlantic Management</u>, 1999 U.S. App. LEXIS 29551, *6 (4th Cir. 1999) ("For a contract to exist, the parties must have a meeting of the minds; the parties therefore must agree on all material terms.").  The Court need not decide which state's law would apply because Kentucky, Virginia and New York all recognize this fundamental concept of contract law.

demand that the cross collateralization agreement be executed without revision is what resulted in the entire deal quickly unraveling.  AIG told the United Parties that it would change the terms of the insurance coverage it was willing to offer if they did not execute the cross collateral agreement.  Accordingly, the cross collateral agreement was material and the parties never reached agreement on this term.  Because there was no agreement on all material terms, there is no contract.[7]

AIG's reliance upon United's execution of the payment agreement is misplaced because that fact is not dispositive of the issue of whether a contract exists. It is not uncommon for parties to need to reach agreement on several documents before a contract exists between them.  The payment agreement was a separate financing agreement, not unlike a mortgage and a residential purchase agreement.  AIG has characterized the package as a program, but there are different counterparties.

The plain language of the payment agreement supports the above analysis.  Paragraph 7 of the addendum to the payment agreement states the following:

> This Agreement together with the Schedules, Addenda, Policies and <u>any related agreements between *You* and *Us*, constitute the basis for a program of Insurance coverage.  We would not have entered into any of them without your agreement on all of them.</u>

(Underline added, italics in original.)  Thus, the payment agreement was executory and when it became clear that no deal was to go forward, the payment agreement had no legal effect, or impact, based upon a failure of consideration.  See <u>Northwestern</u>

---

[7]    See <u>Interocean Shipping</u>, 462 F.2d at 676 ("[u]nder the general principles of contact law, there is no contract if the parties fail to agree on all the essential terms . . . .");  <u>Brooks v. Smith</u>, 269 S.W.2d 259, 260 (Ky. 1954) ("As long as there is an essential term yet to be agreed on, there is no contract.");  <u>Cranbrock Investors, Ltd. v. Great Atlantic Management</u>, 1999 U.S. App. LEXIS 29551, *6 (4th Cir. 1999) ("For a contract to exist, the parties must have a meeting of the minds; the parties therefore must agree on all material terms.").

National Life Ins. Co. v. U.S. Healthcare, Inc., 1998 U.S. Dist. LEXIS 6955, *30-32 (E.D.

Penn. 1998) (Motion for summary judgment to grant motion to order arbitration was

denied where material fact existed on whether there was a failure of consideration).

AIG cannot have a payment agreement without a policy, but one can have a policy

without a payment agreement.  Therefore because no insurance policy was ever agreed

upon , the payment agreement is a nullity.  The situation is analogous to the

arrangement of financing for a car or house where by the financing arrangements would

be meaningless if the car or property is not ultimately delivered.

      The parties did not being discussions concerning the cross

collateralization agreement until after the payment agreement was executed.  AIG had

an obvious interest in collecting premium as soon as possible, even if it meant doing so

before the parties reached agreement on all terms of their contract for the high

deductible workers' compensation policy they had negotiated.  AIG should not be

permitted to benefit from a situation where the only possible hook to an agreement to

arbitrate is contained in a document that covered the financing of an insurance policy

that was never finalized.  If United had been provided the proposed cross

collateralization language earlier, the issue could have been addressed sooner and well

before United executed the payment agreement, paid premium and provided an

irrevocable letter of credit.

      Courts recognize that the mere fact that a party has executed a document

does not mean that a contract exists. In PMC, Inc. v. Atomergic Chemicals Corp., 844

F. Supp. 177, 178 (S.D.N.Y. 1994), the court was faced with the following question:

"whether a party that signs papers which appear on their face to be binding and which

contain an arbitration clause, may be entitled . . . to a judicial determination of the contractual nature of the documents before it is required to submit to arbitration of the dispute." In that case, PMC executed two documents, a blanket purchase order and a confirmation of sale of a certain chemical. The confirmation of sale contained an arbitration clause. After these documents were executed, the parties continued to negotiate a marketing agreement and PMC made a small purchase of the chemical. See id. at 179-80.

　　　　　A few years later, Atomergic served PMC with a demand for arbitration. In response, PMC filed a lawsuit to determine whether a contract existed. PMC submitted evidence to the Court demonstrating that despite its execution of certain documents, the parties did not have a contract. The Court held that PMC had submitted evidence that supported its position that no contract existed. In such a case, PMC was entitled to have a court decide the issue before the matter was referred to arbitration. Id. at 180-82.

　　　　　In Ford Motor Company v. Kasey Kahne, 379 F. Supp. 2d 857, 860-61 (E.D. Mich. 2005), Kasey Kahne and Ford executed a personal services contract whereby Mr. Kahne agreed to race cars as a driver for a Ford supported team. Ford asserted that Mr. Kahne breached this contract while Mr. Kahne asserted that there was no enforceable contract. See id. at 862-65. In granting Mr. Kahne summary judgment, the court recognized that a contract does not exist "unless there is mutual assent on all material terms." Id. at 869. Although the parties had agreed to a number of terms in the executed personal services contract, the parties did not reach agreement on the selection of a racing series and racing team for Mr. Kahne. Instead, those terms were

left open for future negotiation.  Because such terms were material to the contract and were left open, there was no contract.  Id.

Accordingly, United's execution of the payment agreement does not mean that a contract exists or that the United Parties are precluded from having a court determine this fact.  Because the parties could not agree on the terms of the cross collateralization agreement, no contract exists, and the United Parties are entitled to have a court make this determination.

IV.  **THE JUDICIAL DETERMINATION OF WHETHER A CONTRACT EXISTS BETWEEN UNITED AND AIG SHOULD BE MADE BY THE KENTUCKY FEDERAL COURT**

This Court should deny the present petition and allow the Kentucky federal court to decide the issue of whether a contract exists between the parties.  The Court should defer to the Kentucky court because:  (1) the first-to-file rule requires that the Kentucky Action be the one to proceed; (2) absent the null payment agreement (which is a nullity because of a failure of consideration) this Court does not have jurisdiction because there are no other contacts with New York; and (3) for the reasons set forth above, including judicial economy and deference to state regulation.

1.  **Pursuant to 9 U.S.C. § 4, A Court Which, Absent The Agreement at Issue, Has Proper Jurisdiction Must Decide The Issue Of Whether A Contract Exists Before The Matter May Be Referred To Arbitration**

Pursuant to 9 U.S.C. § 4, only a court which, absent the agreement at issue, has proper jurisdiction under Title 28 is authorized to order that arbitration proceed.  Before making the referral to arbitration the court must be satisfied that a contract exists, or determine whether a contract exists.  See 9 U.S.C. § 4 ("A party aggrieved . . . may petition any United States district court which, save for such

agreement, would have jurisdiction under title 28, in a civil action . . . for an order

directing that such arbitration proceed . . . . The court shall hear the parties, and upon

being satisfied that the making of the agreement for arbitration...is not in issue, the

court shall make an order directive the parties to proceed to arbitration...")  In the

absence of the payment agreement's references to New York, this Court does not have

personal jurisdiction over United.  Moreover, this Court does not have personal

jurisdiction over Sapphire and Wellmore, the two parties whose employees were to be

covered by the proposed insurance contract.  In the absence of personal jurisdiction,

this Court does not have jurisdiction under Title 28 and is not the proper forum to decide

this dispute.

      In order for a New York court to have personal jurisdiction over United,

United must have contacts that "show a continuous, permanent and substantial activity

in New York,"[8] or that United "purposely avail[ed] itself to the privilege of conducting

activities within [New York]."[9]  Neither of these showings can be made.  United conducts

no business in New York, does not solicit business in New York and holds no property

in New York.  See Griffin Declaration.  United did not even negotiate the terms of the

proposed contract in New York, but rather in Virginia with AIG's Virginia insurance

broker and with AIG representatives in Ohio.  See Griffin Declaration.  Therefore, United

never purposefully availed itself of contacts with New York with the expectation that it

could be hauled into court in New York.  The only contacts that United had with anyone

---

[8]    Gross v. Bare Escentuals, Inc., No. 03 Civ. 3089 (RLC), 2005 U.S. Dist. LEXIS 6570, at *7 (S.D.N.Y. April 8, 2005).

[9]    Ventura Assoc. v. Int'l Outsourcing Servs., Inc., No. 04 Civ. 5962 (PKL), 2005 U.S. Dist. LEXIS 13991, at *11 (S.D.N.Y. July 12, 2005).

in New York were when United was required by AIG to contact persons in New York in order to resolve the dispute after the deal unraveled. These contacts consisted of an exchange of a few letters and several phone calls.[10] See Griffin Declaration. These few contacts with New York after negotiations over the contract foundered, and which United was compelled to make by AIG in order to get its money back, are not sufficient to confer personal jurisdiction over United.[11]

Two important parties, Sapphire and Wellmore, are not before this Court. Sapphire and Wellmore are subsidiaries of non-party UCC, which paid the premium payments that have not been returned. In addition, Sapphire and Wellmore are the parties whose employees would have been covered by the workers' compensation coverage. Wellmore and Sapphire have operations in Kentucky and Virginia and do not

---

[10]    Importantly, the only reason United communicated with the AIG representative in New York was because United was forced to do so in an effort to secure the return of its money.

[11]    See, e.g., Wilhelmshaven Acquisition Corp. v. Asher, 810 F. Supp. 108, 112-13 (S.D.N.Y. 1993) (Cedarbaum, J.) (finding that telephone calls, correspondence, video conference and telefax communications from the non-domiciliary defendant were insufficient in themselves to give the court personal jurisdiction over the defendant); Fiedler v. First City Nat'l Bank of Houston, 807 F.2d 315, 317-318 (2d Cir. 1986) (two telephone calls and one mailing into New York by the defendant not sufficient to confer personal jurisdiction to the New York court over the defendant because "New York courts have consistently refused to sustain § 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York") (internal citation omitted); Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757, 763-64 (2d Cir. 1983) (one cease and desist letter and an unknown number of shipments of goods sent by the defendant to New York were insufficient to subject the defendant to personal jurisdiction); Sternberg v. Nathan, No. 96-9232, 1997 U.S. App. LEXIS 10376, at *4 (2d Cir. May 7, 1997) (twenty-nine telephone conversations insufficient to confer jurisdiction over the defendant to the court); Int'l Customs Assoc., Inc. v. Ford Motor Co., 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction.") (citing many New York cases holding the same).

conduct business or own assets in New York.  See Griffin Declaration.  Accordingly, this Court has no personal jurisdiction over plaintiffs, Sapphire or Wellmore.

**2.     The First-to-File Rule Dictates That the Kentucky Action Is the One That Should Proceed**

AIG should not be permitted to utilize a provision in payment agreement now that the payment agreement has ceased to have any effect after the parties failed to agree on all material terms of an insurance policy it was meant to finance.  This would encourage AIG's forum shopping.  Therefore, even if this Court finds that it has personal jurisdiction over United, the Court should dismiss this action pursuant to the first-to-file rule and based on the fact that proceedings will continue in Kentucky between the AIG Companies and Sapphire and Wellmore regardless of the outcome of the Court's determination on the petition to compel arbitration.

The Second Circuit follows the well-established first-to-file rule.  This rule states that when two courts have concurrent jurisdiction over an action involving the same parties and issues, the action that was first filed has priority over the second action, absent a showing of special circumstances or a balance of convenience which justifies giving priority to the second action.  See, e.g., Buddyusa, Inc. v. Recording Industry Assoc. of American, Inc., 21 Fed. Appx. 52, 55 (2d Cir. 2001); Williams Advanced Materials, Inc. v. Target Technology Co., No. 03-CV-276-A, 2007 U.S. Dist. LEXIS 56189, at *11-12 (W.D.N.Y. Aug. 1, 2007).  The purpose of the first-to-file rule is "judicial administration and conservation of resources."  First City Nat'l Bank & Trust Co. v. Simmons, 878 F.2d 76, 80 (2d Cir. 1989).

Because the Kentucky Action was the first to be filed, AIG bears the heavy burden of showing that some equitable consideration overcomes the "strong

presumption in favor of the forum of the first-filed suit." Id. AIG cannot meet its burden. First, the Kentucky Action was not an anticipatory filing. United did not receive any notification from AIG that it was planning to file a lawsuit. See Griffin Declaration. In fact, United waited almost a year after its attempts to negotiate an insurance contract broke down before making this filing.

Moreover, the Kentucky Action was not "forum shopping" by the United Parties. The United Parties filed their action in Kentucky because one of the entities that was to be covered under the never-finalized insurance policy was a mining company that has its main operations Kentucky. In addition, the Kentucky Office of Workers' Claims has ordered AIG to file certain documentation about the policy, with which AIG refuses to comply, one of the obvious reasons AIG has acted to evade Plaintiffs' chosen forum in the same state. The proposed workers' compensation insurance coverage was also to cover Kentucky citizens who were employees of Sapphire. All of the AIG parties are subject to jurisdiction in Kentucky and have agents for service of process in Kentucky. Therefore, Kentucky was an appropriate forum for the filing of the lawsuit, and no "special circumstances" exist that would justify giving priority to AIG's second-filed lawsuit.

Because the goal of the first-to-file rule is judicial efficiency, the court that has all of the relevant parties before it is the one that should decide the issue. See Everest Capital Ltd. v. Everest Funds Management, LLC, 178 F. Supp. 2d 459, 464 n.3 (S.D.N.Y. 2002). Here, the Kentucky court is the only possible forum that has jurisdiction over two important parties with interests in the litigation – Sapphire and Wellmore. Not only are Sapphire and Wellmore the parties whose workers would have

been covered by the workers' compensation coverage, they are the parties seeking

return of the premiums. AIG did not include these entities in the New York Action

because they are not subject to personal jurisdiction in New York, and because they

were not parties to the payment agreement. Thus, the Kentucky court is the only court

that has all the relevant parties before it, making it the most appropriate forum to decide

the issue at hand. Accordingly, the Court should dismiss or stay this action until, at a

minimum, the Kentucky court decides whether a contract exists between the parties.

## CONCLUSION

United respectfully requests that this Court deny AIG's Petition and permit

this matter to proceed in Kentucky.

Dated:  New York, New York
        April 4, 2008

                              ANDERSON KILL & OLICK P.C.

                              By:  /s/ John G. Nevius
                                   John G. Nevius, Esq., P.E. (JN-0577)
                                   Natasha Z. Millman, Esq.
                                   1251 Avenue of the Americas
                                   New York, NY  10020
                                   (212) 278-1000

                                   -and-

                                   Samuel D. Hinkle, IV, Esq.
                                   Adam T. Goebel, Esq.
                                   STOLL KEENON OGDEN PLLC
                                   2000 PNC Plaza
                                   500 West Jefferson Street
                                   Louisville, KY  40202
                                   (502) 333-6000

                                   Attorneys for Plaintiff, The United
                                   Company